# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**     **2. PLEASE TYPE OR PRINT**     **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| In re Garrett Motion Inc. Securities Litigation | S.D.N.Y. | Hon. Jennifer L. Rochon |

| | Date the Order or Judgment Appealed from was Entered on the Docket: | District Court Docket No.: |
|---|---|---|
| | 03/31/2023 | 1:20-cv-07992-JLR |

| | Date the Notice of Appeal was Filed: | Is this a Cross Appeal? |
|---|---|---|
| | 04/19/2023 | ☐ Yes   ☑ No |

**Attorney(s) for Appellant(s):**
☑ Plaintiff
☐ Defendant

Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail:

Andrew J. Entwistle, 500 W. 2nd Street, Suite 1900, Austin, Texas 78701, (512) 710-5960, (212) 894-7200,  aentwistle@entwistle-law.com

See Attachment A for Additional Counsel for Appellants

**Attorney(s) for Appellee(s):**
☐ Plaintiff
☑ Defendant

Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail:

See Attachment A

| Has Transcript Been Prepared? | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously? ☐ Yes  ☑ No |
|---|---|---|---|
| n/a | n/a | n/a | If Yes, provide the following:<br><br>Case Name:<br><br>2d Cir. Docket No.:          Reporter Citation: (i.e., F.3d or Fed. App.) |

***ADDENDUM "A":*** COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

***ADDENDUM "B":*** COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☐ U.S. a party<br>☑ Federal question (U.S. not a party) | ☐ Diversity<br>☐ Other (specify): _____ |
| | ☑ Final Decision<br>☐ Interlocutory Decision Appealable As of Right | ☐ Order Certified by District Judge (i.e., Fed . R. Civ. P. 54(b))<br>☐ Other (specify): _____ |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

<table>
<tr><td colspan="3" align="center">**PART B: DISTRICT COURT DISPOSITION** (Check as many as apply)</td></tr>
</table>

| 1. Stage of Proceedings | 2. Type of Judgment/Order Appealed | 3. Relief |
|---|---|---|
| ☑ Pre-trial <br> ☐ During trial <br> ☐ After trial | ☐ Default judgment <br> ☐ Dismissal/FRCP 12(b)(1) lack of subject matter juris. <br> ☐ Dismissal/FRCP 12(b)(6) failure to state a claim <br> ☐ Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint <br> ☐ Dismissal/28 U.S.C. § 1915(e)(2) other dismissal <br><br> ☐ Dismissal/other jurisdiction <br> ☐ Dismissal/merit <br> ☑ Judgment / Decision of the Court <br> ☐ Summary judgment <br> ☐ Declaratory judgment <br> ☐ Jury verdict <br> ☐ Judgment NOV <br> ☐ Directed verdict <br> ☐ Other (specify): | ☐ Damages: <br> ☐ Sought: $ _____ <br> ☐ Granted: $ _____ <br> ☐ Denied: $ _____ <br><br> ☐ Injunctions: <br> ☐ Preliminary <br> ☐ Permanent <br> ☐ Denied |

<table>
<tr><td align="center">**PART C: NATURE OF SUIT** (Check as many as apply)</td></tr>
</table>

| 1. Federal Statutes | | | 2. Torts | 3. Contracts | 4. Prisoner Petitions |
|---|---|---|---|---|---|
| ☐ Antitrust <br> ☐ Bankruptcy <br> ☐ Banks/Banking <br> ☐ Civil Rights <br> ☐ Commerce <br> ☐ Energy <br> ☐ Commodities <br> ☐ Other (specify): _____ | ☐ Communications <br> ☐ Consumer Protection <br> ☐ Copyright ☐ Patent <br> ☐ Trademark <br> ☐ Election <br> ☐ Soc. Security <br> ☐ Environmental | ☐ Freedom of Information Act <br> ☐ Immigration <br> ☐ Labor <br> ☐ OSHA <br> ☑ Securities <br> ☐ Tax | ☐ Admiralty/ Maritime <br> ☐ Assault / Defamation <br> ☐ FELA <br> ☐ Products Liability <br> ☐ Other (Specify): | ☐ Admiralty/ Maritime <br> ☐ Arbitration <br> ☐ Commercial <br> ☐ Employment <br> ☐ Insurance <br> ☐ Negotiable Instruments <br> ☐ Other Specify | ☐ Civil Rights <br> ☐ Habeas Corpus <br> ☐ Mandamus <br> ☐ Parole <br> ☐ Vacate Sentence <br> ☐ Other |

| 5. Other | 6. General | 7. Will appeal raise constitutional issue(s)? |
|---|---|---|
| ☐ Hague Int'l Child Custody Conv. <br> ☐ Forfeiture/Penalty <br> ☐ Real Property <br> ☐ Treaty (specify): _____ <br> ☐ Other (specify): _____ | ☐ Arbitration <br> ☐ Attorney Disqualification <br> ☑ Class Action <br> ☐ Counsel Fees <br> ☐ Shareholder Derivative <br> ☐ Transfer | ☐ Yes    ☑ No <br><br> Will appeal raise a matter of first impression? <br><br> ☐ Yes    ☑ No |

1. Is any matter relative to this appeal still pending below? ☐ Yes, specify: _____ ☑ No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A) Arises from substantially the same case or controversy as this appeal? ☐ Yes ☑ No

   (B) Involves an issue that is substantially similar or related to an issue in this appeal? ☐ Yes ☑ No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| **Name of Appellant:** | | | |

| Date: May 2, 2023 | Signature of Counsel of Record: /s/ Andrew J. Entwistle |
|---|---|

# NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

FORM C (Rev. December 2016)

**ATTACHMENT A**

<u>**Additional Counsel for Plaintiffs-Appellants**</u>

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
Joshua K. Porter
Andrew M. Sher
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
vcappucci@entwistle-law.com
jporter@entwistle-law.com
asher@entwistle-law.com

-and-

Callie D. Crispin (*pro hac vice*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (512) 710-5960
ccrispin@entwistle-law.com

<u>**Counsel for Defendants-Appellees**</u>

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Michael B. Carlinsky
Jacob J. Waldman
Jeremy Baldoni
Jaclyn Palmerson
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jacobwaldman@quinnemanuel.com
jeremybaldoni@quinnemanuel.com
jaclynpalmerson@quinnemanuel.com

-and-

Michael E. Liftik (*pro hac vice*)
1300 I Street, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
michaelliftik@quinnemanuel.com

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| IN RE GARRETT MOTION INC. SECURITIES LITIGATION | Case No. 23-668 |
|---|---|

## ADDENDUM A TO PLAINTIFFS- APPELLANTS'
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1.     Nature of the Action**

The action underlying this appeal is a federal securities fraud class action (the "Action") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased or otherwise acquired the common stock of Garrett Motion Inc. ("Garrett") from February 27, 2021 to September 20, 2021 (the "Class Period"), the date Garrett filed for Chapter 11 bankruptcy protection.

At its core, the Action alleges that, during Class Period, Garrett and its directors and officers (the "Defendants-Appellees") touted to investors the company's financial condition and positioning for long-term success in materially misleading statements and omissions, including but not limited to statements at the outset of the Class Period about Garrett's "significant financial flexibility," "strong financial position," and "flexible and resilient business model." Worse still, the Defendants-Appellees made these statements and subsequent similar statements during the Class Period specifically to allay fear by investors concerning Garrett's obligations arising from the October 1, 2018 spin-off of Garrett (the "Spin-Off") as a stand-alone entity by Honeywell International Inc. ("Honeywell").

In truth, however, Garrett had been facing an escalating financial crisis since the Spin-Off, which was part of a scheme by Honeywell to offload legacy asbestos liabilities and tax

liability from its balance sheet onto Garrett's balance sheet, in addition to other restrictive inter-company agreements (the "Honeywell Obligations"). Indeed, because of the Honeywell Obligations, by the start of the Class Period in February 2021, Garrett had already been forced to retain financial advisors to explore bankruptcy and/or an emergency sale of the company and Defendants-Appellees' statements like those touting Garrett's "significant financial flexibility" and "strong financial position" were contrary to the facts known to the Defendants-Appellees at the time that Garrett could not continue as a going concern. Nevertheless, on the first day of the Class Period, the Chief Executive Officer had the temerity to state "we are well positioned to build upon the progress we achieved during our first full year as an independent company."

As detailed Plaintiffs-Appellees' operative complaint (the "Complaint") (ECF No. 83), the October 1, 2018 Spin-Off saddled Garrett with billions of Honeywell Obligations that limited Garrett's operational flexibility and created an untenable capital structure that resulted in Garrett's bankruptcy just twenty-three months after it became an independent company. By the time the Class Period began, the Defendants-Appellees were fully aware that the adverse impacts of the Honeywell Obligations on Garrett's core business operations and capital structure had materialized to the point Defendants-Appellees had determined to pursue—and were actively pursuing—a sale and/or a Chapter 11 restructuring. The Defendants-Appellees' actual knowledge of the manifest impacts of the Honeywell Obligations on core operations and their consequent determination to pursue a Chapter 11 restructuring cannot be reconciled with the countervailing misstatements and omissions detailed in the Complaint.

In this regard, the allegations in the Complaint put Plaintiffs-Appellees' Action squarely within the reasoning of *In re Vivendi Universal, S.A. Securities Litigation*, in which the district court held defendants liable where they "continued to represent to the public that Vivendi was financially solid, despite being aware of the financial precipice on which it stood when its debt

2

rating was almost downgraded, and the possibility that it would need to declare bankruptcy soon." 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003); *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 232 (2d Cir. 2016) ("Vivendi was months away from bankruptcy or insolvency. Yet, up until approximately July 2002, Vivendi made numerous representations to the market suggesting that the course ahead for the company was smooth sailing."). As detailed in the Complaint, like in *Vivendi*, Defendants-Appellees persisted in making positive statements (rather than just remaining silent on the issues) that stood in stark contrast to the active and ongoing preparations for Garrett's imminent bankruptcy filing.

Ultimately, Defendants-Appellants' misstatements and omissions were highly material to investors. Garrett's common stock lost approximately $350 million in value during the Class Period on trading days following partial corrections on subjects addressed in their previous misstatements and omissions.

## 2.    The Result Below

On March 31, 2023, the Honorable Jennifer L. Rochon of the United States District Court for the Southern District granted Defendants-Appellees' motion to dismiss the Complaint in its entirety, with prejudice. (ECF No. 96).[1] The Clerk entered Judgment the next day. (ECF No. 98). In granting the motion to dismiss, Judge Rochon accepted Defendants-Appellees' arguments

---

[1] The Action was reassigned to newly appointed Judge Rochon on September 22, 2022. (ECF No. 93). The Honorable John Cronin had dismissed a previous iteration of the Complaint on March 22, 2022 (ECF No. 83), which alleged a different class period and theories of liability and scienter. During oral argument, Judge Cronin recognized "Plaintiffs' theory for the case shifted" and Plaintiffs "argued that the Honeywell Obligations created an 'evolving situation.'" *In re Garrett Motion Inc. Sec. Litig.* ("*Garrett I*"), No. Civ. 7992 (JPC), 2022 WL 976269, at *12 (S.D.N.Y. Mar. 31, 2022). As the Court put it, "this evolving situation meant that the Garrett Defendants' knowledge of the devastating impact that the Honeywell Obligations had on Garrett 'grew during the class period' to a point at which they knew that the company would inevitably fail." *Id.* The Court continued that, in "Plaintiffs' view, this meant that the Garrett Defendants were at the very least reckless in making positive statements about the company as the time went on." *Id.* Thus, the Court granted Plaintiffs leave to amend, recognizing Plaintiffs argument that their "new theory could affect whether certain factual and opinion statements are false or misleading." *Id.* at *19.

that Plaintiffs-Appellants failed to plead scienter and failed to allege any material misstatements or omissions made by Defendants-Appellees. (ECF No. 96 p. 18).

Specifically, Judge Rochon found, with respect to pleading scienter, that Plaintiffs-Appellants "failed to allege anything beyond incentive-based compensation, which is not sufficient to show motive under the circumstances alleged" – *i.e.*, the Complaint's allegations that the Chief Executive Officer's "compensation included incentive pay equal to his annual salary, yearly salary increases, and a guarantee of '24 months of base salary and incentive compensation severance in the event of his involuntary termination of employment' and '[s]ome incentive compensation was also tied to Garrett's performance." (*Id*. p. 21).

With respect to showing "a strong inference of scienter through circumstantial evidence about what Defendants knew prior to the Class Period, which was contrary to what Defendants actually said during the Class Period," Judge Rochon noted Plaintiffs-Appellants' argument was "more persuasive – but ultimately still unsuccessful." (*Id*. at 21-22). The District Court ruled that the allegations concerning the effects on Garrett's business from the Honeywell Obligations amounted to fraud by hindsight that were based on admissions in the Chief Financial Officer's first day bankruptcy declaration (*id*. at 23) and that, separately, Garrett's retention of financial advisors to explore bankruptcy while making countervailing statements about Garrett's financial condition was inadequate because "hiring financial advisors alone does not raise an inference of scienter" (*id*. p. 25). Respectfully, Judge Rochon's ruling on scienter was in error.

Judge Rochon also agreed with Defendants-Appellees' argument that Plaintiffs-Appellants "fail to plead with particularity that any of the statements were actually false or misleading when made." (*Id*. at 35). Most significantly, the Court ruled that Defendants-Appellees' statements touting Garrett's "significant financial flexibility," "strong financial position," and "resilient business model" – despite facing bankruptcy – were not false and

misleading because Plaintiffs-Appellants "have not attempted to define 'flexibility' or 'strong financial position,' and they do not specify how these statements contradict previously undisclosed financial data about Garrett." (*Id*. at 36). Respectfully, Judge Rochon's ruling on the Defendants-Appellants' statements were also in error.

Given the District Court's holdings on Section 10(b) of the Exchange Act, the court also dismissed Plaintiffs-Appellants' derivative claims for control person liability under Section 20(a).

Plaintiffs-Appellants timely filed a notice of appeal with the District Court on April 19, 2023. (ECF No. 99).

**3.      The Notice of Appeal and Docket Sheet**

Attached hereto as Exhibit 1 is a copy of the *Notice of Appeal* timely filed by Plaintiffs-Appellants on April 19, 2023. (ECF No. 99).

Attached hereto as Exhibit 2 is a copy of the current District Court docket sheet in *In re Garrett Motion Inc. Securities Litigation*, No. 1:20-cv-07992-JLR (S.D.N.Y.), as of the date of this filing, May 3, 2023.

**4.      The Relevant Orders Forming the Basis for this Appeal**

Attached hereto as Exhibit 3 is a copy of the District Court's *Opinion and Order*, dated March 31, 2023. (ECF No. 96).

Attached hereto as Exhibit 4 is a copy of the District Court Clerk's Judgment, dated March 31, 2023. (ECF No. 98).

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| IN RE GARRETT MOTION INC. SECURITIES LITIGATION | Case No. 23-668 |

## ADDENDUM B TO PLAINTIFFS- APPELLANTS'
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1.     Issues Proposed to be Raised on Appeal**

1.     Whether the Third Amended Complaint sufficiently pleads an actionable misrepresentation or omission of material fact under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Whether the Complaint sufficiently pleads that Defendants-Appellants acted with scienter.

3.     Whether the Complaint sufficiently states a claim under Section 10(b) of the Exchange Act.

4.     Whether the Complaint sufficiently states a claim for control-person liability under Section 20(a) of the Exchange Act.

5.     Whether the District Court erred in disregarding the reasoning in *In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) and *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 232 (2d Cir. 2016), which recognized actionable misstatements and omissions concerning the financial condition of a company facing bankruptcy.

6.      Whether the District Court erred in relying on the prior decision concerning the Second Amended Complaint that alleged a different class period and theories of liability and scienter.

## 2.      Standard of Review for Each Proposed Issue

This Court reviews *de novo* a district court's grant of a motion to dismiss a complaint for failure to state a claim. *See, e.g., Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 282 (2017); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F .3d 161, 167 (2d Cir. 2005).

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

Case No. 1:20-cv-07992-JLR

**NOTICE OF APPEAL**

Notice is hereby given that plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc. and GAMCO Asset Management Inc. (together, "Plaintiffs"), on their own behalf and on behalf of all members of the putative class in the above-captioned matter, hereby appeal to the United States Court of Appeals for the Second Circuit from each and every part of the *Opinion and Order* of the United States District Court for the Southern District of New York, dated March 31, 2023 (ECF No. 96), a copy of which is attached as Exhibit A, granting defendants' motion to dismiss (ECF Nos. 86, 87) the *Third Consolidated Amended Complaint for Violations of Federal Securities Laws* (ECF No. 83).

Dated:     April 19, 2023            Respectfully submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1600
Austin, Texas 78701
Telephone: (512) 710-5960
aentwistle@entwistle-law.com

-and-

Vincent R. Cappucci
Joshua K. Porter
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
vcappucci@entwistle-law.com
jporter@entwistle-law.com

*Counsel for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

Case No. 1:20-cv-07992 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., and GAMCO Asset Management Inc. (together, "Plaintiffs") bring this consolidated, purported class action against Garrett Motion Inc. ("Garrett") and several of its directors and officers, including Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos M. Cardoso, Maura J. Clark, Courtney M. Enghauser, Susan L. Main, Carsten J. Reinhardt, and Scott A. Tozier (together, "Director and Officer Defendants" and together with Garrett, "All Defendants" or "Defendants"), alleging violations of Section 10(b) of the Exchange Act as to All Defendants, and violations of Section 20(a) of the Exchange Act as to the Director and Officer Defendants. ECF No. 83 ("Third Amended Complaint," "Complaint," or "TAC") ¶¶ 1, 31-42, 160-181. Since the commencement of this action, Plaintiffs' Second Amended Complaint was dismissed, with leave to replead, on the grounds that Plaintiffs had failed to adequately plead scienter. *See generally* ECF No. 82 ("March 2022 Opinion"); *In re Garrett Motion Inc. Sec. Litig.* (*Garrett I*), No. 20-cv-7992 (JPC), 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022). Now before the Court is Defendants' motion to dismiss the Third Amended Complaint.

ECF No. 86; ECF No. 87 ("Br.").[1]   For the reasons that follow, Defendants' motion to dismiss is

GRANTED.

## BACKGROUND[2]

The Court assumes the parties' familiarity with the facts underlying this case, the

background of Garrett's spin-off from Honeywell International Inc. ("Honeywell"), and the

subsequent struggles Garrett faced before it filed for bankruptcy in September 2020, all of which

are articulated in the Court's March 31, 2022 Opinion and Order.  *See Garrett I*, 2022 WL

976269, at *2-6.  For purposes of this Opinion, however, the Court will summarize the factual

allegations set forth in the Third Amended Complaint, with a particular focus on the facts alleged

with respect to the narrowed class period in the Third Amended Complaint:  February 27, 2020

---

[1] Plaintiffs filed their Third Amended Complaint on May 2, 2022.  *See* TAC.  Defendants moved
to dismiss the Third Amended Complaint on June 24, 2022.  *See* Br.  On August 18, 2022,
Plaintiffs filed their opposition to the motion.  *See* ECF No. 90 ("Opp.").  On September 22,
2022, the case was reassigned to the undersigned.  ECF No. 93.  On September 23, 2022,
Defendants filed their reply brief in further support of their motion.  *See* ECF No. 94 ("Reply").
Defendants also requested oral argument on the motion.  *See* ECF No. 89.  However, in the
exercise of its discretion, the Court denies that motion as the briefing was extensive and oral
argument would not be helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral
argument rests within its discretion" (citation omitted)).

[2] Unless otherwise stated, the allegations stated herein come from the Third Amended
Complaint, and notwithstanding the "[e]xacting pleading requirements" of the Private Securities
Litigation Reform Act that apply in this case, "as with any motion to dismiss for failure to plead
a claim on which relief can be granted," the Court must "accept all factual allegations in the
complaint as true."  *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 322 (2007).
The Court at this stage may consider, among other things, documents attached to the complaint,
statements or documents incorporated by reference in the complaint, and legally required public
disclosures filed with the U.S. Securities and Exchange Commission ("SEC").  *See Tongue v.
Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  "The Court also considers facts drawn from the news
releases, financial reports, and transcripts of earnings calls that contain the statements that
Plaintiff alleges were false or misleading, and which are incorporated into the Complaint by
reference."  *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 221 (S.D.N.Y. 2021) (citing
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  All emphases from
the Complaint and other papers are omitted unless otherwise indicated.

through September 18, 2020 ("Class Period").  *See* TAC ¶ 1.  The Court will also briefly

summarize its March 2022 Opinion, which articulated many similar principles at issue in the

present motion.

### A.  Factual Background

In October 2018, Honeywell spun-off its transportation systems division, Garrett, into a

stand-alone company (the "Spin-Off").  TAC ¶¶ 4, 31, 43.  That company was incorporated in

Delaware, with its headquarters located in Rolle, Switzerland.  *Id.* ¶ 31.  As part of the Spin-Off,

however, Honeywell saddled Garrett with massive amounts of debt, liabilities, and other

encumbrances.  *Id.* ¶ 44.[3]  The three contracts (the Indemnification Agreement, the Credit

Agreement, and the Tax Matters Agreement, which together will be referred to as the

"Honeywell Obligations") that formed – and severely restricted – Garrett's capital structure are

explained in detail in the March 2022 Opinion.  *See Garrett I*, 2022 WL 976269, at *3-5.  As

relevant here, the Indemnification Agreement required Garrett to indemnify Honeywell "for

certain asbestos liabilities" up to $5.25 billion.  TAC ¶ 45.  The Indemnification Agreement also

restricted the types of transactions Garrett could engage in, and "effectively provided Honeywell

with an absolute veto over any Garrett transaction outside of the ordinary course of business."

*Id.*  Through the Credit Agreement, Garrett assumed significant debt "to fund a $1.6 billion

'dividend' to Honeywell."  *Id.* ¶ 46.  The loans were not scheduled to mature until September 26,

2023 and September 27, 2025.  *Id.*  Finally, Garrett entered into the Tax Matters Agreement,

under which Honeywell required Garrett to reimburse it for certain tax obligations.  *Id.* ¶ 47.

---

[3] Although Honeywell spun off Garrett to avoid billions of dollars in asbestos-related liability,
the propriety of that move is not at issue in this case.  *See Garrett I*, 2022 WL 976269, at *1.

Despite these significant encumbrances, prior to the Class Period, Defendants allegedly regularly lauded Garrett's "superior technology and R&D funding and growth plan" (*id.* ¶ 49), and bragged to investors about its "financial health, flexibility[,] and resiliency" (*id.* ¶ 50). However, from the time of the Spin-Off until the Class Period began on February 27, 2020, Plaintiffs allege that Defendants were developing deeper knowledge into the "undisclosed impacts [of] the inherited capital structure and related Honeywell Obligations." *Id.* ¶ 51. Plaintiffs rely on statements made during the September 2020 bankruptcy proceeding to argue that the company and Board were aware of the significant challenges inherent in Garrett's capital structure, and knew (as of February 27, 2020) that "the inherited capital structure was not resilient, that it was ill suited to any market issues, and, of course, that Garrett was already in the process of pursuing restructuring." *Id.* ¶ 66.

Defendants' knowledge, according to Plaintiffs, began to evolve immediately after the Spin-Off, when the Board was aware that "Garrett's leverage ratio grossly exceeded industry standards." *Id.* ¶ 52. Plaintiffs allege that, "[s]ince the Spin-Off, [Garrett] has struggled with the capital structure Honeywell foisted upon it, which is not sustainable and puts [Garrett] at a substantial disadvantage to its competitors." *Id.* ¶ 53 (citing Quinn Application, *Garrett Motion Inc., et al.*, 20-bk-12212 (Bankr. S.D.N.Y. Sept. 30, 2020), ECF No. 137 ("Quinn Bankr. Application")). Plaintiffs further allege that, prior to the Class Period, in early 2019, Garrett's Board retained (1) financial advisors from Morgan Stanley & Co. LLC ("Morgan Stanley") in order to conduct a strategic review of Garrett's operations only months after the Spin-Off (TAC ¶ 54), and (2) the law firm Quinn Emanuel to review the legality of the Indemnity Agreement and other Honeywell Obligations which impacted Garrett's business (*id.* ¶ 55). Additionally, Garrett attempted to negotiate the terms of the Indemnity Agreement to be less restrictive.

*Id.* ¶ 56.  Plaintiffs allege that these facts demonstrate that, prior to the Class Period, "Defendants understood the enormous impact the Honeywell Obligations and resulting capital structure were having on Garrett's business," and they were attempting to "find a way out of the restrictive underlying agreements."  *Id.* ¶ 56.

Plaintiffs also contend that filings made in the bankruptcy proceeding demonstrate that Garrett's "capital structure and Indemnification Agreement would make it impossible" for Garrett to succeed for four reasons, all allegedly known to Defendants:  (1) the "precarious balance sheet" – replete with debt and other restrictive obligations from the Spin-Off – made it difficult to maintain business with original equipment manufacturers ("OEMs"), who require bids years out of the actual production of vehicles, and who have competing offers from competitors who are not as overleveraged (*see id.* ¶¶ 57-58);[4] (2) Garrett's leverage and indemnity obligations "effectively preclude[d]" it from adapting to a fast-changing automotive industry because it would not be able to "engag[e] in strategic acquisitions or other consolidation" (*id.* ¶ 59); (3) Garrett's leverage also made it difficult to invest in research and development, a necessary area of focus given the fast-changing industry (*id.* ¶ 60); and (4) "no lender or investor" would provide new capital "subordinated to both [Garrett's] funded debt and its indemnity obligations," making it difficult for Garrett to secure such equity capital (*id.* ¶ 61).  In support of these allegations – and as apparent evidence that Defendant knew about these

---

[4] Plaintiffs allege that Garrett's customers "had growing concerns about" Garrett's financials, and cite to statements made in the bankruptcy proceeding in support of this allegation.  TAC ¶ 58.  But the filing – CFO Sean Deason's September 20, 2020 Declaration (*see* ECF No. 15, 20-bk-12212 & ECF No. 88-10, Ex. J to Br. ("Deason Decl.")), which is incorporated by reference into the Third Amended Complaint – is not so specific, and states that "concerns among OEMs and suppliers will grow as [Garrett's] technological advantages decline with underinvestment."  Deason Decl. ¶ 68.

hindrances – Plaintiffs cite to Garrett CFO Sean Deason's September 20, 2020 Declaration.  *See Id.* ¶¶ 58-61 (citing Deason Decl. ¶¶ 65-71).

Furthermore, Plaintiffs allege that, "[r]ecognizing the internally known but publicly undisclosed impacts of the inherited capital structure and Honeywell Obligations," Garrett attempted mediation with Honeywell in September 2019, which was ultimately unsuccessful.  *Id.* ¶ 62.  Garrett then launched what Plaintiffs have described as a "Hail-Mary lawsuit" in December 2019 against Honeywell in New York state court, in an attempt to "void certain aspects of the Honeywell Obligations."  *Id.* ¶ 63.  Plaintiffs allege that this litigation was "futile." *Id.*  It was ultimately resolved in 2021 as part of the bankruptcy proceeding.  *Id.* ¶ 2.

Sometime in late 2019, Garrett's Board also "secretly" directed Morgan Stanley to conduct a market test with about 15 entities to assess the possibility of a merger or acquisition. *Id.* ¶ 64.  After conducting that test, in December 2019 and January 2020, Morgan Stanley reported that "multiple financial sponsors" would be interested in a potential transaction "if and only if" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.*, a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation)."  *Id.* ¶ 64 (citing Deason Decl. ¶ 74).  This report led Defendants to retain, on February 1, 2020, Perella Weinberg Partners ("PWP") to further evaluate strategies like a potential restructuring.  *Id.* ¶¶ 11, 64.

Nevertheless, on February 27, 2020, Garrett issued a press release in which Defendant Rabiller touted Garrett's "significant financial flexibility" that made it "well positioned to build upon the progress we achieved during our first full year as an independent company."  *Id.* ¶ 78

(**Statements 1 & 2**); *see* ECF No. 88-9, Ex. I to Br. at 1 ("Feb. 27, 2020 Press Release").[5]  That

same day, in an earnings call, Defendant Rabiller also told investors that Garrett "maintained

[its] strong financial position" and that Garrett's "flexible and resilient business model" provided

"significant flexibility to help mitigate the impact from any short-term fluctuations in the

underlying macro environment[.]"  TAC ¶ 79 (**Statements 3, 4, 6**).  Rabiller further relayed to

investors that, "[g]oing forward, we plan to continue to utilize our strong free cash flow

generation to reduce net debt and deleverage our balance sheet."  *Id.* ¶ 79 (**Statement 5**).  Garrett

also released its Form 10-K, which stated:

> We believe we will meet our known or reasonably likely future cash
> requirements through the combination of cash flows from operating
> activities, available cash balances and available borrowings through
> our debt agreements.  If these sources of liquidity need to be
> augmented, additional cash requirements would likely be financed
> through the issuance of debt or equity securities; however, there can
> be no assurances that we will be able to obtain additional debt or
> equity financing on acceptable terms in the future.  Based upon our
> history of generating strong cash flows, we believe we will be able to
> meet our short-term liquidity needs for at least the next twelve
> months.

*Id.* ¶ 80 (**Statement 7**); ECF No. 88-8, Ex. H to Br., ("Feb. 27, 2020 10-K").[6]  Defendants

Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier signed the February

2020 Form 10-K, in addition to Defendant Rabiller.  TAC ¶¶ 33, 35-41.

---

[5] All numbered statements – the alleged misstatements – are based on the numbering in
Appendix 1 ("Chart of Alleged Misstatements") to Defendants' Brief in Support of their Motion
to Dismiss, *see* ECF No. 87-1, attached hereto, with non-substantive modifications, as Appendix
A.

[6] Plaintiffs also allege that language contained in the February 2020 10-K, the May 2020 10-Q,
and the July 2020 10-Q was false and misleading.  The February 2020 10-K contained risk
factors about the Indemnity Agreement, stating it "may have material adverse effects on our
liquidity and cash flows and on our results of operations, regardless of whether we experience a
decline in net sales," "may also require us to accrue significant long-term liabilities on our
consolidated and combined balance sheet," and that "our access to capital to fund our operations

The COVID-19 or coronavirus pandemic also began to affect Garrett's operations in or about late February 2020.  Plaintiffs allege that Garrett operated a facility in Wuhan, China, a location that was central to the COVID-19 pandemic, and had to pause operations there for a time.  *See id.* ¶ 87.  On March 19, 2020, as part of a "press release announcing [that] its Wuhan, China facility was restarting operations following the COVID pause[,]" Defendant Rabiller emphasized that Garrett's "focus remains on leveraging our flexible and resilient business model."  *Id.* ¶ 87 (**Statement 6**).  By the following day, March 20, 2020, Garrett's Board had retained the law firm Sullivan & Cromwell and consulting firm AlixPartners LLP "to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure."  *Id.* ¶ 64; *see also id.* ¶ 121.

Days later, on April 7, 2020, Garrett issued another press release that provided a pandemic-related update, reported preliminary first quarter financials, and "withdr[ew] the Company's financial guidance for the year ending December 31, 2020."  *Id.* ¶ 88; *see also* ECF No. 88-11, Ex. K to Br. ("April 7, 2020 Press Release").  In that press release, Defendant Rabiller also praised Garrett's actions "to enhance our liquidity and preserve the long-term health of the business," and the expectation that Garrett would rely on its "resilient business model to emerge from this crisis as a stronger company."  TAC ¶ 88 (**Statements 8 & 9**).

Plaintiffs allege that Defendants continued to make false and misleading statements throughout the spring and summer of 2020.  In particular, Plaintiffs point to the following statements on May 11, 2020:

---

may be materially adversely affected."  TAC ¶ 114, 116 (**Statement 19**).  The 10-K also warned that "[o]ur indebtedness could adversely affect our business, financial condition and results of operations."  TAC ¶ 114 (**Statement 19**).  The May 2020 10-Q and July 2020 10-Q incorporated these risk factors by reference.  TAC ¶¶116-118 (**Statement 19**).

- In a press release, Defendant Rabiller announced Garrett's first quarter 2020 financial results, and claimed that Garrett's "positive business fundamentals remain intact" and Garrett's flexibility allowed it "to maintain our agility and strengthen our position for long-term success." *Id.* ¶ 92 (**Statements 10 & 11**); *see* ECF No. 88-14, Ex. N to Br. at 1 ("May 11, 2020 Press Release").

- In an earnings call, Defendants Rabiller and Bracke boasted that Garrett would "leverage [its] flexible and resilient business model[,]" that its "long-term technology growth strategy remains intact;" and that it was "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success." TAC ¶ 93 (**Statements 12 & 13**); *see* ECF No. 88-12, Ex. L to Br., ("May 11, 2020 Earnings Call").

- In its Form 10-Q, Garrett made the following statement about meeting anticipated cash and liquidity requirements: "If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . . [W]e believe we will be able to meet our short-term liquidity needs for at least the next twelve months." TAC ¶ 94 (**Statement 14**); *see* ECF No. 88-13, Ex. M to Br., ("May 11, 2020 10-Q").

Also on May 11, 2020, Defendant Rabiller told investors on an earnings call that Garrett's "former parent imposed on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment,

meaning that was really unsustainable that way unless everything was perfect.  With insight, it is

clear that our capital structure was ill suited to cope with any meaningful operating challenges."

TAC ¶ 134.

On June 12, 2020, Plaintiffs allege that Garrett "entered into amendments to certain of its

credit agreements – a strategy that Defendants knew at best would simply buy the Company

some additional time."  *Id.* ¶ 72.  In a press release that day, Defendant Rabiller announced that

"[t]he modifications to our Credit Agreement significantly enhance Garrett's financial flexibility

to weather the current pandemic-induced economic slowdown."  *Id.*  He also announced that,

despite the extensive effects the pandemic had on the automotive industry, Garrett's "positive

long-term fundamentals . . . remain intact."  *Id.* ¶ 98 (**Statement 15**).

Plaintiffs allege that three days later, by June 15, 2020, "Garrett had received 5 non-

binding indications of interests, all of which were contingent on delivering Garrett and acquiring

the business 'in a chapter 11 proceeding or other process that could deliver the business free and

clear of its current balance sheet.'"  *Id.* ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett narrowed the

bids to the top three, and in the next three weeks, those companies conducted due diligence.  *Id.*

¶ 69.  During that time, one of the parties removed themselves from consideration.  *Id.*  The two

remaining parties conducted several more weeks of diligence, had expert sessions with advisors

and management, reviewed 50,000 pages of debtors' documents, and submitted over 400

questions related to due diligence.  *Id.*

During the later stages of that diligence, on July 30, 2020, Garrett issued another press

release with its second quarter 2020 financials, in which Defendant Rabiller also assuaged

concerns related to COVID disruptions:

> Garrett's proven track record in operational excellence has helped us
> navigate the current pandemic-induced downturn.  Although the

> market environment remains highly uncertain, we continue to benefit
> from our robust infrastructure and agile working capabilities as we
> execute on our long-term strategy and lead the evolution of advanced
> turbocharging, electric-boosting, and software solutions for the global
> automotive industry.

*Id.* ¶ 101 (**Statement 16**); *see* ECF No. 88-16, Ex. P to Br. ("July 30, 2020 Press Release").  That

same day, on an earnings call with investors and Defendants Rabiller, Deason, and Bracke,

Rabiller boasted about "the strong fundamentals of Garrett . . . combined with a variable cost

model that helps preserve cash and an attractive margin profile," and "the resiliency of

[Garrett's] operating structure."  *Id.* ¶ 102 (**Statement 17**); *see* ECF No. 88-17, Ex. Q to Br.

("July 30, 2020 Earnings Call").  In the Form 10-Q released on July 30, 2020, Garrett also

removed language that had been in the May 2020 10-Q, which stated: "Our management has

concluded that the foregoing conditions and events raise substantial doubt as to our ability to

continue as a going concern. The accompanying financial statements do not include any

adjustments or classifications that may result from the possible inability of the Company to

continue as a going concern within one year after the issuance of the financial statements."  TAC

¶¶ 106-107 (**Statement 18**); *see* ECF No. 88-15, Ex. O to Br. ("July 30, 2020 10-Q").

A few days later, on August 3, 2020, the two remaining bidders who had been finishing

due diligence submitted non-binding proposals to Garrett.  TAC ¶ 70.  On "August 13, 2020,

Garrett signed an Exclusivity Agreement with" stalking horse purchaser, KPS Capital Partners,

LP ("KPS").  TAC ¶¶ 14, 70; *see also* Deason Decl. ¶ 81.

On August 26, 2020, about a month before Garrett entered a final purchase agreement

with KPS ("Purchase Agreement"), but after Garrett signed the Exclusivity Agreement,

Defendants issued yet another press release stating that "today[, Garrett] announced that, with

the assistance of its financial and legal advisors, it is exploring alternatives for addressing its

previously disclosed balance sheet concerns."  TAC ¶ 110; *see* ECF No. 88-18, Ex. R to Br.

("August 26, 2020 Press Release").  Plaintiffs allege that on that day, for the first time, Garrett

revealed that its "leveraged capital structure poses significant challenges to its overall strategic

and financial flexibility . . . thereby putting Garrett at a meaningful disadvantage relative to its

peers."  TAC ¶ 110.  The press release went on to disclose that "Garrett is seeking to address its

balance sheet concerns while its core business remains strong in order to preserve the resources

necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and

other stakeholders, and act as a stable and desirable employer."  *Id.* ¶ 110 (**Statement 20**).

Garrett further warned that "any actions taken by Garrett in relation to liability management may

materially reduce the value or trading price of our common stock, dilute existing holders of our

common stock by the issuance of equity (whether through conversion of existing liabilities into

equity or otherwise), or result in the cancellation of existing common stock."  *Id.* (**Statement

21**).  Finally, the statement declared that "Garrett has not yet determined whether to pursue any

balance sheet restructuring alternatives."  *Id.* ¶ 111 (**Statement 22**).

On September 17, 2020, the Wall Street Journal reported that Garrett was close to a sale

through bankruptcy.  *Id.* ¶ 137.  Garrett's stock price fell from $2.41 on September 17, 2020 to

$2.01 a share on September 18, 2020.  *Id.*  On September 20, 2020, Garrett entered into the

Purchase Agreement with KPS, and filed for bankruptcy.  *Id.* ¶¶ 31, 138; Deason Decl. ¶ 81.

Garrett's stock price subsequently fell from $2.01 on September 18, 2020 to $1.76 per share on

September 20, 2020.  TAC ¶ 138.  Plaintiffs allege that Defendants' bankruptcy filings make

clear that "COVID was not the cause of the Garrett's capital structure problems or its eventual

bankruptcy."  TAC ¶ 66.  But, according to the Press Release issued by Garrett that day, "'the

financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell

– all exacerbated by COVID-19 – created a significant long-term burden on our business'" that led Garrett to bankruptcy.  TAC ¶ 105.

B.     **The Court's March 2022 Opinion**

When Plaintiffs first brought this litigation, their theory of the case was different than articulated now.  In the Second Amended Complaint, Plaintiffs put forth a broad view of the alleged wrongdoing, a longer class period, and a different theory of scienter.   As the Court articulated, Plaintiffs' early theory was that "Defendants made false and misleading statements about whether Garrett would fail because they 'knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed.'"  *Garrett I*, 2022 WL 976269, at *12 (citing ECF No. 43 ("Second Amended Complaint" or "SAC") ¶ 8).  In March 2022, prior to the reassignment of this case to the undersigned, the Court rejected the Second Amended Complaint, and in turn that broad theory, on the grounds that Plaintiffs had failed to plead at least one element of a securities violation:  scienter.  *See Garrett I*, 2022 WL 976269, at *11.

The Court concluded that Plaintiffs failed to plead scienter in part because the allegations did not plead a plausible motive for Defendants to commit fraud.  *Id.* at *12-13.  "[W]hy would the . . . Defendants promise the market that Garrett would continue to innovate and remain a cutting-edge technology company if they knew the company 'was doomed to failure' because it was 'nearly impossible for Garrett to survive as an independent company'?"  *Id.* at *13 (citing SAC ¶¶ 131, 159).  The allegations did not answer this question.  Defendants' compensation packages did not otherwise create a motive to commit the alleged fraud, because motives based on compensation alone are "common to most corporate officers," and because the actual compensation packages were contingent upon "the successful completion of the Spin-Off that

would not vest until Garrett's fourth year as a publicly-traded Company." *Id.* (citing SAC ¶ 259). The Court held that the suggestion that Defendants would "tie their compensation to Garrett surviving for four years if . . . they knew that Garrett had fatal issues . . . defies economic reason . . . ." *Id.* (citations omitted).

This Court also concluded that Plaintiffs had failed to plead the alternative basis for scienter: "strong circumstantial evidence of conscious behavior or recklessness." *Id*. at *13-15. In particular, the Court faulted Plaintiffs' heavy reliance "on the bankruptcy proceedings to impute knowledge onto . . . Defendants *before* those proceedings took place." *Id.* at *14. What Defendants knew and shared during the bankruptcy proceedings – which began in September 2020 – "has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings." *Id.* (citing *Hutchinson v. Perez* (*Hutchinson I*), No. 12-cv-1073 (HB), 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012)).

Additionally, the Court found insufficient Plaintiffs' allegations that Defendants acted with scienter because, shortly before making the alleged misstatements, Garrett "retain[ed] financial advisors [who] . . . concluded bankruptcy was likely without a restructuring of the Honeywell Obligations . . . ." *Id.* (citations omitted). Apart from the fact that failure to disclose the retention of the financial advisors alone does not support an inference of scienter, the Court explained that, as alleged, it was not reckless for Defendant Rabiller to continue to make positive statements about Garrett's financial flexibility after the financial advice was provided to Garrett. *Id.* In particular, the Court emphasized that "Plaintiffs [did] not allege that the financial advisors ever opined that Garrett's *only* option forward was bankruptcy[,]" but instead alleged that Garrett was advised it would need to "restructure the Honeywell Obligations through bankruptcy *or other means*." *Id.* (quoting SAC ¶ 115) (emphasis added). At the time the advisors were

retained, Garrett had sued Honeywell in an attempt to alleviate the burdens caused by the Honeywell Obligations.  *Id.*  With litigation still available as a potential solution to Garrett's woes, it was not reckless for Defendant Rabiller to make positive statements about Garrett trying to increase its financial flexibility.  *Id.*

Finally, the Court rejected Plaintiffs' argument that the Second Amended Complaint properly alleged scienter through the "core operations" theory.  *Id.* at *15.  Under that theory, when the alleged misstatements concern information critical to a company's core operations, knowledge of that critical information is attributable to executives of the company, which permits an inference of scienter.  *Id.*  Specifically, the Court noted that while the viability of the doctrine is currently in doubt, the doctrine can only bolster allegations of scienter and cannot independently create a sufficient allegation of scienter.  *Id.* (collecting cases).  Because Plaintiffs otherwise failed to allege scienter, their "core operations" theory also failed.  *Id.*

## C.    Leave to Replead

The Court allowed Plaintiffs leave to replead because, for the first time at oral argument, Plaintiffs presented "a different theory of . . . Defendants' scienter."  *Id.* at 19.  Specifically, in their Second Amended Complaint, Plaintiffs had alleged that Defendants "knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed."  *Id.* (citing SAC ¶ 8).  However, at oral argument, Plaintiffs for the first time shifted their theory, and argued that there was an "evolving situation" at Garrett, whereby Defendants' knowledge grew, and they only came "to appreciate the full effect of the Honeywell Obligations on the company at a later date."  *Id.*  Because this new theory changed Plaintiffs' allegations of scienter and falsity, and because the March 2022

Opinion was "the first time that the Court . . . ruled on whether Plaintiffs had deficiencies in their

pleadings[,]" the Court granted leave to amend.  *Id.*

In their Third Amended Complaint, Plaintiffs, among other things, shortened the initial

October 1, 2018 through September 18, 2020 Class Period (SAC ¶ 16), to February 27, 2020

through September 18, 2020 (TAC ¶ 1), thereby narrowing the pool of alleged misstatements.

Defendants moved to dismiss the Third Amended Complaint on June 24, 2022.  *See generally*

Br.

## MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  That is, the facts must be sufficient to "allow[ ] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  On a Rule 12(b)(6)

motion, the court must "accept all factual allegations as true, and draw all reasonable inferences

in the plaintiff's favor."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010)

(quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal brackets

omitted).  The court shall not "accept as true a legal conclusion couched as a factual allegation."

*Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

However, securities fraud claims "are subject to heightened pleading requirements that

the plaintiff must meet to survive a motion to dismiss."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99.

Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the

circumstances constituting fraud."  Under Rule 9(b), the Second Circuit has held that "[a]

securities fraud complaint based on misstatements must (1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. The Private Securities Litigation Reform Act ("PSLRA") further provides for heightened pleading standards in securities fraud actions, requiring that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

### DISCUSSION

Under Section 10(b) of the Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The Securities and Exchange Commission ("SEC") has implemented this provision through Rule 10b-5, which "explicitly prohibits making any untrue statement of a material fact." *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citing 17 C.F.R. § 240.10b-5(b)). In order to state a claim under Rule 10b-5, a "plaintiff must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014)).

In their motion to dismiss the Third Amended Complaint, Defendants argue that Plaintiffs have failed to plead three of the six required elements for a Rule 10b-5 claim:  any material misrepresentations or omissions made by Defendants, scienter, and loss causation.  *See generally* Br.  The Court agrees that Plaintiffs have once again failed to plead scienter, and have also failed to allege any material misstatements or omissions made by Defendants.  Therefore, the Court need not address Defendants' arguments regarding loss causation.

### A.  Scienter

In order to adequately plead a claim for securities fraud pursuant to Rule 10b-5 and the heightened pleading requirements of Rule 9(b) and the PLSRA, "a plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'"  *Emps.' Ret. Sys. of Gov't of the Virgin Is.*, 794 F.3d at 305 (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis added).  The state of mind required for a claim pursuant to Rule 10b-5 is an "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)).  Recklessness is also "a sufficiently culpable mental state for securities fraud" in the Second Circuit.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*ECA, Loc. 134*"), 553 F.3d 187, 198 (2d Cir. 2009).  The Supreme Court has opined that a "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314.  A scienter inquiry is thus "inherently comparative" in that "the Court 'must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"  *Saraf v. Ebix, Inc.*, No. 21-cv-01589 (JMF), 2022 WL 4622676, at *3 (S.D.N.Y. Sept. 30, 2022) (quoting *Tellabs, Inc.*,

551 U.S. at 323-24).  Courts also must "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering '*all* of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'"  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (quoting *Tellabs, Inc.*, 551 U.S. at 323, 326).  Finally, "[i]n order to allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving rise to a strong inference that 'someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 543 (S.D.N.Y. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

A plaintiff can satisfy the scienter pleading requirement by alleging facts that show either of the following: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134*, 445 F.3d at 198.  To show a motive and opportunity to defraud, "[p]laintiffs must allege that [a company] or its officers benefitted in some concrete and personal way from the purported fraud[.]" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  If a party cannot show a motive, they may plead scienter through strong circumstantial evidence of conscious misbehavior or recklessness, but "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).  Indeed, "[t]o plead recklessness through circumstantial evidence, Plaintiffs would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . ." *ECA, Loc. 134*, 445 F.3d at 202-03 (internal quotation marks omitted).  This standard presents a "significant burden" for plaintiffs pleading

recklessness in securities fraud litigation. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).

Having failed to plead scienter in their Second Amended Complaint, *see Garrett I*, 2022 WL 976269, at *11, Plaintiffs modified their theory in the Third Amended Complaint. Now Plaintiffs allege that "[e]ach of the Defendants had actual knowledge by no later than February 27, 2020, and increasingly through the [new] Class Period . . . that Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to fix the unsustainable capital structure and the Honeywell Obligations." TAC ¶ 120. On close inspection of the allegations in the Third Amended Complaint, it becomes clear that Plaintiffs' Third Amended Complaint suffers from similar deficiencies as the Second Amended Complaint.

As an initial matter, Plaintiffs appear to admit that their scienter allegations do not rely on Defendants' motives. *See* Opp. at 22 (arguing that "Defendants' laser focus on 'motive' is a red herring" because the Court already acknowledged that a plaintiff need not show motive to allege scienter). Nevertheless, Plaintiffs' Third Amended Complaint contains a section detailing Defendant Rabiller's alleged financial motivations to inflate Garrett's stock price. *See* TAC ¶¶ 128-131. That section outlines Rabiller's employment agreement, which as described in *Garrett I*, includes a compensation package containing over $4 million in "Founder's Grants" that would not vest until Garrett was a public company for at least four years, and other incentive-based compensation. *See id.* ¶¶ 128-130. According to the Third Amended Complaint, Rabiller's compensation included incentive pay equal to his annual salary, yearly salary increases, and a guarantee of "24 months of base salary and incentive compensation

20

severance in the event of his involuntary termination of employment." *Id*. ¶ 129.  Some incentive compensation was also tied to Garrett's performance.  *Id.* ¶ 130.

However, to the extent these allegations differ somewhat from those in the Second Amended Complaint, they do not change the Court's analysis of Rabiller's alleged motive.  As stated in the Court's March 2022 Opinion, "if 'scienter could be pleaded' through incentive compensation 'alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"  *Garrett I*, 2022 WL 976269, at *13 (quoting *Kalnit*, 264 F.3d at 140).  That is why courts have held that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute motive for purposes of this inquiry."  *ECA, Loc. 134*, 553 F.3d at 198 (quotations omitted); *see In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product.  Similarly, corporate executives are generally motivated to maximize bonus compensation.  These allegations do not support an inference of scienter.").  Plaintiffs have failed to allege anything beyond incentive-based compensation, which is not sufficient to show motive under the circumstances alleged here.[7]

Plaintiffs' more persuasive – but ultimately still unsuccessful – argument is that they have shown a strong inference of scienter through circumstantial evidence about what

---

[7] The March 2022 Opinion also noted that motive and opportunity were implausible as alleged there because, if Defendants knew at the time of the Spin-Off that Garrett was likely to fail, they would not have tied their compensation to Garrett's success by permitting their stock to vest only after four years.  *Garrett I*, 2022 WL 976269, at *13.  Even though Plaintiffs no longer contend Defendants knew Garrett would fail from the time of the Spin-Off when the employment agreements were created, for the reasons set forth above, such agreements still do not demonstrate a motive to commit fraud.

Defendants knew prior to the Class Period, which was contrary to what Defendants actually said during the Class Period. *See* Opp. at 19-22. Notably, because Plaintiffs have failed to demonstrate motive, the "strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citation omitted). Courts in this Circuit have described "at least four circumstances [that] may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Garrett I*, 2022 WL 976269, at *14 (quoting *ECA, Loc. 134*, 553 F.3d at 199).

Plaintiffs argue that the Third Amended Complaint alleges sufficient facts under the third prong – that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" prior to February 27, 2020. Opp. at 19 (internal citation omitted). While this analysis necessarily overlaps with the inquiry into whether or not a statement was false or misleading, the Court will nevertheless address each element separately. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) ("Largely for the same reasons that the various statements at issue have been held neither false nor misleading, the facts pled in the SAC fall far short of pleading recklessness, and, thus, scienter."); *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-cv-01405 (RPP), 2009 WL 174656, at *26 (S.D.N.Y. Jan. 26, 2009) ("In such situations, the *scienter* analysis and the determination of whether the defendant made false or misleading statements are essentially combined." (internal quotation marks and citation omitted)).

"To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (internal quotation marks and citation omitted). In support of their scienter allegations, Plaintiffs rely in large part on a declaration submitted by Defendant Deason during the bankruptcy proceedings, dated September 20, 2020. *See generally* Deason Decl. For instance, they allege that soon after the Spin-Off, Defendants knew that Garrett's debt and other obligations made it difficult to maintain business with OEMs, that it was unlikely to be able to adapt to a fast-evolving industry due to its leverage and indemnity obligations, and that lenders and investors were unlikely to provide new capital to the company "subordinated to both [Garrett's] funded debt and its indemnity obligations." TAC ¶ 61; *see also id.* ¶¶ 57-61. In making these allegations, however, Plaintiffs rely on Deason's statements made on September 20, 2020. *See* Deason Decl. ¶¶ 65-71. As this Court explained in its prior opinion, "Defendants' knowledge about Garrett's financial strains *during* the bankruptcy proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings." *Garrett I*, 2022 WL 976269, at *14. "Allegations of 'fraud by hindsight' are insufficient to withstand a motion to dismiss." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *see also Hutchinson I*, 2012 WL 5451258, at *7 ("This case is therefore analogous to a host of cases in which courts have dismissed, as 'fraud in hindsight,' complaints filed after a company's bankruptcy based on

23

the conclusory allegation that defendants had or should have been aware of the 'liquidity crisis.'") (collecting cases).[8]

Perhaps recognizing this flaw, Plaintiffs point to other allegations of scienter to oppose Defendants' motion to dismiss. For instance, they contend that, before the pandemic, "Garrett's customer relationship teams reported to the directors and officers that customers were nervous about the Company's capital structure . . . ." Opp. at 20 (citing TAC ¶ 58). But that allegation is based on Deason's bankruptcy declaration and overstates its contents. Deason's declaration only states that, at the time of the bankruptcy in September 2020, "if . . . balance sheets problems [created by the Spin-Off] are not addressed, concerns among OEMs and suppliers will grow . . . ." Deason Decl. ¶ 68. Plaintiffs' new allegation therefore, again, has little bearing on what Defendants knew prior to the Class Period.

The remaining pre-Class-Period allegations regarding scienter describe Defendants' retention of companies to review their financials and challenge the Honeywell Obligations. Plaintiffs rely on allegations that Garrett, in early 2019, started working with Morgan Stanley "to explore strategic alternatives" and were told in early 2020 that "multiple financial sponsors" would be interested in a potential transaction "*if and only if*" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet . . . ." TAC ¶¶ 64 (citing Deason Decl. ¶ 74), 121; *see* Opp. at 20. And on February 1,

---

[8] Plaintiffs appear to argue that, as described in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), they are merely relying on "post-class period data to confirm what a defendant should have known during the class period." Opp. at 20-21. Of course, a post-class period statement explaining what happened during the class period, to argue that a defendant knew or should have known about that event, is not hindsight, as articulated in *In re Scholastic*. But a post-class period statement about a belief or knowledge a party has at the time that post-class period statement was made does not necessarily impute that belief or knowledge to the class period. *See Garrett I*, 2022 WL 976269, at *14. Plaintiffs largely continue to do the latter in their Third Amended Complaint.

2020, in response to Morgan Stanley's report, Defendants hired Perella Weinberg Partners ("PWP") to further evaluate a potential restructuring. TAC ¶ 64.

These scienter allegations fail for largely the same reasons articulated in the Court's March 2022 Opinion. Because "[n]o multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action," hiring financial advisors alone does not raise an inference of scienter. *Garrett I*, 2022 WL 976269, at *14 (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007)). And the allegation that those advisors warned Garrett that potential buyers were wary of its balance sheet does not support a strong inference of scienter because Plaintiffs still "do not allege that the financial advisors ever opined that Garrett's only option forward was bankruptcy." *Id.* at *14. Rather, the Third Amended Complaint – like the Second Amended Complaint – contains allegations that the financial advisors reported that a merger or other significant transaction was unlikely absent discharging of the Honeywell Obligations, whether that be through litigation, bankruptcy, or some other means. *See* TAC ¶¶ 64, 121 & n.25 ("All financial sponsors insisted on potential transaction structures in which the balance sheet of the Company – including its excess funded debt leverage, the ASASCO Indemnity Agreement and other legal liabilities – could be left behind or discharged and the business of the Company acquired free and clear of those burdens." (quoting Deason Decl. ¶ 74)). While Plaintiffs allege that one option going forward involved "an auction process for a stalking horse bidder to take the company into bankruptcy," *id.* ¶ 11, "discussions about restructuring [are] hardly the same as the company's decision to file for bankruptcy," *Hutchinson v. Perez* (*Hutchinson II*), No. 12-cv-01073 (HB), 2013 WL 1775374, at *3 (S.D.N.Y. Apr. 25, 2013). Therefore, while Garrett's hiring of advisors and discussions about potential bankruptcy is clear in the Complaint, the allegations otherwise

lack specificity as to precisely what Defendants knew about a definitive bankruptcy filing.  *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("Absent concrete allegations as to defendants' knowledge, the Amended Complaint cannot generate a strong inference of scienter." (internal brackets and citation omitted)); *see also Coronel*, 2009 WL 174656, at *27 (holding, in context of scienter, that "because the Complaint alleges no specific facts demonstrating that Defendants possessed – at the time they made the allegedly false statements concerning the reserve amounts – information contradicting their statements, fraud has not been shown").

Further adding ambiguity is the fact that, at the time Morgan Stanley reported to Garrett that "multiple financial sponsors" might be interested in a transaction, Defendants had hired the law firm Quinn Emanuel to launch a "Hail Mary" litigation against Honeywell to attempt to "void certain aspects of the Honeywell Obligations . . . ."  TAC ¶ 63.  Even though Plaintiffs contend that the litigation was "futile," it was ongoing through the bankruptcy proceeding, and only eventually resolved in 2021.  *Id*. ¶¶ 63, 2.  That ongoing litigation, which continued through the Class Period when the alleged misstatements were made, "provided Garrett a potential way to get out of the Honeywell Obligation[s]" that did not involve bankruptcy.  *Garrett I*, 2022 WL 976269, at *14.  This negates any "strong inference" that Defendants knew that bankruptcy was the only option going forward.  Rather, a more compelling, but less cynical, inference from these allegations is that Garrett was doing everything in its power to evaluate other options to avoid bankruptcy, including by seeking the advice of several expert advisors, and by retaining experienced legal counsel to void the restrictive Honeywell Obligations or negotiate a release with Honeywell.  *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("And the alleged emergency Board meeting – in addition to failing to establish with any particularity what

the Board knew – more plausibly evinces that the Board was being circumspect and cautious in the face of *uncertainty* about what the future held for Moonves, as opposed to being evidence that the Board had concrete knowledge that a scathing and accurate report was forthcoming."). Absent motive, Plaintiffs have not met the "greater" burden of pleading conscious misbehavior or recklessness, and have otherwise failed to plead a "strong inference" of scienter arising prior to February 27, 2020.

Plaintiffs' allegations of scienter during the course of the Class Period are also insufficient. The Third Amended Complaint generally describes Defendants' process in assessing whether restructuring through bankruptcy was the only way forward, but it is silent about when Defendants knew that bankruptcy was inevitable. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (affirming dismissal of complaint for failure to plead scienter where it was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position"). Instead, Plaintiffs allege that, during the Class Period, Defendants continued to make optimistic statements about Garrett's well-being and future despite knowing facts to the contrary. Plaintiffs allege that the following facts contributed to Defendants' knowledge during that period:

- On March 20, 2020, Garrett's Board retained the law firm Sullivan & Cromwell, and the consulting firm AlixPartners LLP "to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure." TAC ¶¶ 64, 121.

- On June 12, 2020, Garrett "entered into amendments to certain of its credit agreements – a strategy that Defendants knew at best would simply buy the Company some additional time." *Id.* ¶ 72.

- On June 15, 2020, Garrett received five non-binding indications of interest in response to the advisors' inquiries about a stalking horse purchase, "all of which were contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet.'" *Id.* ¶ 68 (quoting Deason Decl. ¶ 80). The top two candidates subsequently conducted over six weeks of due diligence. *Id.* ¶ 69.

- On August 3, 2020, the two remaining bidders submitted non-binding proposals to Garrett. *Id.* ¶ 70.

- On August 13, 2020, Garrett entered into an Exclusivity Agreement with stalking horse purchaser KPS. *Id.*

Like the allegations prior to the Class Period, these allegations show that Garrett was continuing to investigate restructuring throughout the Class Period. But again, the hiring of financial advisors does not give rise to a strong inference of scienter on its own. And the additional facts do not bolster an inference of scienter because, on balance, they also show that Garrett was investigating its options while the "Hail-Mary" litigation proceeded. Plaintiffs point to Rabiller's August 26, 2020 statement that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives" after Garrett had already signed the Exclusivity Agreement on August 13, 2020. *Id.* ¶ 111. Plaintiffs appear to argue that Defendants were at the very least reckless in making these statements because Garrett knew it had no viable option other than bankruptcy by this time. *See* Opp. at 22 (referencing alleged misstatements that were made

after the Exclusivity Agreement was signed and 25 days before bankruptcy); *see also id.* at 20

(arguing that by Class Period "adverse impact of the Honeywell Obligations had already

materialized sufficiently for Defendants to conclude Garrett had no viable option other than to

pursue bankruptcy"); TAC ¶¶ 7, 121-122.  But the signing of an Exclusivity Agreement does not

mean that a decision had been made concerning bankruptcy.  While the Court is unable to locate

the actual Exclusivity Agreement in the record, and the parties have not delineated the precise

terms of that agreement, Plaintiffs have not pleaded that the Exclusivity Agreement required

Garrett to enter a final agreement with KPS or to enter into bankruptcy.  Generally speaking,

exclusivity agreements provide for a period of time in which one party must *negotiate* for an

eventual purchase, exclusively with the other party.  *See, e.g.*, *TCS Cap. Mgmt., LLC v. Apax*

*Partners, L.P.*, No. 06-cv-13447 (CM), 2008 WL 650385, at *21 (S.D.N.Y. Mar. 7, 2008)

(dismissing claim alleging that it was misleading to not disclose exclusivity agreement "in

anticipation of the sale," because no law imposed a duty to "disclose offers or negotiations to

purchase a majority interest"); *see also Energy Intel. Grp., Inc. v. Cowen & Co., LLC*, No.

14-cv-03789 (NRB), 2016 WL 3939747, at *3 (S.D.N.Y. July 15, 2016) (describing exclusivity

agreement which provided "for 30 days of exclusive negotiations"); *Cyber Media Grp., Inc. v.*

*Island Mortg. Network, Inc.*, 183 F. Supp. 2d 559, 565 (E.D.N.Y. 2002) (describing exclusivity

agreement as barring party from "negotiating with any other prospective buyers for a period of

thirty days").  Defendants did not sign the Purchase Agreement with KPS until September 20,

2020.

　　　　A more plausible inference from Rabiller's August 2020 disclosures is that Defendants

were in a position to update the public as to the efforts it had and was currently taking to assess

Garrett's future viability and warn the public of the difficulties the Company currently faced,

including consideration of, but not a determination to, pursue restructuring.  *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks.").  The August 26, 2020 Press Release provides a fairly robust explanation of Garrett's struggles, including its high leverage and the Honeywell Obligations, as well as its strengths, including "ample liquidity" to support current commitments, and strong operating performance.  *See* August 26, 2020 Press Release.  The Press Release noted that "Garrett has not yet determined" if it would pursue restructuring options, but it further explained that "any actions taken by Garrett in relation to liability management may materially reduce the value" of stocks, or among other things, could cancel existing stock.  *Id.*

Importantly, as stated previously, the final stalking horse Purchase Agreement was not entered into until September 20, 2020, less than a month after the August 26, 2020 press release and the same day the bankruptcy proceeding commenced.  TAC ¶¶ 31, 138.  Because "it would defy economic reason for [Garrett] to make statements that would accelerate a bankruptcy filing, thereby causing more harm to investors, no reasonable inference of fraudulent intent can be drawn" from the failure to disclose the negotiations.  *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013).  Plaintiffs have not pleaded any specific facts suggesting that Defendants had made the decision to enter bankruptcy by August 26, 2020 when the last purported misstatement was made by Defendants.  *See Stratte-McClure*, 776 F.3d at 107 (affirming dismissal of complaint for failure to plead scienter where it was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position"); *Jones*, 550 F. App'x at 28 (noting that  "the second amended complaint alleges no fact supporting an inference that, between September 12, 2011,

and September 30, 2011, defendants became aware that a bankruptcy restructuring was in fact

necessary").  Therefore, it was not "highly unreasonable" or "an extreme departure from the

standards of ordinary care," *ECA, Loc. 134*, 553 F.3d at 203, for Rabiller to warn investors of the

possibility of restructuring, while also indicating that no final decision had been made.[9]

When viewing the full picture of Plaintiffs' allegations regarding Defendants'

knowledge, it becomes clear that Garrett was a company dealing with difficult choices and

considering how to proceed.  *See generally* August 26, 2020 Press Release.  Indeed, "[a]

company is permitted a period of time to investigate any problem it detects before reporting it to

the public."  *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 179830, at *4 (citing *Slayton*,

604 F.3d at 777).  And while, during the Class Period, bankruptcy was one option, "[p]eople in

charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future;

subject to what current data indicates, they can be expected to be confident about their

stewardship and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).  Any inference of recklessness based on Defendants'

---

[9] Plaintiffs rely on *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) to
argue that the "incongruity between word and deed establishes a strong inference of scienter."
Opp. at 21.  In that case, an inference of scienter was warranted because "Citigroup was taking
significant steps internally to address increasing risk in its CDO portfolio but at the same time it
was continuing to mislead investors about the significant risk those assets posed."  *In re
Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d at 238.  Plaintiffs had also adequately pleaded facts
showing that Defendants were aware of the risks posed by the CDOs, or at the very least were
reckless "in not appreciating" the risks they posed.  *Id.* at 237.  Risks, and related statements,
associated with a portion of a company's asset portfolio are different from a company's
consideration of a potential future bankruptcy.  Caselaw makes clear that a company does not
need to immediately disclose that it is considering bankruptcy.  *See, e.g.*, *Hutchinson II*, 2013
WL 1775374, at *3; *In re Renewable Energy Grp. Sec. Litig.*, No. 21-cv-01832 (DLC), 2022 WL
179830, at *4 (S.D.N.Y. Jan. 20, 2022) (citing *Slayton*, 604 F.3d at 777).  And here, unlike in
*Citigroup*, Plaintiffs have failed to plead sufficient facts detailing that Defendants knew or were
reckless in appreciating that bankruptcy was inevitable on or before August 26, 2020, the latest
date upon which Plaintiffs allege a misstatement was made.

optimistic statements is negated by the disclosures themselves, which relay the decline of Garrett and warned investors that a restructuring was possible during the Class Period. *See Kuriakose*, 897 F. Supp. 2d at 185 (noting that "truthful disclosures" negated inference of scienter); *see also Silsby v. Icahn,* 17 F. Supp. 3d 348, 369-70 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) (finding that disclosures weighed against scienter). In February 2020, Garrett's 10-K listed several risk factors with regard to the Indemnity Agreement, stating the agreement "may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales," "may also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet," and that "our access to capital to fund our operations may be materially adversely affected." TAC ¶ 114. The 10-K also warned that "our indebtedness could adversely affect our business, financial condition and results of operations." *Id*. ¶ 114 (brackets omitted). The May 2020 10-Q and July 2020 10-Q incorporated these risk factors by reference. *Id*. ¶¶ 116, 118. In May 2020, Rabiller noted that the capital structure imposed by Honeywell was "ill suited to cope with any meaningful operating challenges." *Id*. ¶ 134. Also, two weeks after Garrett entered into an Exclusivity Agreement with KPS, on August 26, 2020, Defendant Rabiller announced that Garrett was "exploring alternatives for addressing its previously disclosed balance sheet concerns," and shared concern that the "leveraged capital structure" created challenges to "strategic and financial flexibility." *Id*. ¶ 110.[10]

---

[10] Defendants argue that Garrett made robust *pre-Class Period* disclosures about the capital structure of Garrett, its balance sheet, and the restrictions imposed by the Honeywell Obligations. *See* Br. at 4-7. Plaintiffs contend that these are "truth-on-the-market" arguments not appropriate for a motion to dismiss. *See* Opp. at 10-11. The Court is not evaluating pre-Class Period disclosures as part of a truth-on-the-market defense, but is instead noting that contemporaneous Class Period disclosures overall weigh against a strong inference of scienter. *See Kuriakose*, 897 F. Supp. 2d at 185 (finding that allegations do not support an inference of scienter on a motion to

On balance, the most cogent inference that can be drawn from these allegations,

including Garrett's retention of financial and legal advisors, the report from Morgan Stanley, the

Honeywell litigation, and the August 2020 disclosures, is that the company "delayed releasing

information" until signing the stalking horse Purchase Agreement in order to "to carefully

review" its options "and was at worst negligent as to the effect of the delay on investors."

*Stratte-McClure*, 776 F.3d at 107; *see also Jones*, 550 F. App'x at 26 ("Thus, like the district

court, we conclude that the more compelling inference from the facts alleged in the second

amended complaint is that defendants properly disclosed relevant information to the public while

Kodak was struggling to avoid bankruptcy and that defendants' best efforts did not materialize."

(internal brackets, quotation marks, and citation omitted)); *In re PXRE Grp., Ltd., Sec. Litig.*, 600

F. Supp. 2d at 548 ("[T]he Court deems the more compelling inference to be that, rather than

knowing or being reckless in not knowing that PXRE's loss estimates were flawed, Defendants

were, at most, negligent in issuing the challenged statements.").[11]

Accordingly, the Court concludes that Plaintiffs have again failed to adequately plead

scienter, which alone is grounds for granting Defendants' motion and dismissing the Third

Amended Complaint.

---

dismiss in part because "[w]hether executives referred to these loans as 'risky,' 'non-prime,' 'subprime-like,' or 'subprime' is irrelevant since Freddie Mac fully disclosed the composition of the company's portfolio").

[11] Plaintiffs' "core operations" theory fails for the same reasons articulated in the March 2022 Opinion. *See Garrett I*, 2022 WL 976269, *15 ("Because Plaintiffs have failed to allege scienter for any Defendants, none of the allegations involving core operations properly plead scienter." (citing *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171-72 (S.D.N.Y. 2021))).

## B.    Material Misstatements or Omissions

However, even if Plaintiffs had properly pleaded scienter, the Third Amended Complaint would still be dismissed because Plaintiffs have failed to allege any material misstatements or omissions on the part of Defendants.  Defendants contend that: (i) Plaintiffs have failed to adequately plead that any of the alleged misstatements are actually false or misleading, (ii) many of the statements are nonactionable puffery, and (iii) other statements are protected forward-looking statements.  *See* Br. at 7-20.  Because the Court finds that Plaintiffs have failed to allege with particularity that any of the statements were false or misleading, it need not address Plaintiffs' arguments with respect to puffery or the safe harbor for forward-looking statements.[12]

Actionable statements under Rule 10b-5 are "either 'untrue' outright or 'misleading' by virtue of what [they] omit[] to state."  *In re Vivendi, S.A. Sec. Litig.* (*Vivendi II*), 838 F.3d 223, 239 (2d Cir. 2016).  "A statement is misleading if a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)).  While "[s]uch a determination is generally a question reserved for the trier of fact[,]" on a motion to dismiss, a Court may grant the motion if "the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made."  *Id.* (quoting *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990)).  Indeed, even though "[t]he federal securities laws do not protect against only those false and misleading statements that are false or misleading with

---

[12] Nevertheless, as noted in the March 2022 Opinion, the Court again observes without deciding that many of Plaintiffs' allegations do still "appear to be puffery, [and] to fall under the PSLRA's safe harbor and the bespeaks caution doctrine."  *Garrett I*, 2022 WL 976269, at *19 n.17.

respect to very specific material facts," *Vivendi II*, 838 F.3d at 249, at the pleading stage,

"[p]laintiffs [in securities fraud actions] must do more than say that the statements in the press

releases were false and misleading; they must demonstrate with specificity why and how that is

so[,]" *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Defendants argue that Plaintiffs fail to plead with particularity that any of the statements

were actually false or misleading when made. *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d

179, 207 (S.D.N.Y. 2020) ("A violation of Section 10(b) and Rule 10b-5 premised on

misstatements cannot occur unless an alleged material misstatement was false *at the time it was*

*made*." (internal citation omitted)).  The Court agrees.

As a threshold matter, it is important to note that there is no specific allegation in the

Third Amended Complaint as to when, prior to September 20, 2020, bankruptcy was inevitable,

or as the Court described with respect to scienter, when Defendants knew it was inevitable.

Plaintiffs ask the Court to surmise from the allegations that at least by February 27, 2020,

Defendants had actual knowledge that "Garrett was highly unlikely to survive as a stand-alone

Company and any strategic merger or sale of the business would be conditioned on a court-

supervised restructuring to fix the unsustainable capital structure and Honeywell Obligations."

TAC ¶ 120.  In Plaintiffs' view, therefore, every statement in the Class Period implying that

Garrett was *not* inevitably headed for bankruptcy or "court-supervised restructuring" is

misleading.  But, as the Court has already described with respect to scienter, other facts in the

Third Amended Complaint suggest that Defendants may have reasonably understood that Garrett

had options other than bankruptcy before and during the Class Period, or at least until a

reasonable time before the final Purchase Agreement was signed and Garrett filed for bankruptcy

on September 20, 2020.   Plaintiffs do not allege that Garrett or Defendants made any

misstatements in the time directly leading up to the bankruptcy filing in September 2020; in fact, the Class Period ends on August 26, 2020.

During the Class Period, the allegations suggest that Garrett was still considering its options.  Garrett did not receive "non-binding indications of interest" from potential purchasers, contingent on "acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet,'" until June 15, 2020, over halfway through the Class Period.  *Id*. ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett did not receive *final* non-binding proposals until August 3, 2020, or sign the Exclusivity Agreement until August 13, 2020, near the end of the Class Period.  *Id*. ¶ 70.  Throughout this entire time, Garrett amended its credit agreements to obtain some relief (*id*. ¶ 72), and was involved in a pending lawsuit against Honeywell, which sought to void the Honeywell Obligations and rid Garrett of its precarious balance sheet (*id*. ¶ 63).  Only after the bankruptcy filing on September 20, 2020 – nearly a month after the Class Period – was the litigation involving Honeywell resolved.  *Id*. ¶¶ 2, 31, 63.  With this timeline in mind, the Court will address the alleged misstatements in chronological order.

To start, the February 27, 2020 statements (**Statements 1, 2, 3, 4, 5, 6, & 7**) tout Garrett's "significant financial flexibility," "strong financial position," and "resilient business model," among other things.  *Id*. ¶¶ 78-79.  Plaintiffs allege that these statements were false and misleading because Garrett was struggling with its capital structure, had retained financial advisors for strategic review, and was attempting to void the Honeywell Obligations through litigation.  *See id*. ¶ 82.  But these facts do not contradict the optimistic statements made on February 27, 2020.  Plaintiffs have not attempted to define "flexibility" or "strong financial position," and they do not specify how these statements contradict previously undisclosed

financial data about Garrett.  *See Francisco*, 481 F. Supp. 3d at 210 ("In other words, the

complaint does not provide information as to why these activities necessarily belied Abengoa's

statements that it was in sound financial health at the time.").  The February 27, 2020 Press

Release contains statements that provide context for these alleged misstatements; in that press

release, Garrett highlighted that it was endeavoring to "strengthen[] the company's balance sheet

by utilizing our solid cash flow to reduce net debt by $176 million for the year and $292 million

since our Spin-Off."  Feb. 27, 2020 Press Release at 2-3.  The press release further explains that

while "the near-term macro environment remain[ed] volatile," Garrett had a "robust schedule of

new product launches," and was otherwise increasing net sales and net income.  *Id.*   In this

context, and absent any specific allegations to the contrary, Plaintiffs have failed to allege how

these statements are misleading.

   Plaintiffs' further attempts to otherwise show the falsity of these statements fall flat.

First, they argue that Defendant Rabiller's May 11, 2020 admission about Garrett's "rigid capital

structure," "cannot be reconciled" with the optimistic statements made in February 2020.  TAC

¶ 83.  But it is not relevant that in May 2020 – months after the February 2020 statements were

made – Rabiller referenced Garrett's "rigid capital structure," and described the structure as

unsustainable and "ill suited" to handling challenges.  *Id*.  This is classic hindsight, and does not

support Plaintiffs' otherwise conclusory allegations that the February 2020 statements were false

or misleading.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016)

("The fact that a financial item is accounted for differently, or in a later period, does not support

an inference that a previously filed financial statement was fraudulent.  This is an allegation of

fraud by hindsight, which is insufficient to withstand a motion to dismiss." (internal citation

omitted)).

Furthermore, Plaintiffs have not alleged specific facts explaining why it was false or

misleading for Defendants' February 2020 Form 10-K to pronounce:  "We believe we will meet

our known or reasonably likely future cash requirements" and that "[i]f these sources of liquidity

need to be augmented," Garrett may need to issue debt or equity securities.  TAC ¶ 80

(**Statement 7**).  The entire statement makes clear that "there can be no assurances" that such debt

or equity financing would be available.  *Id.*  Garrett qualified that "we believe we will be able to

meet our short-term liquidity needs for at least the next twelve-months."  *Id.*[13]  Plaintiffs have

not alleged any facts showing that Defendants did not hold these beliefs at the time.  Instead,

they contend that the statements were misleading given the steps Garrett had taken to explore a

restructuring.  TAC ¶¶ 84-85.  But at this time, Garrett had not even received proposals from

bidders; thus, the Court is unable to infer from the allegations that Defendants, at the time, had

"actual knowledge that the [bankruptcy] *will* occur," and misled investors by stating otherwise.

*Set Cap. LLC*, 996 F.3d at 85.

---

[13] The 10-K itself contains entire sections devoted to warnings about the Honeywell Obligations, including detailing the terms of the Indemnification Agreement, *see* Feb. 27, 2020 10-K at 22-23, the terms of the Tax Agreement, *see id.* at 27, and the risks of the Spin-Off more generally, *see id.* at 27-29.  In fact, the 10-K specifically says: "Our indebtedness could adversely affect our business, financial condition and results of operations."  *Id.* at 29.  A reasonable investor would certainly be aware of these hindrances, and would likely not ignore these warnings and instead rely on fragmented optimistic statements (arguably puffery) about Garrett's flexibility, strength, or resilience.  *See* Feb. 27, 2020 10-K; *see also* **Statements 1, 2, 3, 4, 5, 6, & 7**.  *See, e.g.*, *ECA, Loc. 134*, 553 F.3d at 206 (concluding that "statements [which] were merely generalizations regarding . . . business practices . . . are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (citations omitted)); *Shemian v. Rsch. In Motion Ltd.*, No. 11-cv-04068 (RJS), 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (concluding that "vague" statements about "success," "exciting growth," "laying a strong foundation," "bullish[-ness]", etc., were nonactionable puffery); *Schaffer v. Horizon Pharma PLC*, No. 16-cv-01763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) ("For example, statements by Defendants extolling their 'unique commercial business model', noting that the company was 'on track', and highlighting that prescription growth was 'exceeding [their] expectations' are not actionable under the securities laws.") (collecting cases).

Notably, Plaintiffs rely on statements made by Defendant Deason in his bankruptcy declaration in September 2020 to allege the falsity of statements made months prior, in February 2020.  TAC ¶¶ 84-95 (citing Deason Decl. ¶¶ 66, 71).  Those statements, made as part of a declaration filed with the bankruptcy proceeding on September 20, 2020, maintain that Garrett "ha[s] no access to equity capital," because investors are unlikely to invest to Garrett's debt due in part to the Indemnity Agreement (Deason Decl. ¶ 71), and that Garrett "has no access to incremental debt" to fund research and development in light of its "high leverage" (*id*. ¶ 66).  Given that Deason's statements were relaying facts as of September 20, 2020, Plaintiffs' allegations of false statements in February 2020 based on these facts rely on hindsight and consequently fail.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d at 211.

The alleged misstatements made in March and April 2020 suffer from the same flaws. Plaintiffs contend that Defendants made a series of misstatements, including explaining that Garrett's "focus remains on leveraging our flexible and resilient business model," touting Garrett's efforts "to enhance our liquidity and preserve the long-term health of the business," and announcing an expectation that Garrett would rely on its "resilient business model to emerge from the crisis as a stronger company."  TAC ¶¶ 87, 88 (**Statements 5, 8, & 9**).  At this time, Defendants had retained more advisors, but Plaintiffs do not otherwise allege specific, undisclosed information that contradicts these statements, or otherwise demonstrate that Defendants knew bankruptcy was inevitable.  It bears noting that by then, Defendants were dealing with the COVID-19 pandemic, and had to shut down a facility in Wuhan, China.  *See id*. ¶ 87.  Defendants had disclosed, and would continue to disclose, the negative impact of COVID on their business.  *See* Feb. 27, 2020 10-K at 19 ("As a result of disruptions to our business as a result of the novel coronavirus, we expect that our revenues and results of operations will be

negatively affected, which, among other things, could cause us to fail to comply with certain financial covenants [including the Credit Agreement and Indemnification Agreement]"); *see also id.* (generally describing potential risks from coronavirus); April 7, 2020 Press Release (noting "substantial disruption" caused by COVID-19, withdrawing 2020 guidance, and indicating steps it is taking to adjust to the pandemic).  Plaintiffs otherwise rely on a statement made by Rabiller in May 2020, *see* TAC ¶ 92, to allege the falsity of statements made months before that, and, in dismissing the disclosures that Garrett made regarding COVID, only assert, without factual support, that "COVID was not the cause of Garrett's eventual bankruptcy," *id.* ¶¶ 90-91. Plaintiffs therefore fail to show that Garrett's optimistic statements in March and April 2020 were false or misleading when made.

With respect to statements made by Defendants in May 2020, Plaintiffs again do not allege any additional undisclosed facts that alter the Court's determination that Plaintiffs have not adequately alleged false or misleading statements by Garrett.  The statements by Defendants on May 11, 2020 resemble statements already addressed herein.  For instance, Defendants stated that Garrett's "positive business fundamentals remain intact," that its flexibility allowed it "to maintain [its] agility and strengthen [its] position for long-term success," that it would "leverage [it's] flexible and resilient business model," and that it remained "well positioned to accelerate [its] cutting-edge technologies to the market and drive long-term success."  *Id*. ¶¶ 92-93 (**Statements 10, 11, 12, 13**).  In the Form 10-Q that month, Garrett again noted that "[i]f these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities . . . [and] we believe we will be able to meet our short-term liquidity needs for at least the next twelve months."  *Id*. ¶ 94 (**Statement 14**).   Also on May 11, 2020, Defendant Rabiller noted in his earnings call that: "Our former parent imposed

on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly

favorable macroeconomic and industry environment, meaning that was really unsustainable that

way unless everything was perfect.  With insight, it is clear that our capital structure was ill

suited to cope with any meaningful operating challenges."  *Id*. ¶ 134.

Nothing in the Third Amended Complaint details precisely why these statements were

false or misleading at the time they were made.  To be sure, Plaintiffs allege that Defendants

were still engaging advisors to explore restructuring options in the face of challenges from its

capital structure.  But these allegations do not imply that bankruptcy was certain, or that

Defendants knew restructuring was the only option going forward.  Nor are they contrary to the

statements made that day.  For instance, on the earnings call, Defendant Bracke noted that, with

respect to dealing with the Honeywell Obligations, "[t]here are a few options open" and went on

to discuss amendments to credit agreements.  May 11, 2020 Earnings Call at 14-15.  And with

respect to the pandemic, Defendant Bracke warned that "there is no firm answer to this.  I think

the only thing we can say is that for now we believe that should be okay, but this can definitely

change depending upon how the crisis develops."  *Id.* at 23.  When viewed in the context of all of

the statements made that day, Defendants appear to have been giving investors insight into the

risks the company faced at that time, including from the COVID-19 pandemic and its "rigid

capital structure," while also noting Garrett's positive features.  *Cf. Slayton*, 604 F.3d at 777

("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit

the defendants engaging in a good-faith process to inform themselves and the public of the

risks."); *see also* May 11, 2020 Earnings Call (discussing the negative effect of the COVID-19

pandemic on Garrett's operations).  The Form 10-Q notes that "there can be no assurances"

about financing options, "particularly in light of the volatility in global financial markets as a

result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . ." TAC ¶ 94. Moreover, and importantly, Plaintiffs yet again impermissibly rely on the same statements made by Defendant Deason in September 2020 in the bankruptcy proceeding to impute knowledge to Defendants back in May 2020. *See id*. ¶¶ 96-97 (citing Deason Decl. ¶¶ 66, 71). When viewed holistically, and without considering the hindsight-based facts alleged in the Third Amended Complaint, Plaintiffs have failed to allege specific facts showing that these May 2020 statements were false or misleading.

On June 12, 2020, Garrett entered into certain "amendments" to credit agreements. TAC ¶ 72. In announcing these moves, Defendant Rabiller declared that "[d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact." *Id*. ¶ 98 (**Statement 15**). Plaintiffs allege this statement was false or misleading because Garrett was actively pursuing restructuring, and knew that Garrett "was unable to survive as an independent company . . . ." *Id*. ¶ 100. However, Rabiller had just announced that Garrett's "modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown." *Id*. ¶ 72. When viewed with this context, Rabiller's statement does not contradict undisclosed facts – or actual knowledge of an inevitable restructuring – but instead voices optimism and an intent by Defendants to take creative measures, such as Credit Agreement modifications, to ensure the success of the company and avoid bankruptcy.

Later in the summer, Garrett had received "5 non-binding indications of interests" from potential buyers that were "contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current

balance sheet.'" *Id.* ¶ 68 (quoting Deason Decl. ¶ 80). After two of those companies began due diligence, Garrett issued a press release and some Defendants went on an earnings call on July 30, 2020 to tout Garrett's "robust infrastructure and agile working capabilities as we execute on our long-term strategy and lead the evolution" in the automotive industry, its "strong fundamentals . . . [and] variable cost model that helps preserve cash and an attractive margin profile," and the "resiliency of [Garrett's] operating structure." *Id.* ¶¶ 101-102 (**Statements 16 & 17**); *see id.* ¶ 104.

Plaintiffs allege that it was misleading to make such optimistic statements while in the final stages of due diligence with a potential stalking horse bidder. *Id.* The Court disagrees. These optimistic statements were made at a time when Garrett was still pursuing litigation against Honeywell to relieve itself of its financial encumbrances bestowed by the parent company during the Spin-Off. *See id.* ¶¶ 2, 63. While Plaintiffs allege that litigation was "futile," Plaintiffs have not alleged that Defendants were aware of that fact when the statements were made. *Id.* ¶ 63; *cf. Garrett I*, 2022 WL 976269, at *14 (noting that Honeywell litigation was a "potential way to get out of the Honeywell Obligation," and therefore it was not "highly unreasonable and . . . representing an extreme departure from the standards of ordinary care . . . for Rabiller to say that the Company took actions to obtain increased financial flexibility" (internal citations and quotation marks omitted)). Notably, also, Defendants did not receive final stalking horse bids until several days after these statements were made, on August 3, 2020. TAC ¶ 104. The only specific fact alleged as contradictory to these statements is that Defendants stated on September 20, 2020, in connection with their bankruptcy announcement, that the "financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – created a significant long-term burden on our

business . . . ." *Id*. ¶ 105 (quoting September 20, 2020 Press Release, available at:

https://investors.garrettmotion.com/news-releases/news-release-details/garrett-motion-enters-

definitive-transaction-agreement-and).  But this alleged admission is from September 20, 2020,

long after the summer 2020 alleged misstatements.  Moreover, on July 30, 2020, Defendants

made further disclosures about the negative impact the pandemic was having on their business.

*See, e.g.*, July 30, 2020 Press Release at 2 (noting that lower production, the shutdown of plants,

and a "challenging demand environment . . . could further challenge our capital structure and

limit our ability to expand on our strategy now and in the future"); *see also* July 30, 2020

Earnings Call at 7, 12 (noting that despite success in continuing operations, the future was

"uncertain," and "our capital structure remains a significant challenge").  Therefore, Plaintiffs do

not allege facts that, absent hindsight, demonstrate with specificity that the June and July 2020

statements were false or misleading.

Plaintiffs also allege that it was misleading for Defendants to omit from their July 2020

Form 10-Q language indicating that "management has concluded that the foregoing conditions

and events raise substantial doubt as to our ability to continue as a going concern."  TAC ¶¶ 106-

107.  Absent a duty to disclose information, "[a]n omission of information . . . is . . . actionable

only when disclosure of such information is necessary to make . . . statements made, in the light

of the circumstances under which they were made, not misleading."  *Gillis*, 197 F. Supp. 3d at

577 (internal quotation marks and citation omitted).  Plaintiffs argue that it was misleading for

Defendants to exclude these risk factors because they knew that Garrett was heading for

bankruptcy at this time.  TAC ¶ 108.  Plaintiffs further contend that the omission misled

investors into thinking that the "going concern" language included in the May 2020 Form 10-Q

"was tied solely to Garrett's credit agreement negotiation," and not its possible bankruptcy.  *Id*.

¶ 109.  But once again, without considering hindsight-based statements, the facts alleged do not

specifically show that, as of July 30, 2020, it was misleading to omit this "going concern"

language.  Defendant Rabiller had already disclosed concerns about the capital structure in May

2020, and Defendant Deason noted in the July 30, 2020 earnings call that, despite the removal of

that language, "[o]ur capital structure remains a significant challenge," particularly "from 2023

onward."  July 30, 2020 Earnings Call at 12.  Plaintiffs have not pointed to – and the Court is not

aware of any – obligation on the part of Defendants to disclose that two potential bidders were

conducting due diligence.  To the contrary, they almost certainly were not under any obligation

to do so.  *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348 (noting that in light of other

disclosures about "intensive efforts to ameliorate the company's liquidity problem, the lack of

disclosure regarding its bankruptcy planning did not transform its disclosures during this period

into misrepresentations").[14]  Plaintiffs therefore have not alleged that the omission of the "going

concern" language was misleading in context.

Finally, Plaintiffs contend that the statements made on August 26, 2020, two weeks after

Garrett had entered an Exclusivity Agreement with KPS, were materially false and misleading.

*See* TAC ¶¶ 110-113.  On that day, Garrett "announced that, with the assistance of its financial

and legal advisors, it is exploring alternatives for addressing its previously disclosed balance

---

[14] The Court also rejects Plaintiffs' allegations that language contained in the February 2020 10-K, May 2020 10-Q, and July 2020 10-Q, articulating risk factors related to the Honeywell Obligations (TAC ¶ 114 (**Statement 19**)) is misleading.  Plaintiffs take issue with the fact that the risk factors warned that there *may* be material adverse effects to liquidity and cash flow from the Indemnity Agreement.  *See id.* ¶¶ 104, 114-118.  When these fairly boilerplate risk factors were printed in Garrett's filings, Garrett had disclosed the contents of the Honeywell agreements, *see, e.g.*, Feb. 2020 10-K, had not yet received final proposals from bidders, and was otherwise attempting to navigate the Honeywell Obligations' encumbrances.  Accordingly, in the context of the facts alleged here, it was not misleading for Plaintiffs to disclose those risk factors, without also stating that bankruptcy was on the horizon.

45

sheet concerns." *Id*. ¶ 110.  Plaintiffs allege that it was false and misleading to state that Garrett

is seeking to address its balance sheet concerns while its "core business remains strong," and that

"any actions taken by Garrett in relation to liability management *may* materially reduce the value

or trading price of our common stock, dilute existing holders of our common stock by the

issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or

result in the cancellation of existing common stock." *Id*. ¶¶ 110, 113 (**Statements 20 & 21**)

(added).  Plaintiffs further contend it was misleading for Defendants to state that "Garrett has not

yet determined whether to pursue any balance sheet restructuring alternatives." *Id*. ¶ 111

(**Statement 22**).  Plaintiffs have not alleged specific facts that contradict these disclosures;

instead, Plaintiffs argue that they are misleading in light of the steps Garrett had previously taken

to explore restructuring, and the fact that Garrett had already entered the Exclusivity Agreement.

*See id*. ¶113.  But the purchase agreement was not signed until September 20, 2020, almost a

month later.  *See* Br. at 19.  This timeline suggests that bankruptcy was not necessarily imminent

(indeed, the Honeywell litigation, albeit deemed as a "Hail Mary," appears to have been

ongoing) and therefore it was not necessarily misleading to state that "Garrett has not yet

determined" whether to pursue bankruptcy, just as the disclosures state.  *Cf. Set Cap. LLC*, 996

F.3d at 85 (concluding complaint adequately alleged that "Defendants knew with virtual

certainty" that their "hedging activity" would decrease value of notes because "three prior

volatility spikes" put them on notice of that effect).  Thus, unlike in *In re Vivendi Universal, S.A.*

(*Vivendi I*), on which Plaintiffs rely, Plaintiffs here have not "alleged sufficient facts to show

defendants could not have reasonably believed the statements made to the public."  381 F. Supp.

2d 158, 182 (S.D.N.Y. 2003).[15] Nothing in the Third Amended Complaint adequately alleges that these statements were false or misleading when made.

While not central to the Court's holding, there is also a sound policy basis, articulated by other courts in this District, for not requiring immediate disclosure when a company is contemplating bankruptcy. *See, e.g.*, *Hutchinson I*, 2012 WL 5451258, at *8 ("Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." (quoting *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009))).[16] This conclusion is also consistent with the principle that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields*, 25 F.3d at 1129-30.

---

[15] The additional cases cited by Plaintiffs involve situations where, unlike here, Defendants had actual knowledge of an event that was already occurring, or certain to occur, but publicly disclosed uncertainty about whether that event would happen. *See In re Globalstar Sec. Litig.*, No. 01-cv-01748 (SHS), 2003 WL 22953163, at *11 (S.D.N.Y. Dec. 15, 2003) (noting in context of Section 11 claim that defendants publicly stated problems "might delay" the availability of their service, when in fact they knew the delay was already happening, and knew it would impact their potential revenue); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized."). Here, Plaintiffs have not alleged when Defendants knew bankruptcy was certain; therefore, the alleged public misstatements do not contradict undisclosed information as alleged in the Third Amended Complaint.

[16] Plaintiffs argue that, unlike the parties in *Beleson*, they are not arguing that Defendants were required to disclose that they were going to file for bankruptcy, only that it was misleading to make certain statements about Garrett's capital structure which led to its bankruptcy, or issue risk factors of what "may happen," when those things were "already materializing." Opp. at 12 n.11. But, for the reasons stated above, Plaintiffs have failed to allege with particularity that the alleged statements were misleading in light of what was "materializing" at the time the statements were made.

47

Accordingly, the Court concludes that Plaintiffs have failed to plead with specificity that the alleged misstatements were false or misleading as required under federal securities laws.

## C.      Section 20 Claim

"To plead a section 20(a) claim, a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Garrett I*, 2022 WL 976269, at *18 (quoting *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 236). When a claim under Section 10(b) is dismissed, a claim under Section 20(a) ought to be dismissed as well.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 108 (noting that if a plaintiff "fails to allege any primary violation[,] . . . it cannot establish control person liability"); *Schwab v. E*TRADE Fin. Corp.*, 752 F. App'x 56, 59-60 (2d Cir. 2018) ("Because [the plaintiff]'s Section 10(b) claim was properly dismissed, . . . [the plaintiff]'s Section 20(a) claim also necessarily fails and was properly dismissed.").  Because the Court has concluded that Plaintiffs' Section 10(b) claim fails on scienter and falsity grounds, the Section 20(a) claim also fails for these reasons.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Third Amended Complaint is dismissed.  Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party.").

The Clerk of Court is respectfully directed to CLOSE this case.

Dated: March 31, 2023
       New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

# APPENDIX A[1]

| # | ¶¶ | Date | Source | Statement[2] |
|---|---|---|---|---|
| 1 | 78 | 2/27/20 | Press Release | "*significant financial flexibility*" |
| 2 | | | | "*well positioned to build upon the progress we achieved during our first full year as an independent company*" |
| 3 | 79<br>87 | 2/27/20<br>3/19/20 | Earnings Call<br>Press Release | "*significant flexibility* to help mitigate the impact from any short-term fluctuations in the underlying macro environment" |
| 4 | | | | "maintained [its] *strong financial position*" |
| 5 | | | | "[g]oing forward, we plan to continue to *utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet*" |
| 6 | | | | "*flexible and resilient business model*" (¶¶ 79, 87) |
| 7 | 80 | 2/27/20 | 10-K | "*We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however,* there *can be no assurances* that we will be able to obtain additional debt or equity financing on acceptable terms in the future. *Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*" |
| 8 | 88 | 4/7/20 | Press Release | "*to enhance our liquidity and preserve the long-term health of the business*" |
| 9 | | | | "*resilient business model* to emerge from this crisis as a stronger company" |
| 10 | 92 | 5/11/20 | Press Release | "*positive business fundamentals remain intact*" |
| 11 | | | | "*to maintain our agility and strengthen our position for long-term success*" |

---

[1] This Appendix is sourced from ECF No. 87-1, Defendants' Appendix 1. The Court has only made non-substantive changes, and attaches this to its Opinion for ease of reference.

[2] Paragraph references are to the Third Amended Complaint ("TAC"). All material in the "Statement" column is quoted from the TAC. Emphases are Plaintiffs'.

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
| 12 |  |  |  | "*take advantage of our[3] flexible and resilient business model*" |
| 13 | 93 | 5/11/20 | Earnings Call | "*well positioned to accelerate our cutting-edge technologies to the market and drive long-term success*" |
| 14 | 94 | 5/11/20 | 10-Q | "If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all… *we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |
| 15 | 98 | 6/12/20 | Press Release | "[d]espite the near-term disruption across the automotive industry and global economy, *it is important to remember that the positive long-term fundamentals of our business remain intact.*" |
| 16 | 101 | 7/30/20 | Press Release | "*agile working capabilities as we execute on our long-term strategy*" |
| 17 | 102 | 7/30/20 | Earnings Call | "*the strong fundamentals of Garrett . . . combined with a variable cost model that helps preserve cash and an attractive margin profile,*" and "the *resiliency of [Garrett's] operating structure.*" |
| 18 | 107 | 7/30/20 | 10-Q | Removal of "going concern" language |

---

[3] Paragraph 93 alleges the statement "leverage [its] flexible and resilient business model," which does not appear in the May 11, 2020 Earnings Call Transcript. *See* ECF No. 88-12, Carlinsky Decl Ex. L. The phrase "take advantage of our flexible and resilient business model" appears on page 12, and so that sentence is included in this Appendix. *See id.* at 12.

| # | ¶¶ | Date | Source | Statement |
|---|----|------|--------|-----------|
| 19 | 114 | 2/27/20 | 10-K | "***may*** *have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales,*" "***may*** *also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet,*" and that "*our access to capital to fund our operations* ***may*** be materially adversely affected." The February 27, 2020 Form 10-K also contained a separate risk factor stating that "[o]ur indebtedness ***could*** adversely affect our business, financial condition and results of operations." |
| | 116-17 | 5/11/20 | 10-Q | References to / inclusion of similar language |
| | 118 | 7/30/20 | 10-Q | References to / inclusion of similar language |
| 20 | 110 | 8/26/20 | Press Release | "*Garrett is seeking to address its balance sheet concerns while* ***its core business remains strong*** *in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer.*" |
| 21 | | | | "*any actions taken by Garrett in relation to liability management* ***may*** *materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock.*" |
| 22 | 111 | 8/26/20 | Press Release | "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives.***" |

# EXHIBIT 2

**Query   Reports   Utilities   Help   Log Out**

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:20-cv-07992-JLR

In re Garrett Motion Inc. Securities Litigation
Assigned to: Judge Jennifer L. Rochon
Related Cases: 1:20-cv-08296-JPC
                    1:20-cv-09279-JPC
Cause: 15:78j(b)ss Stockholder Suit

Date Filed: 09/25/2020
Date Terminated: 03/31/2023
Jury Demand: Plaintiff
Nature of Suit: 850 Securities/Commodities
Jurisdiction: Federal Question

**Lead Plaintiff**

**The Gabelli Asset Fund**                          represented by **Andrew J Entwistle**
                                                                    Entwistle & Cappucci LLP
                                                                    500 West 2nd st
                                                                    Ste 1900
                                                                    Austin, TX 78701
                                                                    512-710-5960
                                                                    Email: aentwistle@entwistle-law.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Andrew Mitchell Sher**
                                                                    Entwistle & Cappucci LLP
                                                                    230 Park Avenue
                                                                    Ste Floor 3
                                                                    New York, NY 10169
                                                                    212-894-7200
                                                                    Fax: 212-894-7272
                                                                    Email: asher@entwistle-law.com
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Callie Crispin**
                                                                    Entwistle & Cappucci LLP
                                                                    500 West 2nd st
                                                                    Ste 1900
                                                                    Austin, TX 78701
                                                                    512-710-5960
                                                                    Email: ccrispin@entwistle-law.com
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Joshua Killion Porter**
                                                                    Entwistle & Cappucci LLP
                                                                    230 Park Avenue

Ste Floor 3
New York, NY 10169
212-894-7200
Fax: 212-894-7272
Email: jporter@entwistle-law.com
*ATTORNEY TO BE NOTICED*

**Vincent Roger Cappucci**
Entwistle & Cappucci LLP
230 Park Avenue
Ste Floor 3
New York, NY 10169
212-894-7200
Email: vcappucci@entwistle-law.com
*ATTORNEY TO BE NOTICED*

**Lead Plaintiff**

**The Gabelli Dividend & Income Trust**          represented by **Andrew J Entwistle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Mitchell Sher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Callie Crispin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua Killion Porter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Roger Cappucci**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lead Plaintiff**

**The Gabelli Value 25 Fund Inc.**          represented by **Andrew J Entwistle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Mitchell Sher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Callie Crispin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua Killion Porter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Roger Cappucci**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Steven Husson**                                      represented by  **Gregory Bradley Linkh**
*Individually and On Behalf of All Others*                            Glancy Prongay & Murray LLP
*Similarly Situated*                                                  230 Park Avenue
                                                                      Suite 358
                                                                      New York, NY 10169
                                                                      212-682-5340
                                                                      Email: glinkh@glancylaw.com
                                                                      *ATTORNEY TO BE NOTICED*

V.

<u>**Consolidated Plaintiff**</u>

**Gabelli Equity Trust Inc.**                          represented by  **Andrew J Entwistle**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

<u>**Consolidated Plaintiff**</u>

**SM Investors LP**                                    represented by  **Andrew J Entwistle**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

<u>**Consolidated Plaintiff**</u>

**SM Investors II LP**                                 represented by  **Andrew J Entwistle**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

<u>**Consolidated Plaintiff**</u>

**Joseph Froehlich**                                   represented by  **Jeremy Alan Lieberman**
                                                                      Pomerantz LLP
                                                                      600 Third Avenue, 20th Floor
                                                                      New York, NY 10016
                                                                      (212)-661-1100

Fax: (212)-661-8665
Email: jalieberman@pomlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Alexander Hood , II**
Pomerantz LLP
600 Third Avenue
New York, NY 10016
(212)-661-1100
Email: ahood@pomlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>Movant</u>

**David Buchholz**                  represented by **Phillip C. Kim**
The Rosen Law Firm
275 Madison Avenue
40th Floor
New York, NY 10016
212-686-1060
Fax: 212-202-3827
Email: pkim@rosenlegal.com
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Investor Club**                   represented by **Gregory Bradley Linkh**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**Gamco Asset Management Inc.**      represented by **Andrew J Entwistle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Mitchell Sher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Callie Crispin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua Killion Porter**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Vincent Roger Cappucci**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Stanislav Vrubel**                    represented by **Jeremy Alan Lieberman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Garrett Motion Inc.**                    represented by **Jaclyn Marie Palmerson**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
732-300-0001
Fax: 212-849-7100
Email: jaclynpalmerson@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Jacob J Waldman**
Quinn Emanuel Urquhart & Sullivan (NYC)
51 Madison Avenue
New York, NY 10010
(212)-849-7000
Fax: (212)-849-7100
Email: jacobwaldman@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
Quinn Emanuel Urquhart & Sullivan (NYC)
51 Madison Avenue
New York, NY 10010
(212)-849-7582
Email: jeremybaldoni@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Michael Barry Carlinsky**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Fax: (212) 849-7100

Email: michaelcarlinsky@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, DC 20001
(202)-538-8141
Fax: (202)-538-8100
Email: michaelliftik@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Olivier Rabiller**                    represented by **Michael Barry Carlinsky**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Jaclyn Marie Palmerson**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Jacob J Waldman**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Jeremy Andrew Baldoni**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Michael Ethan Liftik**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Allesandro Gili**                    represented by **Michael Barry Carlinsky**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Jaclyn Marie Palmerson**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Jacob J Waldman**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peter Bracke**                    represented by    **Michael Barry Carlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob J Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sean Deason**                    represented by    **Michael Barry Carlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Marie Palmerson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob J Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Consolidated Defendant**

**Craig Balis**

**Consolidated Defendant**

**Thierry Mabru**

**Consolidated Defendant**

**Russell James**                                    represented by **Michael Barry Carlinsky**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jaclyn Marie Palmerson**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jacob J Waldman**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jeremy Andrew Baldoni**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael Ethan Liftik**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Carlos M. Cardoso**                                represented by **Michael Barry Carlinsky**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jaclyn Marie Palmerson**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jacob J Waldman**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jeremy Andrew Baldoni**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

Michael Ethan Liftik
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Maura J. Clark**                     represented by **Michael Barry Carlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Marie Palmerson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob J Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Courtney M. Enghauser**               represented by **Michael Barry Carlinsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Marie Palmerson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob J Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Susan L. Main**                      represented by  **Michael Barry Carlinsky**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jaclyn Marie Palmerson**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jacob J Waldman**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jeremy Andrew Baldoni**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael Ethan Liftik**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Carsten Reinhardt**                  represented by  **Michael Barry Carlinsky**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jaclyn Marie Palmerson**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jacob J Waldman**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jeremy Andrew Baldoni**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael Ethan Liftik**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Scott A. Tozier**                    represented by  **Michael Barry Carlinsky**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Jaclyn Marie Palmerson**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Jacob J Waldman**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Jeremy Andrew Baldoni**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Michael Ethan Liftik**
(See above for address)
*ATTORNEY TO BE NOTICED*


| Date Filed | # | Docket Text |
|---|---|---|
| 09/25/2020 | 1 | COMPLAINT against Peter Bracke, Sean Deason, Garrett Motion Inc., Allesandro Gili, Su Ping Lu, Olivier Rabiller. (Filing Fee $ 400.00, Receipt Number ANYSDC-21854738)Document filed by Steven Husson..(Linkh, Gregory) (Entered: 09/25/2020) |
| 09/25/2020 | 2 | CIVIL COVER SHEET filed..(Linkh, Gregory) (Entered: 09/25/2020) |
| 09/25/2020 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Garrett Motion Inc., Olivier Rabiller, Allesandro Gili, Peter Bracke, Sean Deason, and Su Ping Lu, re: 1 Complaint. Document filed by Steven Husson..(Linkh, Gregory) (Entered: 09/25/2020) |
| 09/28/2020 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Gregory Bradley Linkh. The party information for the following party/parties has been modified: Steven Husson. The information for the party/parties has been modified for the following reason/reasons: party text was omitted. (dnh) (Entered: 09/28/2020)** |
| 09/28/2020 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge John G. Koeltl. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(dnh) (Entered: 09/28/2020) |
| 09/28/2020 | | Magistrate Judge Kevin Nathaniel Fox is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (dnh) (Entered: 09/28/2020) |
| 09/28/2020 | | Case Designated ECF. (dnh) (Entered: 09/28/2020) |

| 09/28/2020 | 4 | ELECTRONIC SUMMONS ISSUED as to Peter Bracke, Sean Deason, Garrett Motion Inc., Allesandro Gili, Su Ping Lu, Olivier Rabiller..(dnh) (Entered: 09/28/2020) |
| --- | --- | --- |
| 09/28/2020 | 5 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) Garrett Motion Inc.. Document filed by Steven Husson. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)**...(Linkh, Gregory) (Entered: 09/28/2020) |
| 09/29/2020 | | ***NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 5 Notice of Voluntary Dismissal, was reviewed and referred to Judge John G. Koeltl for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (km) (Entered: 09/29/2020)** |
| 10/01/2020 | | NOTICE OF CASE REASSIGNMENT to Judge John Peter Cronan. Judge John G. Koeltl is no longer assigned to the case..(wb) (Entered: 10/01/2020) |
| 10/26/2020 | 6 | NOTICE OF REASSIGNMENT: This case has been reassigned to the undersigned for all purposes. All counsel must familiarize themselves with the Courts Individual Rules, which are available at https://www.nysd.uscourts.gov/hon-john-p-cronan. Counsel for all parties are hereby ORDERED to appear before the undersigned for an Initial Pretrial Conference ("IPTC") in accordance with Rule 16 of the Federal Rules of Civil Procedure on December 7, 2020 at 2:00 p.m. In light of the ongoing COVID-19 pandemic, the Court will conduct the IPTC by teleconference. At the scheduled time, counsel for all parties should call (866) 434-5269, access code 9176261. Absent leave of Court obtained by letter-motion filed before the conference, all pretrial conferences must be attended by the attorney who will serve as principal trial counsel. The Court will hold an IPTC for the related case Gabelli Asset Fund v. Lu, No. 20-cv-8296, on December 7, 2020 at 2:15 p.m. The Court respectfully asks that counsel for both cases be present for both teleconferences. (And as further set forth herein.) SO ORDERED. Initial Conference set for 12/7/2020 at 02:00 PM before Judge John P. Cronan. (Signed by Judge John P. Cronan on 10/23/2020) (jca) (Entered: 10/26/2020) |
| 11/23/2020 | 7 | LETTER MOTION for Extension of Time addressed to Judge John P. Cronan from Gregory B. Linkh dated 11/23/2020. Document filed by Steven Husson..(Linkh, Gregory) (Entered: 11/23/2020) |
| 11/23/2020 | 8 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** PROPOSED ORDER. Document filed by Steven Husson. Related Document Number: 6 ..(Linkh, Gregory) **Proposed Order to be reviewed by Clerk's Office staff.** Modified on 11/23/2020 (km). (Entered: 11/23/2020) |
| 11/23/2020 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Notice to Attorney Gregory Linkh to RE-FILE Document 8 Proposed Order. Use the event type proposed orders, proposed stipulation and order. The document needs to have handwritten signatures of the attorneys. (km) (Entered: 11/23/2020)** |
| 11/23/2020 | 9 | PROPOSED STIPULATION AND ORDER. Document filed by Steven Husson..(Linkh, Gregory) (Entered: 11/23/2020) |

| | | |
|---|---|---|
| 11/24/2020 | [10](#) | MOTION to Appoint David Buchholz to serve as lead plaintiff(s) ., MOTION to Appoint Counsel *The Rosen Law Firm, P.A.*. Document filed by David Buchholz. (Attachments: # [1](#) Text of Proposed Order Proposed Order).(Kim, Phillip) (Entered: 11/24/2020) |
| 11/24/2020 | [11](#) | MEMORANDUM OF LAW in Support re: [10](#) MOTION to Appoint David Buchholz to serve as lead plaintiff(s) . MOTION to Appoint Counsel *The Rosen Law Firm, P.A.* . Document filed by David Buchholz. (Attachments: # [1](#) Exhibit 1 - PSLRA Early Notice, # [2](#) Exhibit 2 - PSLRA Cert., # [3](#) Exhibit 3 - Loss Chart, # [4](#) Exhibit 4 - Firm Resume).(Kim, Phillip) (Entered: 11/24/2020) |
| 11/24/2020 | [12](#) | MOTION to Appoint Counsel *and to Appoint Lead Plaintiff* ., MOTION to Consolidate Cases No. 1:20-cv-07992-JPC; No. 1:20-cv-08296-JPC; and No. 1:20-cv-09279-JPC . Document filed by Investor Club. (Attachments: # [1](#) Text of Proposed Order).(Linkh, Gregory) (Entered: 11/24/2020) |
| 11/24/2020 | [13](#) | MEMORANDUM OF LAW in Support re: [12](#) MOTION to Appoint Counsel *and to Appoint Lead Plaintiff*. MOTION to Consolidate Cases No. 1:20-cv-07992-JPC; No. 1:20-cv-08296-JPC; and No. 1:20-cv-09279-JPC . . Document filed by Investor Club..(Linkh, Gregory) (Entered: 11/24/2020) |
| 11/24/2020 | [14](#) | DECLARATION of Gregory B. Linkh in Support re: [12](#) MOTION to Appoint Counsel *and to Appoint Lead Plaintiff*. MOTION to Consolidate Cases No. 1:20-cv-07992-JPC; No. 1:20-cv-08296-JPC; and No. 1:20-cv-09279-JPC .. Document filed by Investor Club. (Attachments: # [1](#) Exhibit A - Press Release, # [2](#) Exhibit B - Certifications, # [3](#) Exhibit C - Loss Chart, # [4](#) Exhibit D - Joint Declaration, # [5](#) Exhibit E - Firm Resume).(Linkh, Gregory) (Entered: 11/24/2020) |
| 11/24/2020 | [15](#) | MOTION to Appoint Counsel ., MOTION to Appoint The Gabelli Asset Fund; The Gabelli Dividend & Income Trust; The Gabelli Value 25 Fund Inc.; and GAMCO Asset Management Inc. to serve as lead plaintiff(s) ., MOTION to Consolidate Cases 1:20-CV-07992; 1:20-CV-08296; and 1:20-cv-09279-JPC . Document filed by The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., Gamco Asset Management Inc.. (Attachments: # [1](#) Text of Proposed Order).(Entwistle, Andrew) (Entered: 11/24/2020) |
| 11/24/2020 | [16](#) | MEMORANDUM OF LAW in Support re: [15](#) MOTION to Appoint Counsel . MOTION to Appoint The Gabelli Asset Fund; The Gabelli Dividend & Income Trust; The Gabelli Value 25 Fund Inc.; and GAMCO Asset Management Inc. to serve as lead plaintiff(s) . MOTION to Consolidate Cases 1:20-CV-07992; 1:20-CV-08296; and 1:20-cv-09279-JPC . . Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 11/24/2020) |
| 11/24/2020 | [17](#) | DECLARATION of Andrew J. Entwistle in Support re: [15](#) MOTION to Appoint Counsel . MOTION to Appoint The Gabelli Asset Fund; The Gabelli Dividend & Income Trust; The Gabelli Value 25 Fund Inc.; and GAMCO Asset Management Inc. to serve as lead plaintiff(s) . MOTION to Consolidate Cases 1:20-CV-07992; 1:20-CV-08296; and 1:20-cv-09279-JPC .. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E).(Entwistle, Andrew) (Entered: 11/24/2020) |
| 11/24/2020 | [18](#) | MOTION to Consolidate Cases 20-cv-08296 and 20-cv-09279 ., MOTION to Appoint Stanislav Vrubel to serve as lead plaintiff(s) ., MOTION to Approve Counsel . Document filed |

| | | by Stanislav Vrubel..(Lieberman, Jeremy) (Entered: 11/24/2020) |
|---|---|---|
| 11/24/2020 | 19 | PROPOSED ORDER. Document filed by Stanislav Vrubel. Related Document Number: 18 .. (Lieberman, Jeremy) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 11/24/2020) |
| 11/24/2020 | 20 | MEMORANDUM OF LAW in Support re: 18 MOTION to Consolidate Cases 20-cv-08296 and 20-cv-09279 . MOTION to Appoint Stanislav Vrubel to serve as lead plaintiff(s) . MOTION to Approve Counsel . . Document filed by Stanislav Vrubel..(Lieberman, Jeremy) (Entered: 11/24/2020) |
| 11/24/2020 | 21 | DECLARATION of Jeremy A. Lieberman in Support re: 18 MOTION to Consolidate Cases 20-cv-08296 and 20-cv-09279 . MOTION to Appoint Stanislav Vrubel to serve as lead plaintiff(s) . MOTION to Approve Counsel .. Document filed by Stanislav Vrubel. (Attachments: # 1 Exhibit A - Loss Chart, # 2 Exhibit B - Press Release, # 3 Exhibit C - Certification, # 4 Exhibit D - Movant Declaration, # 5 Exhibit E - Firm Resume).(Lieberman, Jeremy) (Entered: 11/24/2020) |
| 11/25/2020 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 19 Proposed Order was reviewed and approved as to form. (km) (Entered: 11/25/2020) |
| 12/04/2020 | 22 | ORDER granting 7 LETTER MOTION for Extension of Time addressed to Judge John P. Cronan from Gregory B. Linkh dated 11/23/2020. Document filed by Steven Husson. Plaintiffs' request is GRANTED. The Initial Pretrial Conference scheduled for December 7, 2020 at 2:00 p.m. is adjourned sine die. SO ORDERED. The following hearing(s) was terminated: Initial Conference. (Signed by Judge John P. Cronan on 12/3/2020) (rjm) (Entered: 12/04/2020) |
| 12/07/2020 | 23 | NOTICE of Withdrawal re: 10 MOTION to Appoint David Buchholz to serve as lead plaintiff(s) . MOTION to Appoint Counsel *The Rosen Law Firm, P.A*.., 11 Memorandum of Law in Support of Motion,. Document filed by David Buchholz..(Kim, Phillip) (Entered: 12/07/2020) |
| 12/08/2020 | 24 | PROPOSED STIPULATION AND ORDER. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 12/08/2020) |
| 12/08/2020 | 25 | LETTER addressed to Judge John P. Cronan from Andrew J. Entwistle dated December 8, 2020 re: Unopposed Stipulation and Proposed Order concerning Lead Plaintiff Motions. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # 1 Text of Proposed Order).(Entwistle, Andrew) (Entered: 12/08/2020) |
| 01/11/2021 | 26 | LETTER addressed to Judge John P. Cronan from Andrew J. Entwistle dated January 11, 2021 re: Letter. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # 1 Exhibit A). (Entwistle, Andrew) (Entered: 01/11/2021) |
| 01/21/2021 | 27 | OPINION AND ORDER: For the reasons stated above, the Gabelli Entities' motion to consolidate the Husson, Gabelli, and Froehlich actions is GRANTED. Future filings in any case herein consolidated shall be filed and docketed only under Case Number 20 Civ. 7992 (JPC). The Clerk of Court is respectfully directed to change the caption of Case Number 20 Civ. 7992 (JPC) to "In re Garrett Motion Inc. Securities Litigation." The Gabelli Entities' motion for appointment as lead plaintiff is GRANTED, and the Gabelli Entities' motion for approval of selection of lead counsel is GRANTED. The Clerk is respectfully directed to terminate the |

| | | |
|---|---|---|
| | | motion pending at Docket Number 15 in Case Number 20 Civ. 7992. The respective parties withdrew the motions pending at Docket Numbers 10, 12, and 18 in Case Number 20 Civ. 7992. The Clerk of Court is thus respectfully directed to terminate the motions pending at Docket Numbers 10, 12, and 18 in Case Number 20 Civ. 7992. The Clerk of Court is also respectfully directed to terminate the motions pending at Docket Number 11 in Case Number 20 Civ. 8296 and Docket Number 8 in Case Number 20 Civ. 9279. In light of the consolidation of these actions, the Clerk of Court is respectfully directed to close Case Number 20 Civ. 8296 and Case Number 20 Civ. 9279. The Court grants Lead Plaintiff Gabelli Entities leave to file a consolidated amended complaint by February 25, 2021. Defendants shall answer or otherwise respond to the consolidated amended complaint by April 12, 2021. SO ORDERED. (Amended Pleadings due by 2/25/2021., Motions due by 4/12/2021.) (Signed by Judge John P. Cronan on 1/21/2021) (jca) (Entered: 01/21/2021) |
| 02/25/2021 | 28 | NOTICE OF APPEARANCE by Vincent Roger Cappucci on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Cappucci, Vincent) (Entered: 02/25/2021) |
| 02/25/2021 | 29 | NOTICE OF APPEARANCE by Joshua Killion Porter on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Porter, Joshua) (Entered: 02/25/2021) |
| 02/25/2021 | 30 | NOTICE OF APPEARANCE by Andrew Mitchell Sher on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Sher, Andrew) (Entered: 02/25/2021) |
| 02/25/2021 | 31 | NOTICE OF CHANGE OF ADDRESS by Andrew J Entwistle on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. New Address: Entwistle & Cappucci LLP, Frost Bank Tower, 401 Congress Avenue, Suite 1170, Austin, Texas, USA 78701, 512-710-5960..(Entwistle, Andrew) (Entered: 02/25/2021) |
| 02/25/2021 | 32 | AMENDED COMPLAINT amending 1 Complaint against Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Allesandro Gili, Russell James, Su Ping Lu, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier with JURY DEMAND.Document filed by The Gabelli Dividend & Income Trust, Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Value 25 Fund Inc.. Related document: 1 Complaint.. (Entwistle, Andrew) (Entered: 02/25/2021) |
| 02/26/2021 | 33 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent GAMCO Investors, Inc. for Gamco Asset Management Inc.. Document filed by Gamco Asset Management Inc...(Entwistle, Andrew) (Entered: 02/26/2021) |
| 03/26/2021 | 34 | NOTICE OF APPEARANCE by Michael Barry Carlinsky on behalf of Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 03/26/2021) |
| 03/26/2021 | 35 | CONSENT LETTER MOTION for Extension of Time to File *Motion To Dismiss The Consolidated Amended Complaint* addressed to Judge John P. Cronan from Michael B. Carlinsky dated March 26, 2021. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 03/26/2021) |

| 03/26/2021 | [36](#) | ORDER granting [35](#) CONSENT LETTER MOTION for Extension of Time to File Motion To Dismiss The Consolidated Amended Complaint addressed to Judge John P. Cronan from Michael B. Carlinsky dated March 26, 2021. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier. Pursuant to 6.A of the Court's Individual Rules and Practices in Civil Cases, any party seeking to file a motion, must submit a pre-motion letter. Defendants' letter filed March 26, 2021, Dkt. 35, shall serve as the pre-motion letter. Defendants' request is granted. Defendants shall file their motion to dismiss by April 26, 2021. Plaintiffs shall file their opposition by June 25, 2021. Defendants shall file any reply by July 26, 2021. SO ORDERED. (Signed by Judge John P. Cronan on 3/26/2021) (rjm) (Entered: 03/26/2021) |
| 03/26/2021 | | Set/Reset Deadlines: Motions due by 4/26/2021. Responses due by 6/25/2021. Replies due by 7/26/2021. (rjm) (Entered: 03/26/2021) |
| 04/22/2021 | [37](#) | JOINT LETTER MOTION for Extension of Time addressed to Judge John P. Cronan from Andrew J. Entwistle and Michael Carlinsky dated April 22, 2021. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 04/22/2021) |
| 04/23/2021 | [38](#) | ORDER granting [37](#) Letter Motion for Extension of Time. The parties' request is granted. The briefing deadlines for Defendants' motion to dismiss are held in abeyance pending the Bankruptcy Court's decision. The parties are directed to file a status letter within 14 days of the Bankruptcy Court's decision, apprising the Court as to whether Plaintiffs will be filing a Second Amended Complaint and including a proposed updated briefing schedule for Defendants' motion to dismiss. SO ORDERED. (Signed by Judge John P. Cronan on 4/22/21) (yv) (Entered: 04/23/2021) |
| 05/25/2021 | [39](#) | JOINT LETTER addressed to Judge John P. Cronan from Andrew J. Entwistle and Michael Carlinsky dated May 25, 2021 re: Update on May 18, 2021 Hearing in Related Bankruptcy Proceedings. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 05/25/2021) |
| 05/25/2021 | [40](#) | MEMO ENDORSEMENT on re: [39](#) JOINT LETTER addressed to Judge John P. Cronan from Andrew J. Entwistle and Michael Carlinsky dated May 25, 2021 re: Update on May 18, 2021 Hearing in Related Bankruptcy Proceedings. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc. ENDORSEMENT: The parties' request is granted. The abeyance of the briefing deadlines for Defendants' motion to dismiss shall be continued. The parties are directed to file a status letter with this Court within 14 days of the Bankruptcy Court's decision. SO ORDERED. (Signed by Judge John P. Cronan on 5/25/2021) (rjm) (Entered: 05/25/2021) |
| 07/08/2021 | [41](#) | JOINT LETTER addressed to Judge John P. Cronan from Andrew J. Entwistle and Michael Carlinsky dated July 8, 2021 re: Bankruptcy Court Order and Proposed Schedule for Amended Complaint and Briefing Schedule. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc... (Entwistle, Andrew) (Entered: 07/08/2021) |
| 07/10/2021 | [42](#) | MEMO ENDORSEMENT re: [41](#) Letter, filed by The Gabelli Value 25 Fund Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, Gamco Asset Management Inc. ENDORSEMENT: The Court adopts the parties' proposed schedule., (Amended Pleadings due |

| | | |
|---|---|---|
| | | by 7/22/2021., Motions due by 8/11/2021., Responses due by 10/11/2021, Replies due by 11/24/2021.) (Signed by Judge John P. Cronan on 7/9/2021) (nb) (Entered: 07/12/2021) |
| 07/22/2021 | [43](#) | SECOND AMENDED COMPLAINT amending [32](#) Amended Complaint, against Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Su Ping Lu, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier with JURY DEMAND.Document filed by The Gabelli Dividend & Income Trust, Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Value 25 Fund Inc.. Related document: [32](#) Amended Complaint,..(Entwistle, Andrew) (Entered: 07/22/2021) |
| 08/04/2021 | [44](#) | NOTICE OF APPEARANCE by Jaclyn Marie Palmerson on behalf of Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Palmerson, Jaclyn) (Entered: 08/04/2021) |
| 08/04/2021 | [45](#) | NOTICE OF APPEARANCE by Michael Barry Carlinsky on behalf of Garrett Motion Inc... (Carlinsky, Michael) (Entered: 08/04/2021) |
| 08/04/2021 | [46](#) | NOTICE OF APPEARANCE by Jacob J Waldman on behalf of Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Waldman, Jacob) (Entered: 08/04/2021) |
| 08/04/2021 | [47](#) | NOTICE OF APPEARANCE by Jeremy Andrew Baldoni on behalf of Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Baldoni, Jeremy) (Entered: 08/04/2021) |
| 08/06/2021 | [48](#) | LETTER MOTION for Leave to File Excess Pages addressed to Judge John P. Cronan from Michael B. Carlinsky dated August 6, 2021. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 08/06/2021) |
| 08/09/2021 | [49](#) | ORDER granting [48](#) LETTER MOTION for Leave to File Excess Pages. This request is granted. Defendants may file a memorandum of law in support of their anticipated motion to dismiss not to exceed 40 pages, and Plaintiffs may file a memorandum of law in opposition to that motion also not to exceed 40 pages. SO ORDERED. (Signed by Judge John P. Cronan on 8/9/2021) (jca) (Entered: 08/09/2021) |
| 08/11/2021 | [50](#) | NOTICE OF APPEARANCE by Sandra C Goldstein on behalf of Su Ping Lu..(Goldstein, Sandra) (Entered: 08/11/2021) |
| 08/11/2021 | [51](#) | NOTICE OF APPEARANCE by Stefan H. Atkinson on behalf of Su Ping Lu..(Atkinson, Stefan) (Entered: 08/11/2021) |
| 08/11/2021 | [52](#) | NOTICE OF APPEARANCE by Rachel Marie Fritzler on behalf of Su Ping Lu..(Fritzler, Rachel) (Entered: 08/11/2021) |
| 08/11/2021 | [53](#) | NOTICE OF APPEARANCE by Madelyn Morris on behalf of Su Ping Lu..(Morris, Madelyn) (Entered: 08/11/2021) |

| 08/11/2021 | [54] | MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law*. Document filed by Su Ping Lu..(Goldstein, Sandra) (Entered: 08/11/2021) |
|---|---|---|
| 08/11/2021 | [55] | MEMORANDUM OF LAW in Support re: [54] MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law*. . Document filed by Su Ping Lu. (Attachments: # [1] Appendix A).(Goldstein, Sandra) (Entered: 08/11/2021) |
| 08/11/2021 | [56] | DECLARATION of Madelyn Morris in Support re: [54] MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law*.. Document filed by Su Ping Lu. (Attachments: # [1] Exhibit 1, # [2] Exhibit 2, # [3] Exhibit 3, # [4] Exhibit 4, # [5] Exhibit 5, # [6] Exhibit 6, # [7] Exhibit 7, # [8] Exhibit 8, # [9] Exhibit 9).(Morris, Madelyn) (Entered: 08/11/2021) |
| 08/11/2021 | [57] | MOTION to Dismiss *THE SECOND AMENDED COMPLAINT*. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 08/11/2021) |
| 08/11/2021 | [58] | MEMORANDUM OF LAW in Support re: [57] MOTION to Dismiss *THE SECOND AMENDED COMPLAINT*. . Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier. (Attachments: # [1] Appendix 1).(Carlinsky, Michael) (Entered: 08/11/2021) |
| 08/11/2021 | [59] | DECLARATION of Michael B. Carlinsky in Support re: [57] MOTION to Dismiss *THE SECOND AMENDED COMPLAINT*.. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F, # [7] Exhibit G, # [8] Exhibit H, # [9] Exhibit I, # [10] Exhibit J, # [11] Exhibit K, # [12] Exhibit L, # [13] Exhibit M, # [14] Exhibit N, # [15] Exhibit O, # [16] Exhibit P, # [17] Exhibit Q, # [18] Exhibit R). (Carlinsky, Michael) (Entered: 08/11/2021) |
| 08/19/2021 | [60] | **FILING ERROR - CORPORATE PARENT/OTHER AFFILIATE NOT ADDED -** RULE 7.1 CORPORATE DISCLOSURE STATEMENT.. Document filed by Garrett Motion Inc...(Carlinsky, Michael) Modified on 8/20/2021 (lb). (Entered: 08/19/2021) |
| 08/20/2021 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Michael Barry Carlinsky to RE-FILE Document [60] Rule 7.1 Corporate Disclosure Statement. ERROR(S): Corporate Parents were not added. Please re-file this document and when prompted: Are there any corporate parents or other affiliates?, select the YES radio button and enter the Corporate Parent(s) or Affiliate(s). YOU MUST SELECT THE SEARCH BUTTON. Select the correct name or create a new corporate parent. Add the Corporate Parent(s) or Affiliate(s) one party name at a time. (lb)** (Entered: 08/20/2021) |
| 08/23/2021 | [61] | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Oaktree Capital Group, LLC, Other Affiliate Honeywell International Inc. for Garrett Motion Inc.. Document filed by Garrett Motion Inc...(Carlinsky, Michael) (Entered: 08/23/2021) |

| | | |
|---|---|---|
| 08/24/2021 | 62 | MOTION for Michael Ethan Liftik to Appear Pro Hac Vice receipt number ANYSDC-24974537 . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier. (Attachments: # 1 Affidavit of Michael Liftik in Support, # 2 Certificate of Good Standing issued by the District of Columbia bar, # 3 Certificate of Good Standing issued by the Supreme Judicial Court of Massachusetts, # 4 Certificate of Good Standing issued by the Supreme Court of California, # 5 Text of Proposed Order).(Liftik, Michael) Modified on 8/25/2021 (bcu). (Entered: 08/24/2021) |
| 08/25/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 62 MOTION for Michael Ethan Liftik to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 08/25/2021) |
| 08/25/2021 | 63 | ORDER granting 62 Motion for Michael Ethan Liftik to Appear Pro Hac Vice (HEREBY ORDERED by Judge John P. Cronan)(Text Only Order) (mhe) (Entered: 08/25/2021) |
| 10/08/2021 | 64 | LETTER MOTION for Extension of Time addressed to Judge John P. Cronan from Andrew J. Entwistle dated October 8, 2021. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc... (Entwistle, Andrew) (Entered: 10/08/2021) |
| 10/12/2021 | 65 | ORDER granting 64 LETTER MOTION for Extension of Time. Lead Plaintiffs' request is granted. Lead Plaintiffs shall file their opposition to defendants' motion to dismiss by October 26, 2021. Defendant shall file any replies by December 8, 2021. SO ORDERED. (Signed by Judge John P. Cronan on 10/12/2021) (jca) (Entered: 10/12/2021) |
| 10/12/2021 | | Set/Reset Deadlines: Responses due by 10/26/2021 Replies due by 12/8/2021. (jca) (Entered: 10/12/2021) |
| 10/26/2021 | 66 | MEMORANDUM OF LAW in Opposition re: 54 MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law.* . Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 10/26/2021) |
| 10/26/2021 | 67 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE DOCUMENT #69) -** MEMORANDUM OF LAW in Opposition re: 57 MOTION to Dismiss *THE SECOND AMENDED COMPLAINT.* . Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) Modified on 10/27/2021 (ldi). (Entered: 10/26/2021) |
| 10/26/2021 | 68 | DECLARATION of Andrew J. Entwistle in Opposition re: 54 MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law.*, 57 MOTION to Dismiss *THE SECOND AMENDED COMPLAINT.*. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Entwistle, Andrew) (Entered: 10/26/2021) |
| 10/26/2021 | 69 | MEMORANDUM OF LAW in Opposition re: 54 MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law.*, 57 |

| | | MOTION to Dismiss *THE SECOND AMENDED COMPLAINT*. . Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc...(Entwistle, Andrew) (Entered: 10/26/2021) |
|---|---|---|
| 11/19/2021 | 70 | MOTION for Callie D. Crispin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25359578. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit A - Certificate of Good Standing, # 3 Text of Proposed Order).(Crispin, Callie) (Entered: 11/19/2021) |
| 11/22/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 70 MOTION for Callie D. Crispin to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25359578. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 11/22/2021) |
| 11/29/2021 | 71 | ORDER granting 70 Motion for Callie D. Crispin to Appear Pro Hac Vice (HEREBY ORDERED by Judge John P. Cronan)(Text Only Order) (mhe) (Entered: 11/29/2021) |
| 12/06/2021 | 72 | LETTER MOTION for Leave to File Excess Pages addressed to Judge John P. Cronan from Michael B. Carlinsky dated December 6, 2021. Document filed by Peter Bracke, Sean Deason, Garrett Motion Inc., Allesandro Gili, Olivier Rabiller..(Carlinsky, Michael) (Entered: 12/06/2021) |
| 12/07/2021 | 73 | ORDER granting 72 LETTER MOTION for Leave to File Excess Pages. This request is granted. Plaintiff may file a reply brief not exceeding 20 pages. SO ORDERED. (Signed by Judge John P. Cronan on 12/7/2021) (jca) (Entered: 12/07/2021) |
| 12/08/2021 | 74 | REPLY MEMORANDUM OF LAW in Support re: 54 MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law*. . Document filed by Su Ping Lu..(Goldstein, Sandra) (Entered: 12/08/2021) |
| 12/08/2021 | 75 | REPLY MEMORANDUM OF LAW in Support re: 57 MOTION to Dismiss *THE SECOND AMENDED COMPLAINT*. . Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 12/08/2021) |
| 12/08/2021 | 76 | LETTER MOTION for Oral Argument *regarding Motion to Dismiss the Second Amended Complaint* addressed to Judge John P. Cronan from Michael B. Carlinsky dated December 8, 2021. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Allesandro Gili, Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 12/08/2021) |
| 01/12/2022 | 77 | NOTICE OF CHANGE OF ADDRESS by Andrew J Entwistle on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. New Address: Enwistle & Cappucci LLP, 500 West 2nd Street, Suite 1900, Austin, TX, United States 78701, 512-710-5960..(Entwistle, Andrew) (Entered: 01/12/2022) |
| 01/12/2022 | 78 | NOTICE OF CHANGE OF ADDRESS by Callie Crispin on behalf of Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. New Address: Enwistle & Cappucci LLP, 500 West 2nd Street, Suite 1900, Austin, TX, United States 78701, 512-710-5960..(Crispin, Callie) (Entered: 01/12/2022) |

| 02/07/2022 | | Magistrate Judge Jennifer Willis is so redesignated. (wb) (Entered: 02/07/2022) |
|---|---|---|
| 03/10/2022 | 79 | ORDER granting 76 LETTER MOTION for Oral Argument regarding Motion to Dismiss the Second Amended Complaint. On March 28, 2022, at 3:00 p.m. the parties shall appear for oral argument on Defendants' motions to dismiss Plaintiffs' Second Amended Complaint. See Dkts. 54, 57. The argument will take place in Courtroom 12D of 500 Pearl Street, New York, NY 10007. The Clerk of the Court is respectfully directed to close the motion pending at Docket Number 76. SO ORDERED. (Signed by Judge John P. Cronan on 3/9/2022) (jca) (Entered: 03/10/2022) |
| 03/10/2022 | | Set/Reset Hearings: Oral Argument set for 3/28/2022 at 03:00 PM in Courtroom 12D, 500 Pearl Street, New York, NY 10007 before Judge John P. Cronan. (jca) (Entered: 03/10/2022) |
| 03/28/2022 | | Minute Entry for proceedings held before Judge John P. Cronan: Oral Argument held on March 28, 2022. The Court held the scheduled oral argument on Defendants' motions for summary judgment. (Court Reporter Michael McDaniel). (mhe) (Entered: 04/08/2022) |
| 03/30/2022 | 80 | TRANSCRIPT of Proceedings re: CONFERENCE held on 3/28/2022 before Judge John P. Cronan. Court Reporter/Transcriber: Michael McDaniel, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/20/2022. Redacted Transcript Deadline set for 5/2/2022. Release of Transcript Restriction set for 6/28/2022.Filed In Associated Cases: 1:20-cv-07992-JPC, 1:20-cv-08296-JPC, 1:20-cv-09279-JPC.(Moya, Goretti) (Entered: 03/30/2022) |
| 03/30/2022 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 3/28/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...Filed In Associated Cases: 1:20-cv-07992-JPC, 1:20-cv-08296-JPC, 1:20-cv-09279-JPC.(Moya, Goretti) (Entered: 03/30/2022) |
| 03/31/2022 | 82 | OPINION AND ORDER re: 54 MOTION to Dismiss *Count IV of the Second Consolidated Amended Complaint for Violations of Federal Securities Law.* filed by Su Ping Lu, 57 MOTION to Dismiss *THE SECOND AMENDED COMPLAINT.* filed by Allesandro Gili, Garrett Motion Inc., Peter Bracke, Susan L. Main, Maura J. Clark, Sean Deason, Russell James, Scott A. Tozier, Courtney M. Enghauser, Carsten Reinhardt, Olivier Rabiller, Carlos M. Cardoso. For all the reasons given, the Court grants Defendants' motions to dismiss. The Court dismisses with prejudice all claims against Lu. The Court dismisses without prejudice the claims against the Garrett Defendants. If Plaintiffs choose to do so, they have thirty days to file a Third Amended Complaint. Failure to file a Third Amended Complaint within thirty days, and without good cause to excuse such failure, will result in the dismissal of Plaintiffs' claims against the Garrett Defendants with prejudice. The Clerk of the Court is respectfully directed to close the motions pending at Docket Numbers 54 and 57 and to terminate Defendant Su Ping Lu from the case. SO ORDERED. Su Ping Lu terminated. (Signed by Judge John P. Cronan on 3/31/2022) (jca) (Entered: 03/31/2022) |
| 05/02/2022 | 83 | **FILING ERROR - DEFICIENT PLEADING - FRCP RULE 15 NON- COMPLIANCE** THIRD AMENDED COMPLAINT amending 43 Amended Complaint against Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion |

| | | |
|---|---|---|
| | | Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier with JURY DEMAND.Document filed by The Gabelli Dividend & Income Trust, Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Value 25 Fund Inc.. Related document: [43](#) Amended Complaint.(Entwistle, Andrew) Modified on 5/3/2022 (sj). (Entered: 05/02/2022) |
| 05/03/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Andrew J Entwistle re: Document No. [83](#) Amended Complaint. The filing is deficient for the following reason(s): Court's leave has not been granted. File the Exhibit to Pleading event found under the event list Other Documents and attach either opposing party's written consent or Court's leave. (sj) (Entered: 05/03/2022) |
| 05/04/2022 | [84](#) | LETTER addressed to Judge John P. Cronan from Michael B. Carlinsky dated May 4, 2022 re: Requesting a briefing schedule to Defendants' Motion to Dismiss. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier.. (Carlinsky, Michael) (Entered: 05/04/2022) |
| 05/04/2022 | [85](#) | MEMO ENDORSEMENT on re: [84](#) Letter, filed by Garrett Motion Inc., Peter Bracke, Susan L. Main, Maura J. Clark, Sean Deason, Russell James, Scott A. Tozier, Courtney M. Enghauser, Carsten Reinhardt, Olivier Rabiller, Carlos M. Cardoso. ENDORSEMENT: The Court grants the parties' proposed briefing schedule on Defendants' motion to dismiss. Defendants shall file the motion to dismiss by June 24, 2022. Opposition is due by August 16, 2022. And a reply, if any, is due by September 15, 2022. The Clerk of the Court is respectfully directed to accept the pleading at Docket Number 83. The Court granted leave to file a Third Amended Complaint by April 30, 2022. See Dkt. 82 at 39. Although the Third Amended Complaint was not filed until May 2, 2022, see Dkt. 83, the Court sua sponte extends the deadline to May 2, 2022 because justice so requires, see Fed. R. Civ. P. 15(a)(2). SO ORDERED. (Motions due by 6/24/2022., Responses due by 8/16/2022, Replies due by 9/15/2022.) (Signed by Judge John P. Cronan on 5/4/2022) (jca) (Entered: 05/04/2022) |
| 06/24/2022 | [86](#) | MOTION to Dismiss *the Third Amended Complaint*. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 06/24/2022) |
| 06/24/2022 | [87](#) | MEMORANDUM OF LAW in Support re: [86](#) MOTION to Dismiss *the Third Amended Complaint*. . Document filed by Peter Bracke, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Scott A. Tozier. (Attachments: # [1](#) Appendix 1).(Carlinsky, Michael) (Entered: 06/24/2022) |
| 06/24/2022 | [88](#) | DECLARATION of Michael B. Carlinsky in Support re: [86](#) MOTION to Dismiss *the Third Amended Complaint*.. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I, # [10](#) Exhibit J, # [11](#) Exhibit K, # [12](#) Exhibit L, # [13](#) Exhibit M, # [14](#) Exhibit N, # [15](#) Exhibit O, # [16](#) Exhibit P, # [17](#) Exhibit Q, # [18](#) Exhibit R).(Carlinsky, Michael) (Entered: 06/24/2022) |
| 06/24/2022 | [89](#) | LETTER MOTION for Oral Argument addressed to Judge John P. Cronan from Michael B. Carlinsky dated June 24, 2022. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. |

| | | |
|---|---|---|
| | | Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 06/24/2022) |
| 08/16/2022 | 90 | MEMORANDUM OF LAW in Opposition re: 86 MOTION to Dismiss *the Third Amended Complaint.* . Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. (Attachments: # 1 Appendix A - Falsity Chart, # 2 Appendix B - Puffery Chart, # 3 Appendix C - Safe Harbor Chart). (Entwistle, Andrew) (Entered: 08/16/2022) |
| 09/07/2022 | 91 | LETTER MOTION for Extension of Time to File Response/Reply *consented to* addressed to Judge John P. Cronan from Michael B. Carlinsky dated September 7, 2022. Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 09/07/2022) |
| 09/08/2022 | 92 | ORDER granting 91 Letter Motion for Extension of Time to File Response/Reply re 91 LETTER MOTION for Extension of Time to File Response/Reply *consented to* addressed to Judge John P. Cronan from Michael B. Carlinsky dated September 7, 2022. The request is granted. Defendants will file their Reply in Support of the Motion to Dismiss by September 23, 2022. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 91. SO ORDERED. Replies due by 9/23/2022. (Signed by Judge John P. Cronan on 9/8/2022) (jca) (Entered: 09/08/2022) |
| 09/22/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Jennifer L. Rochon. Judge John P. Cronan is no longer assigned to the case..(gp) (Entered: 09/22/2022) |
| 09/22/2022 | 93 | NOTICE OF REASSIGNMENT This case has been reassigned to the undersigned. All counsel must familiarize themselves with the Court's Individual Rules, which are available at https://nysd.uscourts.gov/hon-jennifer-l-rochon. Unless and until the Court orders otherwise, all prior orders, dates, and deadlines shall remain in effect notwithstanding the case's reassignment. Any conference or oral argument before or directed by the Magistrate Judge will proceed as ordered. However, all previously-scheduled appearances or conferences before the District Judge are hereby adjourned pending further notice from the Court. Additionally, within two weeks of the filing of this Order, the parties are hereby ORDERED to file on ECF a joint letter updating the Court on the status of the case. The joint letter shall not exceed four (4) pages. If this case has been settled or otherwise terminated, counsel need not submit such letter or appear, provided that a stipulation of discontinuance, voluntary dismissal, or other proof of termination is filed on the docket prior to the joint letter submission deadline, using the appropriate ECF Filing Event. See SDNY ECF Rules & Instructions §§ 13.17-13.19, available at http://nysd.uscourts.gov/ecf_filing.php. Requests for extensions or adjournment of dates not affected by this Order may be made only in accordance with the Court's Individual Rules and Practices, which are available at https://nysd.uscourts.gov/hon-jennifer-l-rochon. (And as further set forth herein.) SO ORDERED. (Signed by Judge Jennifer L. Rochon on 9/22/2022) (jca) (Entered: 09/22/2022) |
| 09/23/2022 | 94 | REPLY MEMORANDUM OF LAW in Support re: 86 MOTION to Dismiss *the Third Amended Complaint.* . Document filed by Peter Bracke, Carlos M. Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 09/23/2022) |
| 09/30/2022 | 95 | JOINT LETTER addressed to Judge Jennifer L. Rochon from Michael B. Carlinsky and Andrew J. Entwistle dated September 30, 2022 re: Status. Document filed by Peter Bracke, Carlos M. |

| | | |
|---|---|---|
| | | Cardoso, Maura J. Clark, Sean Deason, Courtney M. Enghauser, Garrett Motion Inc., Russell James, Susan L. Main, Olivier Rabiller, Carsten Reinhardt, Scott A. Tozier..(Carlinsky, Michael) (Entered: 09/30/2022) |
| 03/31/2023 | 96 | OPINION AND ORDER re: 86 MOTION to Dismiss *the Third Amended Complaint*. filed by Garrett Motion Inc., Peter Bracke, Susan L. Main, Maura J. Clark, Sean Deason, Russell James, Scott A. Tozier, Courtney M. Enghauser, Carsten Reinhardt, Olivier Rabiller, Carlos M. Cardoso. For the foregoing reasons, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."). The Clerk of Court is respectfully directed to CLOSE this case. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 3/31/2023) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/31/2023) |
| 03/31/2023 | 97 | ORDER terminating 89 Letter Motion for Oral Argument. (HEREBY ORDERED by Judge Jennifer L. Rochon) (Text Only Order) (dbk) (Entered: 03/31/2023) |
| 03/31/2023 | 98 | CLERK'S JUDGMENT re: 96 Memorandum & Opinion in favor of Garrett Motion Inc., Allesandro Gili, Olivier Rabiller, Peter Bracke, Sean Deason against Steven Husson. It is, ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated March 31, 2023, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."); accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/31/2023) (Attachments: # 1 Appeal Package) (km) (Entered: 04/03/2023) |
| 03/31/2023 | | Terminate Transcript Deadlines (km) (Entered: 04/03/2023) |
| 04/19/2023 | 99 | NOTICE OF APPEAL from 96 Memorandum & Opinion,,,,. Document filed by Gamco Asset Management Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc.. Filing fee $ 505.00, receipt number ANYSDC-27625894. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A - Opinion & Order dated March 31, 2023).(Entwistle, Andrew) Modified on 4/19/2023 (nd). (Entered: 04/19/2023) |
| 04/19/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 99 Notice of Appeal,..(nd) (Entered: 04/19/2023) |
| 04/19/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 99 Notice of Appeal, filed by The Gabelli Value 25 Fund Inc., The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, Gamco Asset Management Inc. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 04/19/2023) |

PACER Service Center

| Transaction Receipt | | | |
|---|---|---|---|
| 05/02/2023 12:00:01 | | | |
| **PACER Login:** | entwistlepacer | **Client Code:** | 07796.13.fef |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-07992-JLR |
| **Billable Pages:** | 24 | **Cost:** | 2.40 |

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

Case No. 1:20-cv-07992 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., and GAMCO Asset Management Inc. (together, "Plaintiffs") bring this consolidated, purported class action against Garrett Motion Inc. ("Garrett") and several of its directors and officers, including Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos M. Cardoso, Maura J. Clark, Courtney M. Enghauser, Susan L. Main, Carsten J. Reinhardt, and Scott A. Tozier (together, "Director and Officer Defendants" and together with Garrett, "All Defendants" or "Defendants"), alleging violations of Section 10(b) of the Exchange Act as to All Defendants, and violations of Section 20(a) of the Exchange Act as to the Director and Officer Defendants. ECF No. 83 ("Third Amended Complaint," "Complaint," or "TAC") ¶¶ 1, 31-42, 160-181. Since the commencement of this action, Plaintiffs' Second Amended Complaint was dismissed, with leave to replead, on the grounds that Plaintiffs had failed to adequately plead scienter. *See generally* ECF No. 82 ("March 2022 Opinion"); *In re Garrett Motion Inc. Sec. Litig.* (*Garrett I*), No. 20-cv-7992 (JPC), 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022). Now before the Court is Defendants' motion to dismiss the Third Amended Complaint.

ECF No. 86; ECF No. 87 ("Br.").[1]  For the reasons that follow, Defendants' motion to dismiss is

GRANTED.

## BACKGROUND[2]

The Court assumes the parties' familiarity with the facts underlying this case, the

background of Garrett's spin-off from Honeywell International Inc. ("Honeywell"), and the

subsequent struggles Garrett faced before it filed for bankruptcy in September 2020, all of which

are articulated in the Court's March 31, 2022 Opinion and Order.  *See Garrett I*, 2022 WL

976269, at *2-6.  For purposes of this Opinion, however, the Court will summarize the factual

allegations set forth in the Third Amended Complaint, with a particular focus on the facts alleged

with respect to the narrowed class period in the Third Amended Complaint:  February 27, 2020

---

[1] Plaintiffs filed their Third Amended Complaint on May 2, 2022.  *See* TAC.  Defendants moved
to dismiss the Third Amended Complaint on June 24, 2022.  *See* Br.  On August 18, 2022,
Plaintiffs filed their opposition to the motion.  *See* ECF No. 90 ("Opp.").  On September 22,
2022, the case was reassigned to the undersigned.  ECF No. 93.  On September 23, 2022,
Defendants filed their reply brief in further support of their motion.  *See* ECF No. 94 ("Reply").
Defendants also requested oral argument on the motion.  *See* ECF No. 89.  However, in the
exercise of its discretion, the Court denies that motion as the briefing was extensive and oral
argument would not be helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral
argument rests within its discretion" (citation omitted)).

[2] Unless otherwise stated, the allegations stated herein come from the Third Amended
Complaint, and notwithstanding the "[e]xacting pleading requirements" of the Private Securities
Litigation Reform Act that apply in this case, "as with any motion to dismiss for failure to plead
a claim on which relief can be granted," the Court must "accept all factual allegations in the
complaint as true."  *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 322 (2007).
The Court at this stage may consider, among other things, documents attached to the complaint,
statements or documents incorporated by reference in the complaint, and legally required public
disclosures filed with the U.S. Securities and Exchange Commission ("SEC").  *See Tongue v.
Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  "The Court also considers facts drawn from the news
releases, financial reports, and transcripts of earnings calls that contain the statements that
Plaintiff alleges were false or misleading, and which are incorporated into the Complaint by
reference."  *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 221 (S.D.N.Y. 2021) (citing
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  All emphases from
the Complaint and other papers are omitted unless otherwise indicated.

through September 18, 2020 ("Class Period").  *See* TAC ¶ 1.  The Court will also briefly

summarize its March 2022 Opinion, which articulated many similar principles at issue in the

present motion.

### A.    Factual Background

In October 2018, Honeywell spun-off its transportation systems division, Garrett, into a

stand-alone company (the "Spin-Off").  TAC ¶¶ 4, 31, 43.  That company was incorporated in

Delaware, with its headquarters located in Rolle, Switzerland.  *Id.* ¶ 31.  As part of the Spin-Off,

however, Honeywell saddled Garrett with massive amounts of debt, liabilities, and other

encumbrances.  *Id.* ¶ 44.[3]  The three contracts (the Indemnification Agreement, the Credit

Agreement, and the Tax Matters Agreement, which together will be referred to as the

"Honeywell Obligations") that formed – and severely restricted – Garrett's capital structure are

explained in detail in the March 2022 Opinion.  *See Garrett I*, 2022 WL 976269, at *3-5.  As

relevant here, the Indemnification Agreement required Garrett to indemnify Honeywell "for

certain asbestos liabilities" up to $5.25 billion.  TAC ¶ 45.  The Indemnification Agreement also

restricted the types of transactions Garrett could engage in, and "effectively provided Honeywell

with an absolute veto over any Garrett transaction outside of the ordinary course of business."

*Id.*  Through the Credit Agreement, Garrett assumed significant debt "to fund a $1.6 billion

'dividend' to Honeywell."  *Id.* ¶ 46.  The loans were not scheduled to mature until September 26,

2023 and September 27, 2025.  *Id*.  Finally, Garrett entered into the Tax Matters Agreement,

under which Honeywell required Garrett to reimburse it for certain tax obligations.  *Id.* ¶ 47.

---

[3] Although Honeywell spun off Garrett to avoid billions of dollars in asbestos-related liability,
the propriety of that move is not at issue in this case.  *See Garrett I*, 2022 WL 976269, at *1.

Despite these significant encumbrances, prior to the Class Period, Defendants allegedly regularly lauded Garrett's "superior technology and R&D funding and growth plan" (*id.* ¶ 49), and bragged to investors about its "financial health, flexibility[,] and resiliency" (*id.* ¶ 50). However, from the time of the Spin-Off until the Class Period began on February 27, 2020, Plaintiffs allege that Defendants were developing deeper knowledge into the "undisclosed impacts [of] the inherited capital structure and related Honeywell Obligations." *Id.* ¶ 51. Plaintiffs rely on statements made during the September 2020 bankruptcy proceeding to argue that the company and Board were aware of the significant challenges inherent in Garrett's capital structure, and knew (as of February 27, 2020) that "the inherited capital structure was not resilient, that it was ill suited to any market issues, and, of course, that Garrett was already in the process of pursuing restructuring." *Id.* ¶ 66.

Defendants' knowledge, according to Plaintiffs, began to evolve immediately after the Spin-Off, when the Board was aware that "Garrett's leverage ratio grossly exceeded industry standards." *Id.* ¶ 52. Plaintiffs allege that, "[s]ince the Spin-Off, [Garrett] has struggled with the capital structure Honeywell foisted upon it, which is not sustainable and puts [Garrett] at a substantial disadvantage to its competitors." *Id.* ¶ 53 (citing Quinn Application, *Garrett Motion Inc., et al.*, 20-bk-12212 (Bankr. S.D.N.Y. Sept. 30, 2020), ECF No. 137 ("Quinn Bankr. Application")). Plaintiffs further allege that, prior to the Class Period, in early 2019, Garrett's Board retained (1) financial advisors from Morgan Stanley & Co. LLC ("Morgan Stanley") in order to conduct a strategic review of Garrett's operations only months after the Spin-Off (TAC ¶ 54), and (2) the law firm Quinn Emanuel to review the legality of the Indemnity Agreement and other Honeywell Obligations which impacted Garrett's business (*id.* ¶ 55). Additionally, Garrett attempted to negotiate the terms of the Indemnity Agreement to be less restrictive.

*Id.* ¶ 56.  Plaintiffs allege that these facts demonstrate that, prior to the Class Period, "Defendants understood the enormous impact the Honeywell Obligations and resulting capital structure were having on Garrett's business," and they were attempting to "find a way out of the restrictive underlying agreements."  *Id.* ¶ 56.

Plaintiffs also contend that filings made in the bankruptcy proceeding demonstrate that Garrett's "capital structure and Indemnification Agreement would make it impossible" for Garrett to succeed for four reasons, all allegedly known to Defendants:  (1) the "precarious balance sheet" – replete with debt and other restrictive obligations from the Spin-Off – made it difficult to maintain business with original equipment manufacturers ("OEMs"), who require bids years out of the actual production of vehicles, and who have competing offers from competitors who are not as overleveraged (*see id.* ¶¶ 57-58);[4] (2) Garrett's leverage and indemnity obligations "effectively preclude[d]" it from adapting to a fast-changing automotive industry because it would not be able to "engag[e] in strategic acquisitions or other consolidation" (*id.* ¶ 59); (3) Garrett's leverage also made it difficult to invest in research and development, a necessary area of focus given the fast-changing industry (*id.* ¶ 60); and (4) "no lender or investor" would provide new capital "subordinated to both [Garrett's] funded debt and its indemnity obligations," making it difficult for Garrett to secure such equity capital (*id.* ¶ 61). In support of these allegations – and as apparent evidence that Defendant knew about these

---

[4] Plaintiffs allege that Garrett's customers "had growing concerns about" Garrett's financials, and cite to statements made in the bankruptcy proceeding in support of this allegation.  TAC ¶ 58.  But the filing – CFO Sean Deason's September 20, 2020 Declaration (*see* ECF No. 15, 20-bk-12212 & ECF No. 88-10, Ex. J to Br. ("Deason Decl.")), which is incorporated by reference into the Third Amended Complaint – is not so specific, and states that "concerns among OEMs and suppliers will grow as [Garrett's] technological advantages decline with underinvestment."  Deason Decl. ¶ 68.

hindrances – Plaintiffs cite to Garrett CFO Sean Deason's September 20, 2020 Declaration.  *See Id.* ¶¶ 58-61 (citing Deason Decl. ¶¶ 65-71).

Furthermore, Plaintiffs allege that, "[r]ecognizing the internally known but publicly undisclosed impacts of the inherited capital structure and Honeywell Obligations," Garrett attempted mediation with Honeywell in September 2019, which was ultimately unsuccessful.  *Id.* ¶ 62.  Garrett then launched what Plaintiffs have described as a "Hail-Mary lawsuit" in December 2019 against Honeywell in New York state court, in an attempt to "void certain aspects of the Honeywell Obligations."  *Id.* ¶ 63.  Plaintiffs allege that this litigation was "futile." *Id.*  It was ultimately resolved in 2021 as part of the bankruptcy proceeding.  *Id.* ¶ 2.

Sometime in late 2019, Garrett's Board also "secretly" directed Morgan Stanley to conduct a market test with about 15 entities to assess the possibility of a merger or acquisition. *Id.* ¶ 64.  After conducting that test, in December 2019 and January 2020, Morgan Stanley reported that "multiple financial sponsors" would be interested in a potential transaction "if and only if" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.*, a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation)."  *Id.* ¶ 64 (citing Deason Decl. ¶ 74).  This report led Defendants to retain, on February 1, 2020, Perella Weinberg Partners ("PWP") to further evaluate strategies like a potential restructuring.  *Id.* ¶¶ 11, 64.

Nevertheless, on February 27, 2020, Garrett issued a press release in which Defendant Rabiller touted Garrett's "significant financial flexibility" that made it "well positioned to build upon the progress we achieved during our first full year as an independent company."  *Id.* ¶ 78

(**Statements 1 & 2**); *see* ECF No. 88-9, Ex. I to Br. at 1 ("Feb. 27, 2020 Press Release").[5]  That

same day, in an earnings call, Defendant Rabiller also told investors that Garrett "maintained

[its] strong financial position" and that Garrett's "flexible and resilient business model" provided

"significant flexibility to help mitigate the impact from any short-term fluctuations in the

underlying macro environment[.]"  TAC ¶ 79 (**Statements 3, 4, 6**).  Rabiller further relayed to

investors that, "[g]oing forward, we plan to continue to utilize our strong free cash flow

generation to reduce net debt and deleverage our balance sheet."  *Id.* ¶ 79 (**Statement 5**).  Garrett

also released its Form 10-K, which stated:

> We believe we will meet our known or reasonably likely future cash
> requirements through the combination of cash flows from operating
> activities, available cash balances and available borrowings through
> our debt agreements.  If these sources of liquidity need to be
> augmented, additional cash requirements would likely be financed
> through the issuance of debt or equity securities; however, there can
> be no assurances that we will be able to obtain additional debt or
> equity financing on acceptable terms in the future.  Based upon our
> history of generating strong cash flows, we believe we will be able to
> meet our short-term liquidity needs for at least the next twelve
> months.

*Id.* ¶ 80 (**Statement 7**); ECF No. 88-8, Ex. H to Br., ("Feb. 27, 2020 10-K").[6]  Defendants

Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier signed the February

2020 Form 10-K, in addition to Defendant Rabiller.  TAC ¶¶ 33, 35-41.

---

[5] All numbered statements – the alleged misstatements – are based on the numbering in
Appendix 1 ("Chart of Alleged Misstatements") to Defendants' Brief in Support of their Motion
to Dismiss, *see* ECF No. 87-1, attached hereto, with non-substantive modifications, as Appendix
A.

[6] Plaintiffs also allege that language contained in the February 2020 10-K, the May 2020 10-Q,
and the July 2020 10-Q was false and misleading.  The February 2020 10-K contained risk
factors about the Indemnity Agreement, stating it "may have material adverse effects on our
liquidity and cash flows and on our results of operations, regardless of whether we experience a
decline in net sales," "may also require us to accrue significant long-term liabilities on our
consolidated and combined balance sheet," and that "our access to capital to fund our operations

The COVID-19 or coronavirus pandemic also began to affect Garrett's operations in or about late February 2020.  Plaintiffs allege that Garrett operated a facility in Wuhan, China, a location that was central to the COVID-19 pandemic, and had to pause operations there for a time.  *See id.* ¶ 87.  On March 19, 2020, as part of a "press release announcing [that] its Wuhan, China facility was restarting operations following the COVID pause[,]" Defendant Rabiller emphasized that Garrett's "focus remains on leveraging our flexible and resilient business model."  *Id.* ¶ 87 (**Statement 6**).  By the following day, March 20, 2020, Garrett's Board had retained the law firm Sullivan & Cromwell and consulting firm AlixPartners LLP "to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure."  *Id.* ¶ 64; *see also id.* ¶ 121.

Days later, on April 7, 2020, Garrett issued another press release that provided a pandemic-related update, reported preliminary first quarter financials, and "withdr[ew] the Company's financial guidance for the year ending December 31, 2020."  *Id.* ¶ 88; *see also* ECF No. 88-11, Ex. K to Br. ("April 7, 2020 Press Release").  In that press release, Defendant Rabiller also praised Garrett's actions "to enhance our liquidity and preserve the long-term health of the business," and the expectation that Garrett would rely on its "resilient business model to emerge from this crisis as a stronger company."  TAC ¶ 88 (**Statements 8 & 9**).

Plaintiffs allege that Defendants continued to make false and misleading statements throughout the spring and summer of 2020.  In particular, Plaintiffs point to the following statements on May 11, 2020:

---

may be materially adversely affected."  TAC ¶ 114, 116 (**Statement 19**).  The 10-K also warned that "[o]ur indebtedness could adversely affect our business, financial condition and results of operations."  TAC ¶ 114 (**Statement 19**).  The May 2020 10-Q and July 2020 10-Q incorporated these risk factors by reference.  TAC ¶¶116-118 (**Statement 19**).

- In a press release, Defendant Rabiller announced Garrett's first quarter 2020 financial results, and claimed that Garrett's "positive business fundamentals remain intact" and Garrett's flexibility allowed it "to maintain our agility and strengthen our position for long-term success." *Id.* ¶ 92 (**Statements 10 & 11**); *see* ECF No. 88-14, Ex. N to Br. at 1 ("May 11, 2020 Press Release").

- In an earnings call, Defendants Rabiller and Bracke boasted that Garrett would "leverage [its] flexible and resilient business model[,]" that its "long-term technology growth strategy remains intact;" and that it was "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success." TAC ¶ 93 (**Statements 12 & 13**); *see* ECF No. 88-12, Ex. L to Br., ("May 11, 2020 Earnings Call").

- In its Form 10-Q, Garrett made the following statement about meeting anticipated cash and liquidity requirements:  "If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . . [W]e believe we will be able to meet our short-term liquidity needs for at least the next twelve months." TAC ¶ 94 (**Statement 14**); *see* ECF No. 88-13, Ex. M to Br., ("May 11, 2020 10-Q").

Also on May 11, 2020, Defendant Rabiller told investors on an earnings call that Garrett's "former parent imposed on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment,

meaning that was really unsustainable that way unless everything was perfect.  With insight, it is

clear that our capital structure was ill suited to cope with any meaningful operating challenges."

TAC ¶ 134.

On June 12, 2020, Plaintiffs allege that Garrett "entered into amendments to certain of its

credit agreements – a strategy that Defendants knew at best would simply buy the Company

some additional time."  *Id.* ¶ 72.  In a press release that day, Defendant Rabiller announced that

"[t]he modifications to our Credit Agreement significantly enhance Garrett's financial flexibility

to weather the current pandemic-induced economic slowdown."  *Id.*  He also announced that,

despite the extensive effects the pandemic had on the automotive industry, Garrett's "positive

long-term fundamentals . . . remain intact."  *Id.* ¶ 98 (**Statement 15**).

Plaintiffs allege that three days later, by June 15, 2020, "Garrett had received 5 non-

binding indications of interests, all of which were contingent on delivering Garrett and acquiring

the business 'in a chapter 11 proceeding or other process that could deliver the business free and

clear of its current balance sheet.'"  *Id.* ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett narrowed the

bids to the top three, and in the next three weeks, those companies conducted due diligence.  *Id.*

¶ 69.  During that time, one of the parties removed themselves from consideration.  *Id.*  The two

remaining parties conducted several more weeks of diligence, had expert sessions with advisors

and management, reviewed 50,000 pages of debtors' documents, and submitted over 400

questions related to due diligence.  *Id.*

During the later stages of that diligence, on July 30, 2020, Garrett issued another press

release with its second quarter 2020 financials, in which Defendant Rabiller also assuaged

concerns related to COVID disruptions:

> Garrett's proven track record in operational excellence has helped us
> navigate the current pandemic-induced downturn.  Although the

> market environment remains highly uncertain, we continue to benefit
> from our robust infrastructure and agile working capabilities as we
> execute on our long-term strategy and lead the evolution of advanced
> turbocharging, electric-boosting, and software solutions for the global
> automotive industry.

*Id.* ¶ 101 (**Statement 16**); *see* ECF No. 88-16, Ex. P to Br. ("July 30, 2020 Press Release").  That

same day, on an earnings call with investors and Defendants Rabiller, Deason, and Bracke,

Rabiller boasted about "the strong fundamentals of Garrett . . . combined with a variable cost

model that helps preserve cash and an attractive margin profile," and "the resiliency of

[Garrett's] operating structure."  *Id.* ¶ 102 (**Statement 17**); *see* ECF No. 88-17, Ex. Q to Br.

("July 30, 2020 Earnings Call").  In the Form 10-Q released on July 30, 2020, Garrett also

removed language that had been in the May 2020 10-Q, which stated: "Our management has

concluded that the foregoing conditions and events raise substantial doubt as to our ability to

continue as a going concern. The accompanying financial statements do not include any

adjustments or classifications that may result from the possible inability of the Company to

continue as a going concern within one year after the issuance of the financial statements."  TAC

¶¶ 106-107 (**Statement 18**); *see* ECF No. 88-15, Ex. O to Br. ("July 30, 2020 10-Q").

A few days later, on August 3, 2020, the two remaining bidders who had been finishing

due diligence submitted non-binding proposals to Garrett.  TAC ¶ 70.  On "August 13, 2020,

Garrett signed an Exclusivity Agreement with" stalking horse purchaser, KPS Capital Partners,

LP ("KPS").  TAC ¶¶ 14, 70; *see also* Deason Decl. ¶ 81.

On August 26, 2020, about a month before Garrett entered a final purchase agreement

with KPS ("Purchase Agreement"), but after Garrett signed the Exclusivity Agreement,

Defendants issued yet another press release stating that "today[, Garrett] announced that, with

the assistance of its financial and legal advisors, it is exploring alternatives for addressing its

previously disclosed balance sheet concerns." TAC ¶ 110; *see* ECF No. 88-18, Ex. R to Br. ("August 26, 2020 Press Release"). Plaintiffs allege that on that day, for the first time, Garrett revealed that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility . . . thereby putting Garrett at a meaningful disadvantage relative to its peers." TAC ¶ 110. The press release went on to disclose that "Garrett is seeking to address its balance sheet concerns while its core business remains strong in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer." *Id.* ¶ 110 (**Statement 20**). Garrett further warned that "any actions taken by Garrett in relation to liability management may materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock." *Id.* (**Statement 21**). Finally, the statement declared that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives." *Id.* ¶ 111 (**Statement 22**).

On September 17, 2020, the Wall Street Journal reported that Garrett was close to a sale through bankruptcy. *Id.* ¶ 137. Garrett's stock price fell from $2.41 on September 17, 2020 to $2.01 a share on September 18, 2020. *Id.* On September 20, 2020, Garrett entered into the Purchase Agreement with KPS, and filed for bankruptcy. *Id.* ¶¶ 31, 138; Deason Decl. ¶ 81. Garrett's stock price subsequently fell from $2.01 on September 18, 2020 to $1.76 per share on September 20, 2020. TAC ¶ 138. Plaintiffs allege that Defendants' bankruptcy filings make clear that "COVID was not the cause of the Garrett's capital structure problems or its eventual bankruptcy." TAC ¶ 66. But, according to the Press Release issued by Garrett that day, "'the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell

– all exacerbated by COVID-19 – created a significant long-term burden on our business'" that led Garrett to bankruptcy.  TAC ¶ 105.

B.     **The Court's March 2022 Opinion**

When Plaintiffs first brought this litigation, their theory of the case was different than articulated now.  In the Second Amended Complaint, Plaintiffs put forth a broad view of the alleged wrongdoing, a longer class period, and a different theory of scienter.   As the Court articulated, Plaintiffs' early theory was that "Defendants made false and misleading statements about whether Garrett would fail because they 'knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed.'"  *Garrett I*, 2022 WL 976269, at *12 (citing ECF No. 43 ("Second Amended Complaint" or "SAC") ¶ 8).  In March 2022, prior to the reassignment of this case to the undersigned, the Court rejected the Second Amended Complaint, and in turn that broad theory, on the grounds that Plaintiffs had failed to plead at least one element of a securities violation:  scienter.  *See Garrett I*, 2022 WL 976269, at *11.

The Court concluded that Plaintiffs failed to plead scienter in part because the allegations did not plead a plausible motive for Defendants to commit fraud.  *Id.* at *12-13.  "[W]hy would the . . . Defendants promise the market that Garrett would continue to innovate and remain a cutting-edge technology company if they knew the company 'was doomed to failure' because it was 'nearly impossible for Garrett to survive as an independent company'?"  *Id.* at *13 (citing SAC ¶¶ 131, 159).  The allegations did not answer this question.  Defendants' compensation packages did not otherwise create a motive to commit the alleged fraud, because motives based on compensation alone are "common to most corporate officers," and because the actual compensation packages were contingent upon "the successful completion of the Spin-Off that

would not vest until Garrett's fourth year as a publicly-traded Company." *Id.* (citing SAC ¶ 259).  The Court held that the suggestion that Defendants would "tie their compensation to Garrett surviving for four years if . . . they knew that Garrett had fatal issues . . . defies economic reason . . . ." *Id.* (citations omitted).

This Court also concluded that Plaintiffs had failed to plead the alternative basis for scienter: "strong circumstantial evidence of conscious behavior or recklessness." *Id.* at *13-15. In particular, the Court faulted Plaintiffs' heavy reliance "on the bankruptcy proceedings to impute knowledge onto . . . Defendants *before* those proceedings took place." *Id.* at *14.  What Defendants knew and shared during the bankruptcy proceedings – which began in September 2020 – "has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings." *Id.* (citing *Hutchinson v. Perez* (*Hutchinson I*), No. 12-cv-1073 (HB), 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012)).

Additionally, the Court found insufficient Plaintiffs' allegations that Defendants acted with scienter because, shortly before making the alleged misstatements, Garrett "retain[ed] financial advisors [who] . . . concluded bankruptcy was likely without a restructuring of the Honeywell Obligations . . . ." *Id.* (citations omitted).  Apart from the fact that failure to disclose the retention of the financial advisors alone does not support an inference of scienter, the Court explained that, as alleged, it was not reckless for Defendant Rabiller to continue to make positive statements about Garrett's financial flexibility after the financial advice was provided to Garrett. *Id.*  In particular, the Court emphasized that "Plaintiffs [did] not allege that the financial advisors ever opined that Garrett's *only* option forward was bankruptcy[,]" but instead alleged that Garrett was advised it would need to "restructure the Honeywell Obligations through bankruptcy *or other means*." *Id.* (quoting SAC ¶ 115) (emphasis added).  At the time the advisors were

retained, Garrett had sued Honeywell in an attempt to alleviate the burdens caused by the

Honeywell Obligations.  *Id.*  With litigation still available as a potential solution to Garrett's

woes, it was not reckless for Defendant Rabiller to make positive statements about Garrett trying

to increase its financial flexibility.  *Id.*

　　　　Finally, the Court rejected Plaintiffs' argument that the Second Amended Complaint

properly alleged scienter through the "core operations" theory.  *Id.* at *15.  Under that theory,

when the alleged misstatements concern information critical to a company's core operations,

knowledge of that critical information is attributable to executives of the company, which

permits an inference of scienter.  *Id.*  Specifically, the Court noted that while the viability of the

doctrine is currently in doubt, the doctrine can only bolster allegations of scienter and cannot

independently create a sufficient allegation of scienter.  *Id.* (collecting cases).  Because Plaintiffs

otherwise failed to allege scienter, their "core operations" theory also failed.  *Id.*

### C.　Leave to Replead

　　　　The Court allowed Plaintiffs leave to replead because, for the first time at oral argument,

Plaintiffs presented "a different theory of . . . Defendants' scienter."  *Id.* at 19.  Specifically, in

their Second Amended Complaint, Plaintiffs had alleged that Defendants "knew since the time of

the Spin-Off that the Company's capital structure and Indemnification Agreement would make it

impossible for the Company to succeed."  *Id.* (citing SAC ¶ 8).  However, at oral argument,

Plaintiffs for the first time shifted their theory, and argued that there was an "evolving situation"

at Garrett, whereby Defendants' knowledge grew, and they only came "to appreciate the full

effect of the Honeywell Obligations on the company at a later date."  *Id.*  Because this new

theory changed Plaintiffs' allegations of scienter and falsity, and because the March 2022

Opinion was "the first time that the Court . . . ruled on whether Plaintiffs had deficiencies in their pleadings[,]" the Court granted leave to amend. *Id.*

In their Third Amended Complaint, Plaintiffs, among other things, shortened the initial October 1, 2018 through September 18, 2020 Class Period (SAC ¶ 16), to February 27, 2020 through September 18, 2020 (TAC ¶ 1), thereby narrowing the pool of alleged misstatements. Defendants moved to dismiss the Third Amended Complaint on June 24, 2022. *See generally* Br.

## MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is, the facts must be sufficient to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. On a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal brackets omitted). The court shall not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

However, securities fraud claims "are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud." Under Rule 9(b), the Second Circuit has held that "[a] securities fraud complaint based on misstatements must (1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99.  The Private Securities Litigation Reform Act ("PSLRA") further provides for heightened pleading standards in securities fraud actions, requiring that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## DISCUSSION

Under Section 10(b) of the Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  The Securities and Exchange Commission ("SEC") has implemented this provision through Rule 10b-5, which "explicitly prohibits making any untrue statement of a material fact." *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citing 17 C.F.R. § 240.10b-5(b)).  In order to state a claim under Rule 10b-5, a "plaintiff must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014)).

In their motion to dismiss the Third Amended Complaint, Defendants argue that Plaintiffs have failed to plead three of the six required elements for a Rule 10b-5 claim:  any material misrepresentations or omissions made by Defendants, scienter, and loss causation.  *See generally* Br.  The Court agrees that Plaintiffs have once again failed to plead scienter, and have also failed to allege any material misstatements or omissions made by Defendants.  Therefore, the Court need not address Defendants' arguments regarding loss causation.

### A.      Scienter

In order to adequately plead a claim for securities fraud pursuant to Rule 10b-5 and the heightened pleading requirements of Rule 9(b) and the PLSRA, "a plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'"  *Emps.' Ret. Sys. of Gov't of the Virgin Is.*, 794 F.3d at 305 (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis added).  The state of mind required for a claim pursuant to Rule 10b-5 is an "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)).  Recklessness is also "a sufficiently culpable mental state for securities fraud" in the Second Circuit.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*ECA, Loc. 134*"), 553 F.3d 187, 198 (2d Cir. 2009).  The Supreme Court has opined that a "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314.  A scienter inquiry is thus "inherently comparative" in that "the Court 'must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"  *Saraf v. Ebix, Inc.*, No. 21-cv-01589 (JMF), 2022 WL 4622676, at *3 (S.D.N.Y. Sept. 30, 2022) (quoting *Tellabs, Inc.*,

551 U.S. at 323-24).  Courts also must "evaluate the sufficiency of a complaint's allegations of

scienter 'holistically,' considering '*all* of the facts alleged, taken collectively,' rather than 'any

individual allegation, scrutinized in isolation.'"  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996

F.3d 64, 78 (2d Cir. 2021) (quoting *Tellabs, Inc.*, 551 U.S. at 323, 326).  Finally, "[i]n order to

allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving

rise to a strong inference that 'someone whose intent could be imputed to the corporation acted

with the requisite scienter.'" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp.

3d 515, 543 (S.D.N.Y. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex

Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

      A plaintiff can satisfy the scienter pleading requirement by alleging facts that show either

of the following: "(1) that defendants had the motive and opportunity to commit fraud, or (2)

strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Loc. 134*, 445

F.3d at 198.  To show a motive and opportunity to defraud, "[p]laintiffs must allege that [a

company] or its officers benefitted in some concrete and personal way from the purported

fraud[.]"  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  If a party cannot

show a motive, they may plead scienter through strong circumstantial evidence of conscious

misbehavior or recklessness, but "the strength of the circumstantial allegations must be

correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation

omitted).  Indeed, "[t]o plead recklessness through circumstantial evidence, Plaintiffs would have

to show, at the least, conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care . . . ."  *ECA, Loc. 134*, 445 F.3d at 202-03 (internal

quotation marks omitted).  This standard presents a "significant burden" for plaintiffs pleading

recklessness in securities fraud litigation.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir.

1996).

Having failed to plead scienter in their Second Amended Complaint, *see Garrett I*, 2022

WL 976269, at *11, Plaintiffs modified their theory in the Third Amended Complaint.  Now

Plaintiffs allege that "[e]ach of the Defendants had actual knowledge by no later than February

27, 2020, and increasingly through the [new] Class Period . . . that Garrett was highly unlikely to

survive as a stand-alone Company and any strategic merger or sale of the business would be

conditioned on a court-supervised restructuring to fix the unsustainable capital structure and the

Honeywell Obligations."  TAC ¶ 120.  On close inspection of the allegations in the Third

Amended Complaint, it becomes clear that Plaintiffs' Third Amended Complaint suffers from

similar deficiencies as the Second Amended Complaint.

As an initial matter, Plaintiffs appear to admit that their scienter allegations do not rely on

Defendants' motives.  *See* Opp. at 22 (arguing that "Defendants' laser focus on 'motive' is a red

herring" because the Court already acknowledged that a plaintiff need not show motive to allege

scienter).  Nevertheless, Plaintiffs' Third Amended Complaint contains a section detailing

Defendant Rabiller's alleged financial motivations to inflate Garrett's stock price.  *See* TAC

¶¶ 128-131.  That section outlines Rabiller's employment agreement, which as described in

*Garrett I*, includes a compensation package containing over $4 million in "Founder's Grants"

that would not vest until Garrett was a public company for at least four years, and other

incentive-based compensation.  *See id*. ¶¶ 128-130.  According to the Third Amended

Complaint, Rabiller's compensation included incentive pay equal to his annual salary, yearly

salary increases, and a guarantee of "24 months of base salary and incentive compensation

severance in the event of his involuntary termination of employment." *Id*. ¶ 129.  Some incentive compensation was also tied to Garrett's performance. *Id.* ¶ 130.

However, to the extent these allegations differ somewhat from those in the Second Amended Complaint, they do not change the Court's analysis of Rabiller's alleged motive.  As stated in the Court's March 2022 Opinion, "if 'scienter could be pleaded' through incentive compensation 'alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"  *Garrett I*, 2022 WL 976269, at *13 (quoting *Kalnit*, 264 F.3d at 140).  That is why courts have held that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute motive for purposes of this inquiry." *ECA, Loc. 134*, 553 F.3d at 198 (quotations omitted); *see In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product.  Similarly, corporate executives are generally motivated to maximize bonus compensation.  These allegations do not support an inference of scienter.").  Plaintiffs have failed to allege anything beyond incentive-based compensation, which is not sufficient to show motive under the circumstances alleged here.[7]

Plaintiffs' more persuasive – but ultimately still unsuccessful – argument is that they have shown a strong inference of scienter through circumstantial evidence about what

---

[7] The March 2022 Opinion also noted that motive and opportunity were implausible as alleged there because, if Defendants knew at the time of the Spin-Off that Garrett was likely to fail, they would not have tied their compensation to Garrett's success by permitting their stock to vest only after four years. *Garrett I*, 2022 WL 976269, at *13.  Even though Plaintiffs no longer contend Defendants knew Garrett would fail from the time of the Spin-Off when the employment agreements were created, for the reasons set forth above, such agreements still do not demonstrate a motive to commit fraud.

Defendants knew prior to the Class Period, which was contrary to what Defendants actually said during the Class Period.  *See* Opp. at 19-22.  Notably, because Plaintiffs have failed to demonstrate motive, the "strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal citation omitted).  Courts in this Circuit have described "at least four circumstances [that] may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Garrett I*, 2022 WL 976269, at \*14 (quoting *ECA, Loc. 134*, 553 F.3d at 199).

Plaintiffs argue that the Third Amended Complaint alleges sufficient facts under the third prong – that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" prior to February 27, 2020.  Opp. at 19 (internal citation omitted).  While this analysis necessarily overlaps with the inquiry into whether or not a statement was false or misleading, the Court will nevertheless address each element separately.  *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) ("Largely for the same reasons that the various statements at issue have been held neither false nor misleading, the facts pled in the SAC fall far short of pleading recklessness, and, thus, scienter."); *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-cv-01405 (RPP), 2009 WL 174656, at \*26 (S.D.N.Y. Jan. 26, 2009) ("In such situations, the *scienter* analysis and the determination of whether the defendant made false or misleading statements are essentially combined." (internal quotation marks and citation omitted)).

"To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (internal quotation marks and citation omitted).  In support of their scienter allegations, Plaintiffs rely in large part on a declaration submitted by Defendant Deason during the bankruptcy proceedings, dated September 20, 2020.  *See generally* Deason Decl.  For instance, they allege that soon after the Spin-Off, Defendants knew that Garrett's debt and other obligations made it difficult to maintain business with OEMs, that it was unlikely to be able to adapt to a fast-evolving industry due to its leverage and indemnity obligations, and that lenders and investors were unlikely to provide new capital to the company "subordinated to both [Garrett's] funded debt and its indemnity obligations."  TAC ¶ 61; *see also id.* ¶¶ 57-61.  In making these allegations, however, Plaintiffs rely on Deason's statements made on September 20, 2020.  *See* Deason Decl. ¶¶ 65-71.  As this Court explained in its prior opinion, "Defendants' knowledge about Garrett's financial strains *during* the bankruptcy proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings."  *Garrett I*, 2022 WL 976269, at *14.  "Allegations of 'fraud by hindsight' are insufficient to withstand a motion to dismiss."  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *see also Hutchinson I*, 2012 WL 5451258, at *7 ("This case is therefore analogous to a host of cases in which courts have dismissed, as 'fraud in hindsight,' complaints filed after a company's bankruptcy based on

the conclusory allegation that defendants had or should have been aware of the 'liquidity crisis.'") (collecting cases).[8]

Perhaps recognizing this flaw, Plaintiffs point to other allegations of scienter to oppose Defendants' motion to dismiss.  For instance, they contend that, before the pandemic, "Garrett's customer relationship teams reported to the directors and officers that customers were nervous about the Company's capital structure . . . ."  Opp. at 20 (citing TAC ¶ 58).  But that allegation is based on Deason's bankruptcy declaration and overstates its contents.  Deason's declaration only states that, at the time of the bankruptcy in September 2020, "if . . . balance sheets problems [created by the Spin-Off] are not addressed, concerns among OEMs and suppliers will grow . . . ."  Deason Decl. ¶ 68.  Plaintiffs' new allegation therefore, again, has little bearing on what Defendants knew prior to the Class Period.

The remaining pre-Class-Period allegations regarding scienter describe Defendants' retention of companies to review their financials and challenge the Honeywell Obligations. Plaintiffs rely on allegations that Garrett, in early 2019, started working with Morgan Stanley "to explore strategic alternatives" and were told in early 2020 that "multiple financial sponsors" would be interested in a potential transaction "*if and only if*" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet . . . ."  TAC ¶¶ 64 (citing Deason Decl. ¶ 74), 121; *see* Opp. at 20.  And on February 1,

---

[8] Plaintiffs appear to argue that, as described in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), they are merely relying on "post-class period data to confirm what a defendant should have known during the class period."  Opp. at 20-21.  Of course, a post-class period statement explaining what happened during the class period, to argue that a defendant knew or should have known about that event, is not hindsight, as articulated in *In re Scholastic*.  But a post-class period statement about a belief or knowledge a party has at the time that post-class period statement was made does not necessarily impute that belief or knowledge to the class period.  *See Garrett I*, 2022 WL 976269, at *14.  Plaintiffs largely continue to do the latter in their Third Amended Complaint.

2020, in response to Morgan Stanley's report, Defendants hired Perella Weinberg Partners ("PWP") to further evaluate a potential restructuring.  TAC ¶ 64.

These scienter allegations fail for largely the same reasons articulated in the Court's March 2022 Opinion.  Because "[n]o multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action," hiring financial advisors alone does not raise an inference of scienter.  *Garrett I*, 2022 WL 976269, at *14 (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007)).  And the allegation that those advisors warned Garrett that potential buyers were wary of its balance sheet does not support a strong inference of scienter because Plaintiffs still "do not allege that the financial advisors ever opined that Garrett's only option forward was bankruptcy."  *Id.* at *14. Rather, the Third Amended Complaint – like the Second Amended Complaint – contains allegations that the financial advisors reported that a merger or other significant transaction was unlikely absent discharging of the Honeywell Obligations, whether that be through litigation, bankruptcy, or some other means.  *See* TAC ¶¶ 64, 121 & n.25 ("All financial sponsors insisted on potential transaction structures in which the balance sheet of the Company – including its excess funded debt leverage, the ASASCO Indemnity Agreement and other legal liabilities – could be left behind or discharged and the business of the Company acquired free and clear of those burdens." (quoting Deason Decl. ¶ 74)).  While Plaintiffs allege that one option going forward involved "an auction process for a stalking horse bidder to take the company into bankruptcy," *id.* ¶ 11, "discussions about restructuring [are] hardly the same as the company's decision to file for bankruptcy," *Hutchinson v. Perez* (*Hutchinson II*), No. 12-cv-01073 (HB), 2013 WL 1775374, at *3 (S.D.N.Y. Apr. 25, 2013).  Therefore, while Garrett's hiring of advisors and discussions about potential bankruptcy is clear in the Complaint, the allegations otherwise

lack specificity as to precisely what Defendants knew about a definitive bankruptcy filing.  *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("Absent concrete allegations as to defendants' knowledge, the Amended Complaint cannot generate a strong inference of scienter." (internal brackets and citation omitted)); *see also Coronel*, 2009 WL 174656, at *27 (holding, in context of scienter, that "because the Complaint alleges no specific facts demonstrating that Defendants possessed – at the time they made the allegedly false statements concerning the reserve amounts – information contradicting their statements, fraud has not been shown").

Further adding ambiguity is the fact that, at the time Morgan Stanley reported to Garrett that "multiple financial sponsors" might be interested in a transaction, Defendants had hired the law firm Quinn Emanuel to launch a "Hail Mary" litigation against Honeywell to attempt to "void certain aspects of the Honeywell Obligations . . . ."  TAC ¶ 63.  Even though Plaintiffs contend that the litigation was "futile," it was ongoing through the bankruptcy proceeding, and only eventually resolved in 2021.  *Id.* ¶¶ 63, 2.  That ongoing litigation, which continued through the Class Period when the alleged misstatements were made, "provided Garrett a potential way to get out of the Honeywell Obligation[s]" that did not involve bankruptcy.  *Garrett I*, 2022 WL 976269, at *14.  This negates any "strong inference" that Defendants knew that bankruptcy was the only option going forward.  Rather, a more compelling, but less cynical, inference from these allegations is that Garrett was doing everything in its power to evaluate other options to avoid bankruptcy, including by seeking the advice of several expert advisors, and by retaining experienced legal counsel to void the restrictive Honeywell Obligations or negotiate a release with Honeywell.  *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("And the alleged emergency Board meeting – in addition to failing to establish with any particularity what

the Board knew – more plausibly evinces that the Board was being circumspect and cautious in the face of *uncertainty* about what the future held for Moonves, as opposed to being evidence that the Board had concrete knowledge that a scathing and accurate report was forthcoming."). Absent motive, Plaintiffs have not met the "greater" burden of pleading conscious misbehavior or recklessness, and have otherwise failed to plead a "strong inference" of scienter arising prior to February 27, 2020.

Plaintiffs' allegations of scienter during the course of the Class Period are also insufficient. The Third Amended Complaint generally describes Defendants' process in assessing whether restructuring through bankruptcy was the only way forward, but it is silent about when Defendants knew that bankruptcy was inevitable. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (affirming dismissal of complaint for failure to plead scienter where it was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position"). Instead, Plaintiffs allege that, during the Class Period, Defendants continued to make optimistic statements about Garrett's well-being and future despite knowing facts to the contrary. Plaintiffs allege that the following facts contributed to Defendants' knowledge during that period:

- On March 20, 2020, Garrett's Board retained the law firm Sullivan & Cromwell, and the consulting firm AlixPartners LLP "to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure." TAC ¶¶ 64, 121.

- On June 12, 2020, Garrett "entered into amendments to certain of its credit agreements – a strategy that Defendants knew at best would simply buy the Company some additional time." *Id*. ¶ 72.

- On June 15, 2020, Garrett received five non-binding indications of interest in response to the advisors' inquiries about a stalking horse purchase, "all of which were contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet.'" *Id*. ¶ 68 (quoting Deason Decl. ¶ 80).  The top two candidates subsequently conducted over six weeks of due diligence. *Id.* ¶ 69.

- On August 3, 2020, the two remaining bidders submitted non-binding proposals to Garrett. *Id*. ¶ 70.

- On August 13, 2020, Garrett entered into an Exclusivity Agreement with stalking horse purchaser KPS. *Id.*

Like the allegations prior to the Class Period, these allegations show that Garrett was continuing to investigate restructuring throughout the Class Period.  But again, the hiring of financial advisors does not give rise to a strong inference of scienter on its own.  And the additional facts do not bolster an inference of scienter because, on balance, they also show that Garrett was investigating its options while the "Hail-Mary" litigation proceeded.  Plaintiffs point to Rabiller's August 26, 2020 statement that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives" after Garrett had already signed the Exclusivity Agreement on August 13, 2020. *Id*. ¶ 111.  Plaintiffs appear to argue that Defendants were at the very least reckless in making these statements because Garrett knew it had no viable option other than bankruptcy by this time.  *See* Opp. at 22 (referencing alleged misstatements that were made

after the Exclusivity Agreement was signed and 25 days before bankruptcy); *see also id.* at 20

(arguing that by Class Period "adverse impact of the Honeywell Obligations had already

materialized sufficiently for Defendants to conclude Garrett had no viable option other than to

pursue bankruptcy"); TAC ¶¶ 7, 121-122.  But the signing of an Exclusivity Agreement does not

mean that a decision had been made concerning bankruptcy.  While the Court is unable to locate

the actual Exclusivity Agreement in the record, and the parties have not delineated the precise

terms of that agreement, Plaintiffs have not pleaded that the Exclusivity Agreement required

Garrett to enter a final agreement with KPS or to enter into bankruptcy.  Generally speaking,

exclusivity agreements provide for a period of time in which one party must *negotiate* for an

eventual purchase, exclusively with the other party.  *See, e.g.*, *TCS Cap. Mgmt., LLC v. Apax*

*Partners, L.P.*, No. 06-cv-13447 (CM), 2008 WL 650385, at *21 (S.D.N.Y. Mar. 7, 2008)

(dismissing claim alleging that it was misleading to not disclose exclusivity agreement "in

anticipation of the sale," because no law imposed a duty to "disclose offers or negotiations to

purchase a majority interest"); *see also Energy Intel. Grp., Inc. v. Cowen & Co., LLC*, No.

14-cv-03789 (NRB), 2016 WL 3939747, at *3 (S.D.N.Y. July 15, 2016) (describing exclusivity

agreement which provided "for 30 days of exclusive negotiations"); *Cyber Media Grp., Inc. v.*

*Island Mortg. Network, Inc.*, 183 F. Supp. 2d 559, 565 (E.D.N.Y. 2002) (describing exclusivity

agreement as barring party from "negotiating with any other prospective buyers for a period of

thirty days").  Defendants did not sign the Purchase Agreement with KPS until September 20,

2020.

A more plausible inference from Rabiller's August 2020 disclosures is that Defendants

were in a position to update the public as to the efforts it had and was currently taking to assess

Garrett's future viability and warn the public of the difficulties the Company currently faced,

including consideration of, but not a determination to, pursue restructuring. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks.").  The August 26, 2020 Press Release provides a fairly robust explanation of Garrett's struggles, including its high leverage and the Honeywell Obligations, as well as its strengths, including "ample liquidity" to support current commitments, and strong operating performance. *See* August 26, 2020 Press Release.  The Press Release noted that "Garrett has not yet determined" if it would pursue restructuring options, but it further explained that "any actions taken by Garrett in relation to liability management may materially reduce the value" of stocks, or among other things, could cancel existing stock. *Id.*

Importantly, as stated previously, the final stalking horse Purchase Agreement was not entered into until September 20, 2020, less than a month after the August 26, 2020 press release and the same day the bankruptcy proceeding commenced.  TAC ¶¶ 31, 138.  Because "it would defy economic reason for [Garrett] to make statements that would accelerate a bankruptcy filing, thereby causing more harm to investors, no reasonable inference of fraudulent intent can be drawn" from the failure to disclose the negotiations. *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013).  Plaintiffs have not pleaded any specific facts suggesting that Defendants had made the decision to enter bankruptcy by August 26, 2020 when the last purported misstatement was made by Defendants. *See Stratte-McClure*, 776 F.3d at 107 (affirming dismissal of complaint for failure to plead scienter where it was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position"); *Jones*, 550 F. App'x at 28 (noting that "the second amended complaint alleges no fact supporting an inference that, between September 12, 2011,

and September 30, 2011, defendants became aware that a bankruptcy restructuring was in fact

necessary"). Therefore, it was not "highly unreasonable" or "an extreme departure from the

standards of ordinary care," *ECA, Loc. 134*, 553 F.3d at 203, for Rabiller to warn investors of the

possibility of restructuring, while also indicating that no final decision had been made.[9]

When viewing the full picture of Plaintiffs' allegations regarding Defendants'

knowledge, it becomes clear that Garrett was a company dealing with difficult choices and

considering how to proceed. *See generally* August 26, 2020 Press Release. Indeed, "[a]

company is permitted a period of time to investigate any problem it detects before reporting it to

the public." *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 179830, at *4 (citing *Slayton*,

604 F.3d at 777). And while, during the Class Period, bankruptcy was one option, "[p]eople in

charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future;

subject to what current data indicates, they can be expected to be confident about their

stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994). Any inference of recklessness based on Defendants'

---

[9] Plaintiffs rely on *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) to argue that the "incongruity between word and deed establishes a strong inference of scienter." Opp. at 21. In that case, an inference of scienter was warranted because "Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d at 238. Plaintiffs had also adequately pleaded facts showing that Defendants were aware of the risks posed by the CDOs, or at the very least were reckless "in not appreciating" the risks they posed. *Id.* at 237. Risks, and related statements, associated with a portion of a company's asset portfolio are different from a company's consideration of a potential future bankruptcy. Caselaw makes clear that a company does not need to immediately disclose that it is considering bankruptcy. *See, e.g.*, *Hutchinson II*, 2013 WL 1775374, at *3; *In re Renewable Energy Grp. Sec. Litig.*, No. 21-cv-01832 (DLC), 2022 WL 179830, at *4 (S.D.N.Y. Jan. 20, 2022) (citing *Slayton*, 604 F.3d at 777). And here, unlike in *Citigroup*, Plaintiffs have failed to plead sufficient facts detailing that Defendants knew or were reckless in appreciating that bankruptcy was inevitable on or before August 26, 2020, the latest date upon which Plaintiffs allege a misstatement was made.

optimistic statements is negated by the disclosures themselves, which relay the decline of Garrett

and warned investors that a restructuring was possible during the Class Period.  *See Kuriakose*,

897 F. Supp. 2d at 185 (noting that "truthful disclosures" negated inference of scienter); *see also*

*Silsby v. Icahn,* 17 F. Supp. 3d 348, 369-70 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616

F. App'x 448 (2d Cir. 2015) (finding that disclosures weighed against scienter).  In February

2020, Garrett's 10-K listed several risk factors with regard to the Indemnity Agreement, stating

the agreement "may have material adverse effects on our liquidity and cash flows and on our

results of operations, regardless of whether we experience a decline in net sales," "may also

require us to accrue significant long-term liabilities on our consolidated and combined balance

sheet," and that "our access to capital to fund our operations may be materially adversely

affected."  TAC ¶ 114.  The 10-K also warned that "our indebtedness could adversely affect our

business, financial condition and results of operations."  *Id*. ¶ 114 (brackets omitted).  The May

2020 10-Q and July 2020 10-Q incorporated these risk factors by reference.  *Id*. ¶¶ 116, 118.  In

May 2020, Rabiller noted that the capital structure imposed by Honeywell was "ill suited to cope

with any meaningful operating challenges."  *Id*. ¶ 134.  Also, two weeks after Garrett entered

into an Exclusivity Agreement with KPS, on August 26, 2020, Defendant Rabiller announced

that Garrett was "exploring alternatives for addressing its previously disclosed balance sheet

concerns," and shared concern that the "leveraged capital structure" created challenges to

"strategic and financial flexibility."  *Id*. ¶ 110.[10]

---

[10] Defendants argue that Garrett made robust *pre-Class Period* disclosures about the capital
structure of Garrett, its balance sheet, and the restrictions imposed by the Honeywell Obligations.
*See* Br. at 4-7.  Plaintiffs contend that these are "truth-on-the-market" arguments not appropriate
for a motion to dismiss.  *See* Opp. at 10-11.  The Court is not evaluating pre-Class Period
disclosures as part of a truth-on-the-market defense, but is instead noting that contemporaneous
Class Period disclosures overall weigh against a strong inference of scienter.  *See Kuriakose*, 897
F. Supp. 2d at 185 (finding that allegations do not support an inference of scienter on a motion to

On balance, the most cogent inference that can be drawn from these allegations, including Garrett's retention of financial and legal advisors, the report from Morgan Stanley, the Honeywell litigation, and the August 2020 disclosures, is that the company "delayed releasing information" until signing the stalking horse Purchase Agreement in order to "to carefully review" its options "and was at worst negligent as to the effect of the delay on investors." *Stratte-McClure*, 776 F.3d at 107; *see also Jones*, 550 F. App'x at 26 ("Thus, like the district court, we conclude that the more compelling inference from the facts alleged in the second amended complaint is that defendants properly disclosed relevant information to the public while Kodak was struggling to avoid bankruptcy and that defendants' best efforts did not materialize." (internal brackets, quotation marks, and citation omitted)); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 548 ("[T]he Court deems the more compelling inference to be that, rather than knowing or being reckless in not knowing that PXRE's loss estimates were flawed, Defendants were, at most, negligent in issuing the challenged statements.").[11]

Accordingly, the Court concludes that Plaintiffs have again failed to adequately plead scienter, which alone is grounds for granting Defendants' motion and dismissing the Third Amended Complaint.

---

dismiss in part because "[w]hether executives referred to these loans as 'risky,' 'non-prime,' 'subprime-like,' or 'subprime' is irrelevant since Freddie Mac fully disclosed the composition of the company's portfolio").

[11] Plaintiffs' "core operations" theory fails for the same reasons articulated in the March 2022 Opinion. *See Garrett I*, 2022 WL 976269, *15 ("Because Plaintiffs have failed to allege scienter for any Defendants, none of the allegations involving core operations properly plead scienter." (citing *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171-72 (S.D.N.Y. 2021))).

B.      **Material Misstatements or Omissions**

However, even if Plaintiffs had properly pleaded scienter, the Third Amended Complaint

would still be dismissed because Plaintiffs have failed to allege any material misstatements or

omissions on the part of Defendants.  Defendants contend that: (i) Plaintiffs have failed to

adequately plead that any of the alleged misstatements are actually false or misleading, (ii) many

of the statements are nonactionable puffery, and (iii) other statements are protected forward-

looking statements.  *See* Br. at 7-20.  Because the Court finds that Plaintiffs have failed to allege

with particularity that any of the statements were false or misleading, it need not address

Plaintiffs' arguments with respect to puffery or the safe harbor for forward-looking statements.[12]

Actionable statements under Rule 10b-5 are "either 'untrue' outright or 'misleading' by

virtue of what [they] omit[] to state."  *In re Vivendi, S.A. Sec. Litig.* (*Vivendi II*), 838 F.3d 223,

239 (2d Cir. 2016).  "A statement is misleading if a reasonable investor would have received a

false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596,

609 (S.D.N.Y. 2017) (quoting *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180

(S.D.N.Y. 2010)).  While "[s]uch a determination is generally a question reserved for the trier of

fact[,]" on a motion to dismiss, a Court may grant the motion if "the Court, drawing all

reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ

on the question of whether the statements alleged in the complaint were misleading in light of the

circumstances under which they were made."  *Id.* (quoting *In re Par Pharm., Inc. Sec. Litig.*, 733

F. Supp. 668, 677 (S.D.N.Y. 1990)).  Indeed, even though "[t]he federal securities laws do not

protect against only those false and misleading statements that are false or misleading with

---

[12] Nevertheless, as noted in the March 2022 Opinion, the Court again observes without deciding
that many of Plaintiffs' allegations do still "appear to be puffery, [and] to fall under the PSLRA's
safe harbor and the bespeaks caution doctrine."  *Garrett I*, 2022 WL 976269, at *19 n.17.

respect to very specific material facts," *Vivendi II*, 838 F.3d at 249, at the pleading stage,

"[p]laintiffs [in securities fraud actions] must do more than say that the statements in the press

releases were false and misleading; they must demonstrate with specificity why and how that is

so[,]"*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

      Defendants argue that Plaintiffs fail to plead with particularity that any of the statements

were actually false or misleading when made.  *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d

179, 207 (S.D.N.Y. 2020) ("A violation of Section 10(b) and Rule 10b-5 premised on

misstatements cannot occur unless an alleged material misstatement was false *at the time it was*

*made*." (internal citation omitted)).  The Court agrees.

      As a threshold matter, it is important to note that there is no specific allegation in the

Third Amended Complaint as to when, prior to September 20, 2020, bankruptcy was inevitable,

or as the Court described with respect to scienter, when Defendants knew it was inevitable.

Plaintiffs ask the Court to surmise from the allegations that at least by February 27, 2020,

Defendants had actual knowledge that "Garrett was highly unlikely to survive as a stand-alone

Company and any strategic merger or sale of the business would be conditioned on a court-

supervised restructuring to fix the unsustainable capital structure and Honeywell Obligations."

TAC ¶ 120.  In Plaintiffs' view, therefore, every statement in the Class Period implying that

Garrett was *not* inevitably headed for bankruptcy or "court-supervised restructuring" is

misleading.  But, as the Court has already described with respect to scienter, other facts in the

Third Amended Complaint suggest that Defendants may have reasonably understood that Garrett

had options other than bankruptcy before and during the Class Period, or at least until a

reasonable time before the final Purchase Agreement was signed and Garrett filed for bankruptcy

on September 20, 2020.   Plaintiffs do not allege that Garrett or Defendants made any

misstatements in the time directly leading up to the bankruptcy filing in September 2020; in fact, the Class Period ends on August 26, 2020.

During the Class Period, the allegations suggest that Garrett was still considering its options.  Garrett did not receive "non-binding indications of interest" from potential purchasers, contingent on "acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet,'" until June 15, 2020, over halfway through the Class Period.  *Id*. ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett did not receive *final* non-binding proposals until August 3, 2020, or sign the Exclusivity Agreement until August 13, 2020, near the end of the Class Period.  *Id*. ¶ 70.  Throughout this entire time, Garrett amended its credit agreements to obtain some relief (*id*. ¶ 72), and was involved in a pending lawsuit against Honeywell, which sought to void the Honeywell Obligations and rid Garrett of its precarious balance sheet (*id*. ¶ 63).  Only after the bankruptcy filing on September 20, 2020 – nearly a month after the Class Period – was the litigation involving Honeywell resolved.  *Id*. ¶¶ 2, 31, 63.  With this timeline in mind, the Court will address the alleged misstatements in chronological order.

To start, the February 27, 2020 statements (**Statements 1, 2, 3, 4, 5, 6, & 7**) tout Garrett's "significant financial flexibility," "strong financial position," and "resilient business model," among other things.  *Id*. ¶¶ 78-79.  Plaintiffs allege that these statements were false and misleading because Garrett was struggling with its capital structure, had retained financial advisors for strategic review, and was attempting to void the Honeywell Obligations through litigation.  *See id*. ¶ 82.  But these facts do not contradict the optimistic statements made on February 27, 2020.  Plaintiffs have not attempted to define "flexibility" or "strong financial position," and they do not specify how these statements contradict previously undisclosed

financial data about Garrett.  *See Francisco*, 481 F. Supp. 3d at 210 ("In other words, the

complaint does not provide information as to why these activities necessarily belied Abengoa's

statements that it was in sound financial health at the time.").  The February 27, 2020 Press

Release contains statements that provide context for these alleged misstatements; in that press

release, Garrett highlighted that it was endeavoring to "strengthen[] the company's balance sheet

by utilizing our solid cash flow to reduce net debt by $176 million for the year and $292 million

since our Spin-Off."  Feb. 27, 2020 Press Release at 2-3.  The press release further explains that

while "the near-term macro environment remain[ed] volatile," Garrett had a "robust schedule of

new product launches," and was otherwise increasing net sales and net income.  *Id.*   In this

context, and absent any specific allegations to the contrary, Plaintiffs have failed to allege how

these statements are misleading.

      Plaintiffs' further attempts to otherwise show the falsity of these statements fall flat.

First, they argue that Defendant Rabiller's May 11, 2020 admission about Garrett's "rigid capital

structure," "cannot be reconciled" with the optimistic statements made in February 2020.  TAC

¶ 83.  But it is not relevant that in May 2020 – months after the February 2020 statements were

made – Rabiller referenced Garrett's "rigid capital structure," and described the structure as

unsustainable and "ill suited" to handling challenges.  *Id*.  This is classic hindsight, and does not

support Plaintiffs' otherwise conclusory allegations that the February 2020 statements were false

or misleading.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016)

("The fact that a financial item is accounted for differently, or in a later period, does not support

an inference that a previously filed financial statement was fraudulent.  This is an allegation of

fraud by hindsight, which is insufficient to withstand a motion to dismiss." (internal citation

omitted)).

Furthermore, Plaintiffs have not alleged specific facts explaining why it was false or misleading for Defendants' February 2020 Form 10-K to pronounce:  "We believe we will meet our known or reasonably likely future cash requirements" and that "[i]f these sources of liquidity need to be augmented," Garrett may need to issue debt or equity securities.  TAC ¶ 80 (**Statement 7**).  The entire statement makes clear that "there can be no assurances" that such debt or equity financing would be available.  *Id.*  Garrett qualified that "we believe we will be able to meet our short-term liquidity needs for at least the next twelve-months."  *Id.*[13]  Plaintiffs have not alleged any facts showing that Defendants did not hold these beliefs at the time.  Instead, they contend that the statements were misleading given the steps Garrett had taken to explore a restructuring.  TAC ¶¶ 84-85.  But at this time, Garrett had not even received proposals from bidders; thus, the Court is unable to infer from the allegations that Defendants, at the time, had "actual knowledge that the [bankruptcy] *will* occur," and misled investors by stating otherwise.  *Set Cap. LLC*, 996 F.3d at 85.

---

[13] The 10-K itself contains entire sections devoted to warnings about the Honeywell Obligations, including detailing the terms of the Indemnification Agreement, *see* Feb. 27, 2020 10-K at 22-23, the terms of the Tax Agreement, *see id.* at 27, and the risks of the Spin-Off more generally, *see id.* at 27-29.  In fact, the 10-K specifically says: "Our indebtedness could adversely affect our business, financial condition and results of operations."  *Id.* at 29.  A reasonable investor would certainly be aware of these hindrances, and would likely not ignore these warnings and instead rely on fragmented optimistic statements (arguably puffery) about Garrett's flexibility, strength, or resilience.  *See* Feb. 27, 2020 10-K; *see also* **Statements 1, 2, 3, 4, 5, 6, & 7**.  *See, e.g.*, *ECA, Loc. 134*, 553 F.3d at 206 (concluding that "statements [which] were merely generalizations regarding . . . business practices . . . are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (citations omitted)); *Shemian v. Rsch. In Motion Ltd.*, No. 11-cv-04068 (RJS), 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013), *aff'd,* 570 F. App'x 32 (2d Cir. 2014) (concluding that "vague" statements about "success," "exciting growth," "laying a strong foundation," "bullish[-ness]", etc., were nonactionable puffery); *Schaffer v. Horizon Pharma PLC*, No. 16-cv-01763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) ("For example, statements by Defendants extolling their 'unique commercial business model', noting that the company was 'on track', and highlighting that prescription growth was 'exceeding [their] expectations' are not actionable under the securities laws.") (collecting cases).

Notably, Plaintiffs rely on statements made by Defendant Deason in his bankruptcy declaration in September 2020 to allege the falsity of statements made months prior, in February 2020.  TAC ¶¶ 84-95 (citing Deason Decl. ¶¶ 66, 71).  Those statements, made as part of a declaration filed with the bankruptcy proceeding on September 20, 2020, maintain that Garrett "ha[s] no access to equity capital," because investors are unlikely to invest to Garrett's debt due in part to the Indemnity Agreement (Deason Decl. ¶ 71), and that Garrett "has no access to incremental debt" to fund research and development in light of its "high leverage" (*id*. ¶ 66). Given that Deason's statements were relaying facts as of September 20, 2020, Plaintiffs' allegations of false statements in February 2020 based on these facts rely on hindsight and consequently fail.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d at 211.

The alleged misstatements made in March and April 2020 suffer from the same flaws. Plaintiffs contend that Defendants made a series of misstatements, including explaining that Garrett's "focus remains on leveraging our flexible and resilient business model," touting Garrett's efforts "to enhance our liquidity and preserve the long-term health of the business," and announcing an expectation that Garrett would rely on its "resilient business model to emerge from the crisis as a stronger company."  TAC ¶¶ 87, 88 (**Statements 5, 8, & 9**).  At this time, Defendants had retained more advisors, but Plaintiffs do not otherwise allege specific, undisclosed information that contradicts these statements, or otherwise demonstrate that Defendants knew bankruptcy was inevitable.  It bears noting that by then, Defendants were dealing with the COVID-19 pandemic, and had to shut down a facility in Wuhan, China.  *See id*. ¶ 87.  Defendants had disclosed, and would continue to disclose, the negative impact of COVID on their business.  *See* Feb. 27, 2020 10-K at 19 ("As a result of disruptions to our business as a result of the novel coronavirus, we expect that our revenues and results of operations will be

negatively affected, which, among other things, could cause us to fail to comply with certain financial covenants [including the Credit Agreement and Indemnification Agreement]"); *see also id.* (generally describing potential risks from coronavirus); April 7, 2020 Press Release (noting "substantial disruption" caused by COVID-19, withdrawing 2020 guidance, and indicating steps it is taking to adjust to the pandemic). Plaintiffs otherwise rely on a statement made by Rabiller in May 2020, *see* TAC ¶ 92, to allege the falsity of statements made months before that, and, in dismissing the disclosures that Garrett made regarding COVID, only assert, without factual support, that "COVID was not the cause of Garrett's eventual bankruptcy," *id.* ¶¶ 90-91. Plaintiffs therefore fail to show that Garrett's optimistic statements in March and April 2020 were false or misleading when made.

With respect to statements made by Defendants in May 2020, Plaintiffs again do not allege any additional undisclosed facts that alter the Court's determination that Plaintiffs have not adequately alleged false or misleading statements by Garrett. The statements by Defendants on May 11, 2020 resemble statements already addressed herein. For instance, Defendants stated that Garrett's "positive business fundamentals remain intact," that its flexibility allowed it "to maintain [its] agility and strengthen [its] position for long-term success," that it would "leverage [it's] flexible and resilient business model," and that it remained "well positioned to accelerate [its] cutting-edge technologies to the market and drive long-term success." *Id.* ¶¶ 92-93 (**Statements 10, 11, 12, 13**). In the Form 10-Q that month, Garrett again noted that "[i]f these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities . . . [and] we believe we will be able to meet our short-term liquidity needs for at least the next twelve months." *Id.* ¶ 94 (**Statement 14**). Also on May 11, 2020, Defendant Rabiller noted in his earnings call that: "Our former parent imposed

on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly

favorable macroeconomic and industry environment, meaning that was really unsustainable that

way unless everything was perfect.  With insight, it is clear that our capital structure was ill

suited to cope with any meaningful operating challenges."  *Id*. ¶ 134.

        Nothing in the Third Amended Complaint details precisely why these statements were

false or misleading at the time they were made.  To be sure, Plaintiffs allege that Defendants

were still engaging advisors to explore restructuring options in the face of challenges from its

capital structure.  But these allegations do not imply that bankruptcy was certain, or that

Defendants knew restructuring was the only option going forward.  Nor are they contrary to the

statements made that day.  For instance, on the earnings call, Defendant Bracke noted that, with

respect to dealing with the Honeywell Obligations, "[t]here are a few options open" and went on

to discuss amendments to credit agreements.  May 11, 2020 Earnings Call at 14-15.  And with

respect to the pandemic, Defendant Bracke warned that "there is no firm answer to this.  I think

the only thing we can say is that for now we believe that should be okay, but this can definitely

change depending upon how the crisis develops."  *Id.* at 23.  When viewed in the context of all of

the statements made that day, Defendants appear to have been giving investors insight into the

risks the company faced at that time, including from the COVID-19 pandemic and its "rigid

capital structure," while also noting Garrett's positive features.  *Cf. Slayton*, 604 F.3d at 777

("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit

the defendants engaging in a good-faith process to inform themselves and the public of the

risks."); *see also* May 11, 2020 Earnings Call (discussing the negative effect of the COVID-19

pandemic on Garrett's operations).  The Form 10-Q notes that "there can be no assurances"

about financing options, "particularly in light of the volatility in global financial markets as a

result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . ."  TAC ¶ 94.  Moreover, and importantly, Plaintiffs yet again impermissibly rely on the same statements made by Defendant Deason in September 2020 in the bankruptcy proceeding to impute knowledge to Defendants back in May 2020.  *See id*. ¶¶ 96-97 (citing Deason Decl. ¶¶ 66, 71).  When viewed holistically, and without considering the hindsight-based facts alleged in the Third Amended Complaint, Plaintiffs have failed to allege specific facts showing that these May 2020 statements were false or misleading.

On June 12, 2020, Garrett entered into certain "amendments" to credit agreements.  TAC ¶ 72.  In announcing these moves, Defendant Rabiller declared that "[d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact."  *Id*. ¶ 98 (**Statement 15**).  Plaintiffs allege this statement was false or misleading because Garrett was actively pursuing restructuring, and knew that Garrett "was unable to survive as an independent company . . . ." *Id*. ¶ 100.  However, Rabiller had just announced that Garrett's "modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown."  *Id*. ¶ 72.  When viewed with this context, Rabiller's statement does not contradict undisclosed facts – or actual knowledge of an inevitable restructuring – but instead voices optimism and an intent by Defendants to take creative measures, such as Credit Agreement modifications, to ensure the success of the company and avoid bankruptcy.

Later in the summer, Garrett had received "5 non-binding indications of interests" from potential buyers that were "contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current

balance sheet.'"  *Id*. ¶ 68 (quoting Deason Decl. ¶ 80).  After two of those companies began due

diligence, Garrett issued a press release and some Defendants went on an earnings call on July

30, 2020 to tout Garrett's "robust infrastructure and agile working capabilities as we execute on

our long-term strategy and lead the evolution" in the automotive industry, its "strong

fundamentals . . . [and] variable cost model that helps preserve cash and an attractive margin

profile," and the "resiliency of [Garrett's] operating structure."  *Id*. ¶¶ 101-102 (**Statements 16

& 17**); *see id*. ¶ 104.

Plaintiffs allege that it was misleading to make such optimistic statements while in the

final stages of due diligence with a potential stalking horse bidder.  *Id*.  The Court disagrees.

These optimistic statements were made at a time when Garrett was still pursuing litigation

against Honeywell to relieve itself of its financial encumbrances bestowed by the parent

company during the Spin-Off.  *See id*. ¶¶ 2, 63.  While Plaintiffs allege that litigation was

"futile," Plaintiffs have not alleged that Defendants were aware of that fact when the statements

were made.  *Id*. ¶ 63; *cf. Garrett I*, 2022 WL 976269, at *14 (noting that Honeywell litigation

was a "potential way to get out of the Honeywell Obligation," and therefore it was not "highly

unreasonable and . . . representing an extreme departure from the standards of ordinary care . . .

for Rabiller to say that the Company took actions to obtain increased financial flexibility"

(internal citations and quotation marks omitted)).  Notably, also, Defendants did not receive final

stalking horse bids until several days after these statements were made, on August 3, 2020.  TAC

¶ 104.  The only specific fact alleged as contradictory to these statements is that Defendants

stated on September 20, 2020, in connection with their bankruptcy announcement, that the

"financial strains of the heavy debt load and liabilities we inherited in the spinoff from

Honeywell – all exacerbated by COVID-19 – created a significant long-term burden on our

business . . . ."  *Id.* ¶ 105 (quoting September 20, 2020 Press Release, available at:

https://investors.garrettmotion.com/news-releases/news-release-details/garrett-motion-enters-

definitive-transaction-agreement-and).  But this alleged admission is from September 20, 2020,

long after the summer 2020 alleged misstatements.  Moreover, on July 30, 2020, Defendants

made further disclosures about the negative impact the pandemic was having on their business.

*See, e.g.*, July 30, 2020 Press Release at 2 (noting that lower production, the shutdown of plants,

and a "challenging demand environment . . . could further challenge our capital structure and

limit our ability to expand on our strategy now and in the future"); *see also* July 30, 2020

Earnings Call at 7, 12 (noting that despite success in continuing operations, the future was

"uncertain," and "our capital structure remains a significant challenge").  Therefore, Plaintiffs do

not allege facts that, absent hindsight, demonstrate with specificity that the June and July 2020

statements were false or misleading.

Plaintiffs also allege that it was misleading for Defendants to omit from their July 2020

Form 10-Q language indicating that "management has concluded that the foregoing conditions

and events raise substantial doubt as to our ability to continue as a going concern."  TAC ¶¶ 106-

107.  Absent a duty to disclose information, "[a]n omission of information . . . is . . . actionable

only when disclosure of such information is necessary to make . . . statements made, in the light

of the circumstances under which they were made, not misleading."  *Gillis*, 197 F. Supp. 3d at

577 (internal quotation marks and citation omitted).  Plaintiffs argue that it was misleading for

Defendants to exclude these risk factors because they knew that Garrett was heading for

bankruptcy at this time.  TAC ¶ 108.  Plaintiffs further contend that the omission misled

investors into thinking that the "going concern" language included in the May 2020 Form 10-Q

"was tied solely to Garrett's credit agreement negotiation," and not its possible bankruptcy.  *Id.*

¶ 109.  But once again, without considering hindsight-based statements, the facts alleged do not

specifically show that, as of July 30, 2020, it was misleading to omit this "going concern"

language.  Defendant Rabiller had already disclosed concerns about the capital structure in May

2020, and Defendant Deason noted in the July 30, 2020 earnings call that, despite the removal of

that language, "[o]ur capital structure remains a significant challenge," particularly "from 2023

onward."  July 30, 2020 Earnings Call at 12.  Plaintiffs have not pointed to – and the Court is not

aware of any – obligation on the part of Defendants to disclose that two potential bidders were

conducting due diligence.  To the contrary, they almost certainly were not under any obligation

to do so.  *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348 (noting that in light of other

disclosures about "intensive efforts to ameliorate the company's liquidity problem, the lack of

disclosure regarding its bankruptcy planning did not transform its disclosures during this period

into misrepresentations").[14]  Plaintiffs therefore have not alleged that the omission of the "going

concern" language was misleading in context.

Finally, Plaintiffs contend that the statements made on August 26, 2020, two weeks after

Garrett had entered an Exclusivity Agreement with KPS, were materially false and misleading.

*See* TAC ¶¶ 110-113.  On that day, Garrett "announced that, with the assistance of its financial

and legal advisors, it is exploring alternatives for addressing its previously disclosed balance

---

[14] The Court also rejects Plaintiffs' allegations that language contained in the February 2020 10-K, May 2020 10-Q, and July 2020 10-Q, articulating risk factors related to the Honeywell Obligations (TAC ¶ 114 (**Statement 19**)) is misleading.  Plaintiffs take issue with the fact that the risk factors warned that there *may* be material adverse effects to liquidity and cash flow from the Indemnity Agreement.  *See id*. ¶¶ 104, 114-118.  When these fairly boilerplate risk factors were printed in Garrett's filings, Garrett had disclosed the contents of the Honeywell agreements, *see, e.g.*, Feb. 2020 10-K, had not yet received final proposals from bidders, and was otherwise attempting to navigate the Honeywell Obligations' encumbrances.  Accordingly, in the context of the facts alleged here, it was not misleading for Plaintiffs to disclose those risk factors, without also stating that bankruptcy was on the horizon.

sheet concerns." *Id*. ¶ 110. Plaintiffs allege that it was false and misleading to state that Garrett is seeking to address its balance sheet concerns while its "core business remains strong," and that "any actions taken by Garrett in relation to liability management *may* materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock." *Id*. ¶¶ 110, 113 (**Statements 20 & 21**) (added). Plaintiffs further contend it was misleading for Defendants to state that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives." *Id*. ¶ 111 (**Statement 22**). Plaintiffs have not alleged specific facts that contradict these disclosures; instead, Plaintiffs argue that they are misleading in light of the steps Garrett had previously taken to explore restructuring, and the fact that Garrett had already entered the Exclusivity Agreement. *See id*. ¶113. But the purchase agreement was not signed until September 20, 2020, almost a month later. *See* Br. at 19. This timeline suggests that bankruptcy was not necessarily imminent (indeed, the Honeywell litigation, albeit deemed as a "Hail Mary," appears to have been ongoing) and therefore it was not necessarily misleading to state that "Garrett has not yet determined" whether to pursue bankruptcy, just as the disclosures state. *Cf. Set Cap. LLC*, 996 F.3d at 85 (concluding complaint adequately alleged that "Defendants knew with virtual certainty" that their "hedging activity" would decrease value of notes because "three prior volatility spikes" put them on notice of that effect). Thus, unlike in *In re Vivendi Universal, S.A.* (*Vivendi I*), on which Plaintiffs rely, Plaintiffs here have not "alleged sufficient facts to show defendants could not have reasonably believed the statements made to the public." 381 F. Supp.

2d 158, 182 (S.D.N.Y. 2003).[15]   Nothing in the Third Amended Complaint adequately alleges that these statements were false or misleading when made.

While not central to the Court's holding, there is also a sound policy basis, articulated by other courts in this District, for not requiring immediate disclosure when a company is contemplating bankruptcy.  *See, e.g.*, *Hutchinson I*, 2012 WL 5451258, at *8 ("Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." (quoting *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009))).[16]   This conclusion is also consistent with the principle that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields*, 25 F.3d at 1129-30.

---

[15] The additional cases cited by Plaintiffs involve situations where, unlike here, Defendants had actual knowledge of an event that was already occurring, or certain to occur, but publicly disclosed uncertainty about whether that event would happen.  *See In re Globalstar Sec. Litig.*, No. 01-cv-01748 (SHS), 2003 WL 22953163, at *11 (S.D.N.Y. Dec. 15, 2003) (noting in context of Section 11 claim that defendants publicly stated problems "might delay" the availability of their service, when in fact they knew the delay was already happening, and knew it would impact their potential revenue); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized.").  Here, Plaintiffs have not alleged when Defendants knew bankruptcy was certain; therefore, the alleged public misstatements do not contradict undisclosed information as alleged in the Third Amended Complaint.

[16] Plaintiffs argue that, unlike the parties in *Beleson*, they are not arguing that Defendants were required to disclose that they were going to file for bankruptcy, only that it was misleading to make certain statements about Garrett's capital structure which led to its bankruptcy, or issue risk factors of what "may happen," when those things were "already materializing."  Opp. at 12 n.11.  But, for the reasons stated above, Plaintiffs have failed to allege with particularity that the alleged statements were misleading in light of what was "materializing" at the time the statements were made.

Accordingly, the Court concludes that Plaintiffs have failed to plead with specificity that the alleged misstatements were false or misleading as required under federal securities laws.

### C.    Section 20 Claim

"To plead a section 20(a) claim, a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Garrett I*, 2022 WL 976269, at *18 (quoting *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 236). When a claim under Section 10(b) is dismissed, a claim under Section 20(a) ought to be dismissed as well. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108 (noting that if a plaintiff "fails to allege any primary violation[,] . . . it cannot establish control person liability"); *Schwab v. E*TRADE Fin. Corp.*, 752 F. App'x 56, 59-60 (2d Cir. 2018) ("Because [the plaintiff]'s Section 10(b) claim was properly dismissed, . . . [the plaintiff]'s Section 20(a) claim also necessarily fails and was properly dismissed."). Because the Court has concluded that Plaintiffs' Section 10(b) claim fails on scienter and falsity grounds, the Section 20(a) claim also fails for these reasons.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party.").

The Clerk of Court is respectfully directed to CLOSE this case.

Dated:  March 31, 2023
        New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge

# APPENDIX A[1]

| # | ¶¶ | Date | Source | Statement[2] |
|---|-----|------|--------|--------------|
| 1 | 78 | 2/27/20 | Press Release | "*significant financial flexibility*" |
| 2 | | | | "*well positioned to build upon the progress we achieved during our first full year as an independent company*" |
| 3 | 79 87 | 2/27/20 3/19/20 | Earnings Call Press Release | "*significant flexibility* to help mitigate the impact from any short-term fluctuations in the underlying macro environment" |
| 4 | | | | "maintained [its] *strong financial position*" |
| 5 | | | | "[g]oing forward, we plan to continue to *utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet*" |
| 6 | | | | "*flexible and resilient business model*" (¶¶ 79, 87) |
| 7 | 80 | 2/27/20 | 10-K | "*We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however,* there *can be no assurances* that we will be able to obtain additional debt or equity financing on acceptable terms in the future. *Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*" |
| 8 | 88 | 4/7/20 | Press Release | "*to enhance our liquidity and preserve the long-term health of the business*" |
| 9 | | | | "*resilient business model* to emerge from this crisis as a stronger company" |
| 10 | 92 | 5/11/20 | Press Release | "*positive business fundamentals remain intact*" |
| 11 | | | | "*to maintain our agility and strengthen our position for long-term success*" |

---

[1] This Appendix is sourced from ECF No. 87-1, Defendants' Appendix 1.  The Court has only made non-substantive changes, and attaches this to its Opinion for ease of reference.

[2] Paragraph references are to the Third Amended Complaint ("TAC").  All material in the "Statement" column is quoted from the TAC.  Emphases are Plaintiffs'.

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
| 12 | | | | "*take advantage of our[3] flexible and resilient business model*" |
| 13 | 93 | 5/11/20 | Earnings Call | "*well positioned to accelerate our cutting-edge technologies to the market and drive long-term success*" |
| 14 | 94 | 5/11/20 | 10-Q | "If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all… *we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |
| 15 | 98 | 6/12/20 | Press Release | "[d]espite the near-term disruption across the automotive industry and global economy, *it is important to remember that the positive long-term fundamentals of our business remain intact.*" |
| 16 | 101 | 7/30/20 | Press Release | "*agile working capabilities as we execute on our long-term strategy*" |
| 17 | 102 | 7/30/20 | Earnings Call | "*the strong fundamentals of Garrett . . . combined with a variable cost model that helps preserve cash and an attractive margin profile,*" and "the *resiliency of [Garrett's] operating structure.*" |
| 18 | 107 | 7/30/20 | 10-Q | Removal of "going concern" language |

---

[3] Paragraph 93 alleges the statement "leverage [its] flexible and resilient business model," which does not appear in the May 11, 2020 Earnings Call Transcript. *See* ECF No. 88-12, Carlinsky Decl Ex. L. The phrase "take advantage of our flexible and resilient business model" appears on page 12, and so that sentence is included in this Appendix. *See id.* at 12.

| # | ¶¶ | Date | Source | Statement |
|---|----|------|--------|-----------|
| 19 | 114 | 2/27/20 | 10-K | "***may*** *have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales,*" "***may*** *also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet,*" and that "our access to capital to fund our operations ***may*** be materially adversely affected." The February 27, 2020 Form 10-K also contained a separate risk factor stating that "[o]ur indebtedness ***could*** adversely affect our business, financial condition and results of operations." |
| | 116-17 | 5/11/20 | 10-Q | References to / inclusion of similar language |
| | 118 | 7/30/20 | 10-Q | References to / inclusion of similar language |
| 20 | 110 | 8/26/20 | Press Release | "*Garrett is seeking to address its balance sheet concerns while **its core business remains strong** in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer.*" |
| 21 | | | | "*any actions taken by Garrett in relation to liability management **may** materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock.*" |
| 22 | 111 | 8/26/20 | Press Release | "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives.***" |

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

                                             20 **CIVIL** 7992 (JLR)

                                                      **JUDGMENT**

----------------------------------------------------------X

         It is, **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated March 31, 2023, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."); accordingly, the case is closed.

**Dated:** New York, New York
       March 31, 2023

                                       **RUBY J. KRAJICK**

                                       _____
                                       **Clerk of Court**

                         **BY:**     K. Mango

                                       _____
                                       **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

## NOTICE OF APPEAL

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the       ☐ judgment       ☐ order       entered on: _____

(date that judgment or order was entered on docket)

that:

_____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____
Dated                                                           Signature*

_____
Name (Last, First, MI)

_____
Address                           City                  State                      Zip Code

_____          _____
Telephone Number                                      E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

## MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                              date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

_____          _____
Dated:                           Signature

_____
Name (Last, First, MI)

_____  _____  _____  _____
Address                  City        State        Zip Code

_____          _____
Telephone Number                 E-mail Address (if available)

Rev. 3/27/15

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (     )(     )

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                          **MOTION FOR LEAVE TO
                                                   PROCEED IN FORMA
_____           PAUPERIS ON APPEAL**

_____

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____          _____
Dated                                      Signature

_____
Name (Last, First, MI)

_____
Address                         City                State                Zip Code

_____          _____
Telephone Number                          E-mail Address (if available)

Rev. 12/23/13

## Application to Appeal In Forma Pauperis

_____**v.** _____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br> Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br> Date: _____ |

My issues on appeal are: (<u>required</u>):

1.   *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$ 0** | **$ 0** | **$ 0** | **$ 0** |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

4.      *How much cash do you and your spouse have? $_____*

   *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

**If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.**

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.      *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included? ☐ Yes ☐ No<br>    Is property insurance included? ☐ Yes ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

| | | | |
|---|---|---|---|
| Transportation (not including motor vehicle payments) | | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | | |
| | Homeowner's or renter's: | $ | $ |
| | Life: | $ | $ |
| | Health: | $ | $ |
| | Motor vehicle: | $ | $ |
| | Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | | $ | $ |
| Installment payments | | | |
| | Motor Vehicle: | $ | $ |
| | Credit card (name): | $ | $ |
| | Department store (name): | $ | $ |
| | Other: | $ | $ |
| Alimony, maintenance, and support paid to others | | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | | $ | $ |
| Other (specify): | | $ | $ |
| **Total monthly expenses:** | | $ 0 | $ 0 |

9.  *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    ☐ Yes        ☐ No        If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

    *If yes, how much?* $ _____

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____