# 23-668

## United States Court of Appeals for the Second Circuit

IN RE GARRETT MOTION INC. SECURITIES LITIGATION

--------------------------------

THE GABELLI ASSET FUND, THE GABELLI DIVIDEND & INCOME TRUST, THE GABELLI VALUE 25 FUND INC. and GAMCO ASSET MANAGEMENT INC., on behalf of themselves and a putative class of similarly situated investors,

*Plaintiffs-Appellants*,

v.

GARRETT MOTION, INC., OLIVIER RABILLER, PETER BRACKE, SEAN DEASON, RUSSELL JAMES, CARLOS CARDOSO, MAURA CLARK, COURTNEY ENGHAUSER, SUSAN MAIN, CARSTEN REINHARDT and SCOTT TOZIER,

*Defendants-Appellees.*

--------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS**

---

Andrew J. Entwistle
ENTWISTLE & CAPPUCCI LLP
500 W. 2nd Street, Suite 1900
Austin, TX 78701
(512) 710-5960
aentwistle@entwistle-law.com

Arthur V. Nealon
Joshua K. Porter
ENTWISTLE & CAPPUCCI LLP
230 Park Avenue, 3rd Floor
New York, NY 10169
(212) 894-7200
anealon@entwistle-law.com
jporter@entwistle-law.com

*Counsel for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1:

1.     Plaintiffs-Appellants The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, and The Gabelli Value 25 Fund Inc. are mutual funds with no corporate parents.  No public company owns or holds 10% or more of their stock.

2.     Plaintiff-Appellant GAMCO Asset Management Inc. identifies GAMCO Investors, Inc. as its parent corporation and confirms that it is 100% owned by GAMCO Investors, Inc., a public company traded on the over-the-counter markets.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF JURISDICTION...........................................................6

ISSUES PRESENTED FOR REVIEW ......................................................6

STATEMENT OF THE CASE...................................................................7

A.    Garrett's Spin-Off.......................................................................7

B.    Defendants' Pre-Class Period Statements Touting Garrett's Strong Financial Flexibility and Positioning for Success ...........................................9

C.    Garrett's Preparation for Bankruptcy .................................................9

D.    Defendants' Class Period Misstatements and Omissions............................11

E.    Defendants' Motions to Dismiss and the Disposition Below ......................13

    1.    The Superseded Second Amended Complaint....................................13

    2.    The Operative Third Amended Complaint .........................................15

    3.    The District Court's Dismissal of the Third Amended Complaint .....15

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW ...................................................................20

ARGUMENT ...................................................................................21

I.    THE THIRD AMENDED COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS REPEATEDLY MADE FALSE AND MISLEADING STATEMENTS ...............................................................21

    A.    The District Court Erred in Disregarding This Court's Reasoning in *Vivendi II* in Dismissing the Third Amended Complaint ..................21

B.      As in *Vivendi II*, Defendants Violated Their Duty to Speak Truthfully
        and Accurately.....................................................................................24

C.      The Third Amended Complaint Adequately Pleads Actionable
        Misstatements and Omissions Under This Court's Precedent............26

II.     THE DISTRICT COURT ERRED IN RULING THAT PLAINTIFFS
        FAILED TO ADEQUATELY PLEAD SCIENTER ....................................30

A.      Defendants' Statements Regarding Garrett's Financial Flexibility and
        Positioning for the Future Were Contrary to Facts Known or
        Available to Them................................................................................31

B.      The Third Amended Complaint Supports a Strong Inference of
        Scienter ................................................................................................32

C.      The District Court's Scienter Analysis Improperly Relied on the Prior
        Decision Addressing a Different Liability Theory ............................35

D.      The District Court Erred in Failing to Weigh Plaintiffs' Scienter
        Allegations as a Whole........................................................................39

III.    THE DISTRICT COURT ERRED IN FINDING THAT ALLEGATIONS
        BASED ON POST-CLASS PERIOD STATEMENTS IN THE DEASON
        BANKRUPTCY DECLARATION CONSTITUTED FRAUD BY
        HINDSIGHT.............................................................................................40

A.      Plaintiffs Properly Relied on the Deason Bankruptcy Declaration to
        Show Defendants' Knowledge of Contrary Facts..............................41

B.      Plaintiffs Adequately Alleged That Defendants Knew or Should Have
        Known That Their Statements Were False or Misleading When Made
        ..............................................................................................................42

IV.     THE DISTRICT COURT ERRED IN DETERMINING THAT POLICY
        CONSIDERATIONS RELIEVED DEFENDANTS' DUTY TO TELL THE
        WHOLE TRUTH WHEN THEY CHOSE TO SPEAK ABOUT
        GARRETT'S FINANCIAL CONDITION ....................................................44

CONCLUSION ......................................................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...........................................................................45

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002) ................................................................... 27, 45

*Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ................................................................... 25, 27

*In re Garrett Motion Inc. Sec. Litig.*,
  No. 1:20-cv-07992 (JLR), 2023 WL 2744029
  (S.D.N.Y. Mar. 31, 2023) ...................................................................... passim

*In re Garrett Motion Inc. Sec. Litig.*,
  No. 20 Civ. 7992 (JPC), 2022 WL 976269
  (S.D.N.Y. Mar. 31, 2022) ...................................................................... passim

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ................................................................... 39, 40

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ...................................................... 32, 33, 41, 44

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) .........................................................................20

*In re Tower Auto. Sec. Litig.*,
  483 F. Supp. 2d 327 (S.D.N.Y. 2007) .........................................................26

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .........................................................29

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................. passim

*Int'l Controls Corp. v. Vesco*,
    556 F.2d 665 (2d Cir. 1977) ........................................................35

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
    655 F.3d 136 (2d Cir. 2011) ........................................................20

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ........................................................39

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014) ........................................................19

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ........................................... passim

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) .................................................. 19, 41

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) .................................................. 30, 39

*Setzer v. Omega Healthcare Investors, Inc.*,
    968 F.3d 204 (2d Cir. 2020) ...................................... 33, 34, 35, 45

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ........................................................30

*Solow v. Citigroup, Inc.*,
    827 F. Supp. 2d 280 (S.D.N.Y. 2011) ........................................33

*South Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ........................................................40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................... 20, 21, 40

**Statutes**

15 U.S.C. § 78t(a) ........................................................45

15 U.S.C. § 78u–4(b)(2) ........................................................30

## PRELIMINARY STATEMENT

Mere months from filing for bankruptcy – and while its insolvency advisors ran a board-directed, full-blown bid process to select a stalking horse bidder – Appellees Garrett Motion, Inc. ("Garrett" or the "Company") and its directors and officers (the "Individual Defendants" and, with Garrett, the "Defendants") made numerous misleading positive statements to investors about Garrett's financial condition, including touting its financial flexibility, underscoring its positioning for long-term success, and claiming it had the ability to meet liquidity needs for at least a year. Defendants' message of "smooth sailing" ahead was a far cry from the gale force winds of bankruptcy that Defendants knew they were about to unleash on unsuspecting investors. This conduct violated the well-established rule in this Circuit that "at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *In re Vivendi, S.A. Sec. Litig.* ("*Vivendi II*"), 838 F.3d 223, 258 (2d Cir. 2016).

Indeed, Defendants' misconduct here is remarkably like that in *Vivendi II*, where this Court affirmed post-trial that Vivendi Universal, S.A. ("Vivendi") was liable for each of the positive statements concerning the company's operations and liquidity made at a time it was, in reality, facing severe undisclosed financial difficulties and had already retained financial advisors to consider bankruptcy:

In the worst case scenario, which inquiries later revealed was not an altogether unlikely one, Vivendi was months away from bankruptcy or insolvency. Yet, up until approximately July 2002, Vivendi made numerous representations to the market suggesting that the course ahead for the company was smooth sailing.

*Id.* at 232.

In affirming, this Court found that Vivendi's statements emphasizing "its strong free cash flow," "growth prospects," and "strong balance sheet" were all misleading in the context of Vivendi's liquidity risk because "such statements strongly suggested that Vivendi faced no liquidity risk at the time." *Id.* at 246, 251–52. That rationale applies with equal force here where Plaintiffs' Third Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Third Amended Complaint") pleads in detail twenty-two misstatements and omissions by Defendants that describe clear skies and calm seas for Garrett ahead, while Defendants secretly retained top insolvency counsel and advisors and directed their bankers to conduct a bid process to select a stalking horse bidder for a sale in conjunction with the bankruptcy filing they were actively preparing. These allegations were all largely confirmed by the revelations in the September 20, 2020 declaration by Defendant Sean Deason (the "Deason Bankruptcy Declaration") – Garrett's Chief Financial Officer – filed by Garrett as part of its first-day bankruptcy pleadings and elsewhere in other filings.

Nevertheless, the United States District Court for the Southern District of New York (Rochon, J.) (the "<u>District Court</u>") incorrectly concluded that Plaintiffs failed to plead "that any of the statements were actually false or misleading when made." *In re Garrett Motion Inc. Sec. Litig.* ("<u>*Garrett II*</u>"), No. 1:20-cv-07992 (JLR), 2023 WL 2744029, at \*16 (S.D.N.Y. Mar. 31, 2023). This was clear error. Among other things, the District Court disregarded this Court's reasoning in *Vivendi II* and the remarkable similarities with the instant case, including that, in *Vivendi II*, this Court recognized that the federal securities laws prohibit a company from publicly touting the strength of its financial condition while secretly preparing for bankruptcy. Significantly, the *Vivendi II* Court found actionable misstatements about the company's financial condition even where bankruptcy was only "one of four possible scenarios" facing the company and, as the Court observed on similar facts, was "not an altogether unlikely one." *Vivendi II*, 838 F.3d at 232.

Those are substantially the circumstances detailed in the Third Amended Complaint but ignored by the District Court in concluding that Plaintiffs had to show precisely "when, prior to September 20, 2020, bankruptcy was inevitable." *Garrett II*, 2023 WL 2744029, at \*16. There is nothing in the case law that requires Plaintiffs to show that Garrett's bankruptcy was "inevitable," and indeed, such a requirement is contrary to *Vivendi II*. Compounding its error, the District Court reached that conclusion despite clear evidence that, by the beginning of the Class Period,

Defendants had retained insolvency advisors, and that in the weeks that followed, Defendants directed them to conduct a stalking horse bid process, multiple rounds of diligence were conducted, a stalking horse bidder was selected, and preparations for the complex bankruptcy for this global company were underway. Those and other facts detailed in the Third Amended Complaint and admitted in the Deason Bankruptcy Declaration make clear that, at a minimum, bankruptcy was likely – if not inevitable (as the District Court erroneously required) – and that falsity was more than sufficiently pleaded for the matter to survive a motion to dismiss.

The District Court likewise erred in concluding that the Deason Bankruptcy Declaration's confirmation of the facts surrounding Defendants' bankruptcy preparations amounted to alleging "fraud by hindsight," rather than supporting a strong inference of scienter. In fact, the Deason Bankruptcy Declaration sets forth in detail the cascading and failed steps that *Defendants themselves* were taking before and during the Class Period to escape Garrett's onerous (and ultimately fatal) obligations to its former parent Honeywell International Inc. ("Honeywell"), and thus established contrary facts known or available to Defendants *before and contemporaneously with* their twenty-two misstatements and omissions. The inference that Defendants knew that their statements touting Garrett's financial condition while preparing for bankruptcy would mislead investors is *at least* as compelling as the contrary and strained inference that these experienced executives

honestly believed that Garrett was prospering or were merely uncertain about the peril the Company then faced. After all, if that were true, Defendants' active bankruptcy preparations would have been wholly illogical and wasteful.

Lastly, while not central to its holding, the District Court also erred in citing the "sound policy basis . . . for not requiring immediate disclosure when a company is contemplating bankruptcy." As stated in *Vivendi II*, "Vivendi was months away from bankruptcy or insolvency. Yet, up until approximately July 2002, Vivendi made numerous representations to the market suggesting that the course ahead for the company was smooth sailing." *Vivendi II*, 838 F.3d at 232. Just as in *Vivendi II*, having chosen to speak, Defendants could not describe Garrett's financial condition as "smooth sailing," while feverishly preparing to unleash the gale force winds of bankruptcy on unsuspecting investors. *Id.* While there is no obligation to disclose the pursuit of bankruptcy on its own, where, as here, Defendants chose to speak about Garrett's financial condition, they were required to warn about the coming storm. *See id.*

Respectfully, this Court should reverse the District Court's dismissal of the Third Amended Complaint so that Plaintiffs' well-pleaded allegations concerning Defendants' twenty-two misstatements and omissions and scienter can be tested in discovery. At the very least, the Court should remand the case to the District Court with directions to consider Plaintiffs' theory of the case under *Vivendi II*.

## STATEMENT OF JURISDICTION

This appeal arises from the District Court's March 31, 2023 final judgment granting Defendants' motion to dismiss the Third Amended Complaint. Plaintiffs timely filed a notice of appeal on April 19, 2023.

The District Court had subject-matter jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1337.

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Should the District Court's ruling be reversed because the District Court disregarded this Court's reasoning in *Vivendi II* by holding that Defendants' twenty-two Class Period misstatements and omissions touting Garrett's financial condition were not actionable even though Garrett was actively preparing for bankruptcy?

2. Did the District Court err in disregarding the well-settled principle that Defendants were required to tell the whole truth once they chose to make positive statements touting Garrett's financial condition?

3. Did the District Court err in finding that the Third Amended Complaint's allegations of specific facts known or available to Defendants – as revealed in the Deason Bankruptcy Declaration and elsewhere – that were contrary to Defendants' twenty-two misstatements and omissions concerning Garrett's

financial condition do not raise a strong inference of Defendants' scienter that was at least as plausible as any contrary inference?

4. Did the District Court err in determining that Plaintiffs' scienter allegations as confirmed by the Deason Bankruptcy Declaration were merely "fraud by hindsight," even though the declaration clearly revealed contrary facts that Defendants contemporaneously knew or had access to when making their alleged material misstatements and omissions touting Garrett's financial condition?

## STATEMENT OF THE CASE

### A. Garrett's Spin-Off

Garrett engineers, develops, and sells turbochargers and electric-boosting technologies for ground-based vehicle engines produced by automotive and truck manufacturers. (JA-1121 ¶ 31).[1] Garrett, based in Switzerland, was formerly a subsidiary of industrial giant Honeywell. *Id.* On October 1, 2018, Honeywell spun off Garrett as a stand-alone publicly traded company (the "Spin-Off"). *Id.* The Spin-Off was designed to offload up to $5.25 billion in Honeywell's legacy asbestos liabilities (unrelated to Garrett) pursuant to an Indemnity Agreement that enabled Honeywell to exercise control of key Garrett corporate decisions by including a set

---

[1] References to the Joint Appendix are designated "JA-__." All citations to documents not included in the Joint Appendix or Special Appendix but available on the District Court's ECF docket are referenced by "document name, ECF No.___."

of loan-like covenants. (JA-1124 ¶¶ 44-45). The Spin-Off also required Garrett both to satisfy up to $250 million of Honeywell's tax obligations under a Tax Matters Agreement and to fund a $1.6 billion "dividend" to Honeywell under a Credit Agreement.[2] (JA-1124 to 1125 ¶¶ 44-47).

While the underlying agreements were publicly disclosed, Defendants hid the extent to which the Honeywell Obligations constrained Garrett's ability to conduct its core business operations. (JA-1128 ¶ 53, JA-1129 to 1130 ¶¶ 56-61). Garrett's own bankruptcy filings conceded for the first time that "[s]ince the Spin-Off, the Company [] struggled with the capital structure Honeywell foisted upon it, which [was] not sustainable and put[] the Company at a substantial disadvantage to its competitors" (JA-1128 ¶ 53), which prevented Garrett from accessing any new debt or equity capital to fund operations or implement any long-term growth strategy (JA-1130 ¶¶ 60-61) and prohibited Garrett from entering any strategic transaction, such as a merger, acquisition, or sale at a time when its industry was consolidating. (JA-1130 ¶ 59). Moreover, as early as 2019, Garrett's customer relationship teams reported to Defendants that customers were nervous about the Company's capital structure. (JA-1129 ¶ 58). Garrett remained bound by the

---

[2] The Indemnity Agreement, Tax Matters Agreement, and Credit Agreement are collectively referred to herein as the "Honeywell Obligations."

Honeywell Obligations until it filed for Chapter 11 bankruptcy protection on September 20, 2020 (the "<u>Bankruptcy Proceedings</u>").  (JA-1130 to 1131 ¶ 62).

## B. Defendants' Pre-Class Period Statements Touting Garrett's Strong Financial Flexibility and Positioning for Success

For the first sixteen months following the Spin-Off, Defendants engendered investor confidence by hyping Garrett's core business operations in public filings and presentations touting the Company's financial flexibility, research and development, and positioning for long-term success.  (JA-1125 to 1127 ¶¶ 48-50).  Simply put, from the Spin-Off to the start of the Class Period on February 27, 2020, Garrett consistently represented that it had the financial resources to fund research and development, promote growth, and maintain its ongoing operations.  But, by at least the beginning of the Class Period, Defendants knew that their representations either had never been, or were no longer, true.

## C. Garrett's Preparation for Bankruptcy

Garrett retained Morgan Stanley & Co. LLC ("<u>Morgan Stanley</u>") to explore strategic alternatives in the *first quarter of 2019*.  (JA-1128 ¶ 54).  Around the same time, Garrett retained Quinn Emanuel Urquhart & Sullivan, LLP ("<u>Quinn Emanuel</u>") to evaluate the validity of the Honeywell Obligations and to assist in negotiating with Honeywell for relief from the Honeywell Obligations.  (JA-1129 ¶¶ 55-56).  In late 2019, Defendants secretly directed Morgan Stanley to commence a marketing and sales process for Garrett, which included a market test on a "no-names basis"

with approximately 15 potential merger or acquisition partners.  (JA-1131 ¶ 64).  In December 2019, Garrett commenced a lawsuit against Honeywell in New York Supreme Court seeking to void certain aspects of the Honeywell Obligations.  (JA-1131 ¶ 63).  The unsuccessful lawsuit was later resolved as part of the Bankruptcy Proceedings.  *Id.*

By early 2020, Morgan Stanley reported to Garrett that no strategic transactions were available without disposing of or otherwise restructuring the Honeywell Obligations.  Accordingly, on February 1, 2020, Garrett retained Perella Weinberg Partners ("<u>Perella Weinberg</u>") to evaluate restructuring scenarios.  (JA-1131 ¶ 64).  Shortly thereafter, Defendants directed the active solicitation of a "stalking horse bidder" in pursuit of court-supervised restructuring.  (JA-1132 ¶¶ 66-67).  Thus, by the beginning of the Class Period on February 27, 2020, Defendants knew from Morgan Stanley that an out-of-court restructuring was off the table and that, as a result, Defendants had directed the active solicitation of a stalking horse bidder.  By March, Garrett had retained AlixPartners to assist in reviewing and pursuing the steps necessary to proceed with a Chapter 11 proceeding.  (JA-1131 ¶ 64).  By June, Garrett had entered the final stages of due diligence with potential stalking horse bidders in connection with the bid process that began in February (JA-1132 ¶¶ 67-68), and by July, Garrett had received five

non-binding indications of interest and was near the completion of bidder due diligence. (JA-1132 to 1133 ¶¶ 68-69).

Finally, in August 2020, Garrett entered into an Exclusivity Agreement with stalking horse bidder KPS Capital Partners, LP ("KPS Capital") (JA-1133 ¶ 70), following which Garrett finalized its plans to seek court-supervised restructuring in a Chapter 11 proceeding – plans it had been actively pursuing since the start of the Class Period. Garrett filed its Chapter 11 petition just twenty-five days later. (JA-1160 ¶ 138).

## D. Defendants' Class Period Misstatements and Omissions

Beginning on February 27, 2020, and continuing through the end of the Class Period when Garrett commenced the Bankruptcy Proceedings under Chapter 11 on September 20, 2020, Defendants made twenty-two misstatements and omissions concerning Garrett's financial condition that painted a picture of clear skies and calm seas, despite knowing that the Company was actively preparing for a bankruptcy that was both likely and imminent. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss the Third Amended Complaint ("Plaintiffs' Opposition"), ECF No. 90 at Appendix A (Chart of Alleged Misstatements and Omissions).

For example:

- On February 27, 2020 – after Morgan Stanley confirmed that a sale would not be possible without disposing of the Honeywell Obligations through litigation or bankruptcy (and less than a month after Garrett hired Perella Weinberg) (JA-0720 to 0721 ¶ 74) – Defendant Olivier Rabiller touted the

Company's "significant financial flexibility" and "strong financial position," and asserted that the Company was "well positioned to build upon the progress" in its first year (JA-1135 ¶¶ 78-79);

- On May 11, 2020 – months after Defendants hired AlixPartners and directed the active solicitation of a stalking horse bidder and pursuit of court-supervised restructuring (JA-0722 ¶¶ 77-78) – Defendants touted Garrett's "positive business fundamentals" and "position for long-term success" (JA-1140 ¶ 92);

- On June 12, 2020 – while in the final stages of due diligence with potential stalking horse bidders for the Company (JA-0722 to 0723 ¶¶ 79-81) – Defendants reassured investors that "[d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact" (JA-1142 ¶ 98); and

- On July 30, 2020 – after receiving five non-binding indications of interest, all of which were contingent on buying Garrett free and clear of the Honeywell Obligations, and after conducting months of due diligence in pursuit of court-supervised restructuring (JA-0723 ¶ 80)[3] – Defendants assured investors "we continue to benefit from our robust infrastructure and agile working capabilities as we execute on our long-term strategy" (JA-1144 ¶ 101) and filed a Form 10-Q that removed cautionary "going concern" language (JA-1146 ¶¶ 107-108).

Perhaps most glaringly, on August 26, 2020 – thirteen days *after* Garrett entered into an Exclusivity Agreement with stalking horse bidder KPS Capital for a sale in bankruptcy and just weeks before Garrett initiated the Bankruptcy Proceedings – Defendants claimed that "Garrett has not yet determined whether to

_____

[3] The Deason Bankruptcy Declaration states that "[a]ll second round bidders made clear to the Company that they would not purchase the Company except in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet." (JA-0723 ¶ 80).

pursue any balance sheet restructuring alternatives." (JA-1147 ¶ 111).

**E.**     **Defendants' Motions to Dismiss and the Disposition Below**

Shortly after Garrett initiated the Bankruptcy Proceedings, which finally wiped out Garrett's stock price, several groups of investors, including Plaintiffs, filed securities fraud class actions against the Individual Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs were appointed as lead plaintiffs in the consolidated class action on January 21, 2021. (*See* Opinion and Order Appointing Lead Plaintiff and Consolidating Cases, ECF No. 27).

**1.**     **The Superseded Second Amended Complaint**

After initially filing a consolidated amended complaint against the Individual Defendants that excluded Garrett because of the automatic stay in bankruptcy, on July 22, 2021, with approval of United States Bankruptcy Judge Michael E. Wiles, Plaintiffs filed the Second Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Second Amended Complaint"), adding Garrett as a named Defendant. (JA-0186 to 0187 ¶ 29). The Second Amended Complaint alleged a different theory than the one subject to the instant appeal. It alleged a class period that began with the October 1, 2018 Spin-Off and alleged that Defendants knew immediately that Garrett was not viable because of the Honeywell Obligations. (JA-0184 ¶ 16).

On March 31, 2022, the Honorable John P. Cronan granted Defendants' motions to dismiss Plaintiffs' "core theory in the Second Amended Complaint that the Garrett Defendants made false and misleading statements about whether Garrett would fail because they knew ***at the time of the spinoff*** 'that Garrett's overleveraged capital structure would inevitably cause it to fail.'" *In re Garrett Motion Inc. Sec. Litig.* ("*Garrett I*"), No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *12 (S.D.N.Y. Mar. 31, 2022).[4] However, Judge Cronan observed that, during oral arguments, Plaintiffs had advanced "a theory of liability different from what they allege[d] in the Second Amended Complaint." *Id.*

Specifically, Judge Cronan noted that Plaintiffs:

> argued that the Honeywell Obligations created "an evolving situation." This evolving situation meant that the Defendants' knowledge of the devastating impact that the Honeywell Obligations had on Garrett "grew during the class period" to a point at which they knew that the company would inevitably fail. In Plaintiffs' view, this meant that the Defendants were at the very least reckless in making positive statements about the company as time went on.

*Id.* As a result of Plaintiffs' new argument that Defendants' knowledge of Garrett's problems evolved over time, Judge Cronan gave Plaintiffs "thirty days to file a Third Amended Complaint" to comport with the theory advanced at oral argument. *Id.* at *19.

---

[4] Unless otherwise indicated, all citations and internal quotation marks in cases have been omitted and all emphasis has been added.

### 2.   The Operative Third Amended Complaint

Consistent with Judge Cronan's ruling, on May 2, 2022, Plaintiffs filed the Third Amended Complaint. (JA-1106). Using the court's decision as guidance, *see Garrett I*, 2022 WL 976269, at *19, the Third Amended Complaint utilized the instant Class Period beginning on February 27, 2020 (the day Garrett announced its year-end 2019 results) and narrowed the alleged misstatements and omissions to only those made by Defendants after Garrett engaged Perella Weinberg to evaluate restructuring scenarios, after Defendants had been told by Morgan Stanley that no interested party would consider a purchase of the Company outside of bankruptcy, and after Defendants directed its advisors to conduct an active bid process for a stalking horse bidder. The shorter Class Period also impacted Plaintiffs' allegations of scienter, which now specifically included, *inter alia*, allegations that "[e]ach of the Defendants had actual knowledge by no later than February 27, 2020, and *increasingly through the Class Period* . . . that Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to fix the unsustainable capital structure and Honeywell Obligations." (JA-1152 ¶ 120).

### 3.   The District Court's Dismissal of the Third Amended Complaint

On June 24, 2022, Defendants moved to dismiss the Third Amended Complaint. (*See* Memorandum of Law in Support of Defendants' Motion to Dismiss

the Third Amended Complaint, ECF No. 87).  After full briefing but before resolution of Defendants' motion to dismiss, the case was reassigned from Judge Cronan to United States District Judge Jennifer L. Rochon.  (JA-1482).

Plaintiffs' Opposition relied on *Vivendi II* for the notion set forth herein that "positive countervailing misstatements about the present state of the Company and its finances . . . are categorically not permitted under the federal securities laws when a Company has retained restructuring advisors and is facing a near-certain restructuring."  (ECF No. 90 at 11).

On March 31, 2023, Judge Rochon dismissed the Third Amended Complaint after determining that Plaintiffs failed to plead with specificity that Defendants acted with the requisite scienter or that Defendants made any statements that were false or misleading when made.  *See Garrett II*, 2023 WL 2744029, at \*9.  The District Court's ruling disregarded the central teaching of *Vivendi II*, only citing it twice for general principles of law.[5]

---

[5] Judge Cronan's prior decision did not address *Vivendi II* either but that was because Plaintiffs did not rely on *Vivendi II* in their opposition to Defendants' motion to dismiss the Second Amended Complaint.  As discussed, the Second Amended Complaint alleged a different theory of falsity over a longer class period that commenced at the Spin-Off.  (JA-0184 ¶ 16).

# SUMMARY OF ARGUMENT

The District Court erred in failing to consider the adequacy of Plaintiffs' allegations concerning Defendants' twenty-two misstatements or omissions under the reasoning of *Vivendi II* and related Second Circuit cases. *Vivendi II* makes clear that a company is liable for making positive statements concerning its operations and liquidity if made at a time that it is facing severe undisclosed financial difficulties and as a result has already retained financial advisors to consider bankruptcy. *See Vivendi II*, 838 F.3d at 251–52. That is the precise case here.

In finding that Plaintiffs did not adequately plead why or how any of the alleged twenty-two misstatements and omissions were false and misleading, the District Court erroneously imposed a more exacting standard than the law requires. Rather than accepting the factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the District Court construed the allegations to create the inference that Defendants could have reasonably believed – despite the retention and massive efforts by Garrett's advisors and bankers – that bankruptcy was a mere possibility until Garrett's September 20, 2020 bankruptcy filing. That interpretation is counterfactual and simply does not address Plaintiffs' allegations demonstrating that Defendants' public statements during the Class Period touting Garrett's financial condition and long-term viability were contrary to facts well known and information available to Defendants as they actively prepared for an

imminent bankruptcy filing. Indeed, while the stalking horse bid process and due diligence took several months from the inception of the Class Period to be completed, it is telling that Garrett filed for Chapter 11 bankruptcy less than one month after stalking horse bidder KPS Capital was selected. That the selection of the stalking horse bidder was a linchpin to Garrett's planned bankruptcy only underscores the significance of the stalking horse bid process and Defendants' direction to its advisors to begin that process at or about the time that the Class Period began on February 27, 2020.[6]

Put simply, the District Court ignored the well-established rule in the Second Circuit that "at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *Vivendi II*, 838 F.3d at 258; *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Once a company speaks on

---

[6] Defendants argued in briefing that "The Vast Majority of Alleged Misstatements Are Still Puffery." (Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Third Amended Complaint, ECF No. 94 at 5). This is wrong and contrary to the teaching of *Vivendi II*. The District Court should not have considered the individual misstatements myopically, but rather holistically and in the context in which they were made. Public misstatements contradicting facts well known and accessible to Defendants are actionable, not mere puffery. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts."); *see also* Plaintiffs' Opposition, ECF No. 90 at 14.

an issue or topic, there is a duty to tell the whole truth."). Defendants violated that duty when they failed to disclose "the whole truth" about Garrett's financial condition as they repeatedly reassured investors that Garrett was progressing well as a stand-alone company with financial flexibility, a strong financial position, a resilient business model, and free cash flow.

The District Court also erroneously disregarded the statements made by Garrett's Chief Financial Officer in the Deason Bankruptcy Declaration because it determined that Plaintiffs' dependance on Defendants' post-Class Period admissions amounted merely to fraud by hindsight. That ruling contravenes Second Circuit precedent permitting reliance on post-class period data to confirm that Defendants knew or should have known they were misrepresenting material facts when making public statements during the Class Period. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Novak*, 216 F.3d at 312–13. More importantly, because Garrett's bankruptcy filings contain detailed admissions regarding what Defendants knew before and during the Class Period, it does not matter that the Class Period in the Third Amended Complaint ends two days before Garrett initiated the Bankruptcy Proceedings.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(6). *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). In doing so, the Court must assume all facts alleged within the four corners of the complaint are true and draw all reasonable inferences in Plaintiffs' favor. *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 141 (2d Cir. 2011).

The United States Supreme Court has instructed that a complaint only "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And while pleading standards are heightened for securities fraud claims, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007), the heightened standards must not be "mistaken for impossible ones." *Synchrony*, 988 F.3d at 161. As this Court has recognized, "Equally as important as concerns about facilitating overly burdensome and expensive discovery and litigation are concerns about prematurely dismissing cases where plaintiffs have plausibly alleged with particularity the existence of securities fraud." *Synchrony*, 988 F.3d at 161.

With respect to the requirement of scienter, the Supreme Court has instructed that courts must evaluate the allegations holistically to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. Moreover, "the inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences," but must only be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

## ARGUMENT

I. **THE THIRD AMENDED COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS REPEATEDLY MADE FALSE AND MISLEADING STATEMENTS**

A. **The District Court Erred in Disregarding This Court's Reasoning in *Vivendi II* in Dismissing the Third Amended Complaint**

The District Court found that Plaintiffs did not allege with specificity why and how the alleged misstatements were false and misleading or that "Defendants made any misstatements in the time directly leading up to the bankruptcy filing in September 2020." *Garrett II*, 2023 WL 2744029, at *16. That finding misunderstands Plaintiffs' allegations.

The Third Amended Complaint alleges that from February 27, 2020 to September 18, 2020, inclusive, Defendants made specific countervailing statements "touting Garrett's flexibility, financial condition, resiliency, long-term strategy, ability to meet its liquidity needs, and positioning to build toward the future" (JA-1117 ¶ 17), all of which stood in stark contrast to facts then known to Defendants regarding Garrett's unsustainable capital structure (as revealed by admissions in

Garrett's Chapter 11 bankruptcy filings) (JA-1115 to 1117 ¶ 16) and which "were irreconcilable with Defendants' knowledge of Garrett's deepening financial and operational crisis." (JA-1135 ¶ 75). Plaintiffs' theory of liability thus focuses on the material discrepancies between what Defendants touted to investors in the final seven months leading up to Garrett's anticipated Chapter 11 bankruptcy filing and how those representations differed from the reality of Defendants' focused preparations toward the bankruptcy filing. (JA 1134 to 1151 ¶¶ 75-118). As this Court observed in *Vivendi II*, the point is not whether bankruptcy was inevitable, it suffices if it is a likely possibility. *See* 838 F.3d at 232. And like *Vivendi II*, that was certainly the case here where, at or about the time the Class Period began, Defendants were told by Morgan Stanley that a sale of the Company was not possible outside of bankruptcy, and, consequently, Defendants directed their advisors to move forward with a bid process to select a stalking horse bidder for a bankruptcy filing. (JA-1131 to 1132 ¶ 64). In that context, when Defendants painted a picture of "smooth sailing" ahead for Garrett, they were also then required to disclose the gale force winds coming with the bankruptcy filing that they were actively engaged in preparing. *See Vivendi II*, 838 F.3d at 251 (affirming that Vivendi's statements about its growth and cash flow were "misleading for omission to disclose Vivendi's liquidity risk").

Put another way, the District Court's determination that Plaintiffs needed to show "when, prior to September 20, 2020, bankruptcy was inevitable, or . . . when Defendants knew it was inevitable," *Garrett II*, 2023 WL 2744029, at *16, imposed a burden on Plaintiffs that is inconsistent with this Court's holding in *Vivendi II* that, having chosen to speak about the company's liquidity in the face of active bankruptcy preparations, Defendants were obligated to issue warnings about those preparations to avoid misleading investors that were otherwise led to believe that the company was smooth sailing. *Vivendi II*, 838 F.3d at 232.

When viewed through the lens of the "liquidity risk theory" of misleading half-truths articulated in *Vivendi II*, 838 F.3d at 240, it becomes clear that the District Court plainly erred in concluding that "other facts in the Third Amended Complaint suggest that Defendants may have reasonably understood that Garrett had options other than bankruptcy before and during the Class Period, or at least until a reasonable time before the final Purchase Agreement was signed and Garrett filed for bankruptcy on September 20, 2020." *Garrett II*, 2023 WL 2744029, at *16.[7]

---

[7] In that same vein, the District Court improperly faulted Plaintiffs for not defining "financial flexibility" or "strong financial position," and for not explaining why those statements were false and misleading, even though those terms have a common usage and were obviously facially misleading when considering that Garrett was actively preparing for a bankruptcy filing at the time those statements were made.

**B.** **As in *Vivendi II*, Defendants Violated Their Duty to Speak Truthfully and Accurately**

In reaching its conclusion, the District Court disregarded the precedent established by this Court in *Vivendi II* that, having decided to speak in the face of bankruptcy preparations and known liquidity risk, the failure to warn about those facts rendered the unqualified statements "materially false or misleading in regard to [the company]'s true liquidity risk." *Id.* at 250. As this Court explained:

> During the Class Period, Vivendi also made numerous statements about, for example, its cash flow and its debt. ***Whether misleading or not when made, such statements strongly suggested that Vivendi faced no liquidity risk at the time***. Given that Vivendi was in a phase of intense buying, moreover, any investor attuned to Vivendi's pattern of behavior would be keen to know whether and how Vivendi was making sufficient profits to translate into cash flow that would cover all of Vivendi's sundry debt obligations. We find the evidence introduced at trial sufficient to support the jury's conclusion that ***a reasonable investor could find Vivendi's statements about high EBITDA growth misleading for omission to disclose Vivendi's liquidity risk***.

*Id.* at 251.

*Vivendi II* articulated the applicable principle that is the core of the Third Amended Complaint, which is that "half-truths, or statements that are misleading by omission" are actionable misstatements under the federal securities laws. *Id.* at 240. In reiterating that principle, this Court made the critical distinction between viewing statements in isolation versus in the appropriate context:

> In Plaintiffs' opening statements, for example, counsel for Plaintiffs remarked at points that Plaintiffs were "going to prove . . . that the defendant *failed to tell the truth* about the growing problems about its

liquidity." In isolation, this statement could be taken to suggest that Plaintiffs would attempt to prove that Vivendi was liable *merely* for failing to disclose the company's liquidity risk[.] . . . In context, however, Plaintiffs' opening statements made clear that the *way* in which they alleged that Vivendi "failed to tell the truth" was by making affirmative statements that were either outright lies or misleading half-truths.

*Id.*

Here, the District Court disregarded the critical fact that, as in *Vivendi II*, Defendants' positive countervailing statements during the Class Period touting Garrett's "strong financial position" and "resilient business model" were half-truths at best, made to mislead investors about Garrett's true financial health, while Defendants were at the same time secretly and actively pursuing a sale through Chapter 11.[8] In this regard, the Third Amended Complaint states with particularity each alleged misstatement and omission, as well as a detailed explanation of who made the statement, when and where the statement was made, and the specific facts that demonstrate why each misstatement and omission was false and misleading. (JA-1135 to 1151 ¶¶ 78-118). That is sufficient to overcome a motion to dismiss. *See Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("Because the Complaint states with particularity the statements it alleges are misleading and the reasons why these statements are

---

[8] *See* Plaintiffs' Opposition, ECF No. 90 at 10–13.

fraudulent, we hold that the Complaint adequately alleges false statements of material fact.").[9]

## C. The Third Amended Complaint Adequately Pleads Actionable Misstatements and Omissions Under This Court's Precedent

The Third Amended Complaint alleges with particularity that Garrett's partial corrective disclosures were inadequate because, as of August 26, 2020, "Garrett still failed to fully disclose the truth by concealing that it had already gone through two bid processes, permitted extensive due diligence, selected a stalking horse bidder, signed the Exclusivity Agreement, and that it was making final preparations to file for court-supervised restructuring." (JA-1159 ¶ 136). For example:

- On February 27, 2020, and again in April and May 2020, Defendants made public statements touting the resiliency of Garrett's financial structure and its ability to maintain "positive long-term business fundamentals" without mentioning the material fact that Defendants were approaching the final stages of due diligence with potential stalking horse bidders in what had already been months-long restructuring preparations (JA-1114 ¶ 13);

- On June 12, 2020, Defendants reassured investors that "the positive long-term fundamentals of [Garrett's] business remain intact" without revealing the material fact that they were advancing their discussions with potential stalking horse bidders in anticipation of a sale through Chapter 11 bankruptcy (JA-1142 ¶ 98); and

---

[9] The District Court's reliance on *In re Tower Automotive Securities Litigation*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007), *see Garrett II*, 2023 WL 2744029, at *20, was likewise inconsistent with the "well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *Vivendi II*, 838 F.3d at 258.

- On August 26, 2020, Defendants publicly stated that Garrett had "not yet determined whether to pursue any balance sheet restructuring alternatives," when, in fact, Garrett had just signed an Exclusivity Agreement with stalking horse bidder KPS Capital as part its plan to initiate a court-supervised reorganization and sale, which occurred less than a month later (JA-1159 to 1160 ¶ 136).

Taking those allegations as true and making all inferences in Plaintiffs' favor, as the Court must on a motion to dismiss, *Blanford*, 793 F.3d at 307, Defendants' failure to disclose the steps taken in furtherance of their restructuring plan, *while* giving false reassurances to investors that Garrett was well-positioned both financially and operationally for long-term success, adequately states a claim of securities fraud under this Court's precedent. *See Vivendi II*, 838 F.3d at 262 ("at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim."); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) ("Assuming Caiola can prove these allegations, the lack of an independent duty is not, under such circumstances, a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.").

Indeed, the District Court's conclusion that Defendants' statements were not false or misleading because "bankruptcy was not necessarily imminent" when each statement was made is contrary to this Court's reasoning in *Vivendi II* that the **risk**

of a liquidity crisis or bankruptcy (versus an ***actual*** liquidity crisis or filing of bankruptcy) is a proper basis for § 10(b) liability because "[f]raud depends on the state of events when a statement is made, not on what happens later." 838 F.3d at 262. That is why this Court held that Vivendi's "numerous representations to the market suggesting that the course ahead for the company was smooth sailing" were actionable misstatements in the context of Vivendi's liquidity risk because "***[i]n the worst case scenario***, which inquiries later revealed was not an altogether unlikely one, Vivendi was months away from bankruptcy or insolvency." *Id.* at 232. As in the present case, Vivendi's board of directors secretly hired a financial advisor "to assess the severity of Vivendi's financial difficulties." *Id.* at 237. The financial advisor informed Vivendi's board "that one of four possible scenarios [was] that Vivendi would have to file for bankruptcy protection as early as September"—one month after what the plaintiffs would later allege to be the end of the class period. *Id.* Yet, two days later, Vivendi issued a press release touting its "strong free cash flow" and its confidence in "its capacity to meet its anticipated obligations over the next 12 months." *Id.* at 252.

Like in *Vivendi II*, the Third Amended Complaint alleges with particularity that Defendants concealed material information from investors by making positive countervailing public statements suggesting that Garrett was maintaining a "strong financial position" and "strong free cash flow generation" (JA-1135 ¶ 79) and that it

was "well positioned" to "drive long-term success" (JA-1140 ¶ 93) when, in reality, Defendants were actively preparing for a sale through Chapter 11 bankruptcy. *See Vivendi II*, 838 F.3d at 250 ("The test for whether a statement [or omission] is materially misleading under Section 10(b) is not whether the statement was misleading in and of itself, but whether the defendants' representations, taken together and in context, would have mislead a reasonable investor."). By not disclosing the whole truth about Garrett's financial situation until its commencement of the Bankruptcy Proceedings, Defendants violated their duty to speak truthfully and completely when they decided to speak on Garrett's viability and financial health without disclosing all the various steps they had taken in preparing for the Chapter 11 filing. *See id.* at 258.

For the same reason, the District Court also erred in concluding that "unlike in *In re Vivendi Universal, S.A.* (*Vivendi I*), on which Plaintiffs rely, Plaintiffs here have not 'alleged sufficient facts to show defendants could not have reasonably believed the statements made to the public.'" *Garrett II*, 2023 WL 2744029, at \*20 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003)). Morgan Stanley's conclusion that Garrett could not be sold outside of bankruptcy, and the resulting retention of Perella Weinberg and AlixPartners in preparation for bankruptcy, demonstrate that Defendants could not have reasonably believed that their statements touting Garrett's "significant financial

flexibility," "strong financial position," and ability "to meet [its] short-term liquidity needs for at least the next twelve months" were true and accurate representations of its known liquidity risks, and the known risk represented by Defendants' active bankruptcy preparations.

## II.   THE DISTRICT COURT ERRED IN RULING THAT PLAINTIFFS FAILED TO ADEQUATELY PLEAD SCIENTER

The requirement that a securities plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" (15 U.S.C. § 78u–4(b)(2); *Novak*, 216 F.3d at 311) can be satisfied "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). In this Circuit, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  In evaluating the sufficiency of a complaint's allegations of scienter, the Court must view them "holistically, considering *all* of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).

### A. Defendants' Statements Regarding Garrett's Financial Flexibility and Positioning for the Future Were Contrary to Facts Known or Available to Them

The District Court ruled that Plaintiffs failed to adequately plead a strong inference of scienter based on its findings that the allegations in the Third Amended Complaint (i) relied on fraud by hindsight,[10] (ii) failed to state with particularity "what Defendants knew about a definitive bankruptcy filing," (iii) failed to address "when Defendants knew that bankruptcy was inevitable," and (iv) supported "a more compelling, but less cynical, inference . . . that Garrett was doing everything in its power to evaluate other options to avoid bankruptcy." *Garrett II*, 2023 WL 2744029, at *11–14. The District Court's findings were wrong.

Once again, the District Court erroneously based its findings on the misconception that Plaintiffs' theory of scienter depended on showing that Defendants knew for certain that bankruptcy was inevitable when they made each alleged misstatement and omission during the Class Period. To the contrary, the Third Amended Complaint specifically alleges that Defendants knew "by no later than February 27, 2020, and increasingly through the Class Period . . . that Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to

---

[10] The District Court's flawed analysis on fraud by hindsight is further discussed in Point III, *infra*.

fix the unsustainable capital structure and Honeywell Obligations." (JA-1152
¶ 120). In other words, Defendants were, at the very least, reckless in continuing to
make "specific statements designed to reassure investors . . . that Garrett's current
results and operations indicated investors could expect long-term success at the new
company" (JA-1135 ¶ 76), when Defendants knew facts or had access to information
suggesting that their public statements were not accurate. *See Novak*, 216 F.3d at
311.

At bottom, it is well-established in the Second Circuit that "[w]here the
complaint alleges that defendants knew facts or had access to non-public information
contradicting their public statements, recklessness is adequately pled for defendants
who knew or should have known they were misrepresenting material facts with
respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63,
76 (2d Cir. 2001).

## B. The Third Amended Complaint Supports a Strong Inference of Scienter

The allegations detailed in the Third Amended Complaint in support of
Plaintiffs' theory of scienter are precisely the types of allegations that courts in this
Circuit have routinely recognized as supporting a strong inference of scienter or
reckless intent. In *In re Scholastic Corporation*, for example, this Court found that
the plaintiffs had adequately pled an inference of reckless intent on the grounds that
their complaint included "detailed allegations as to what defendants knew on a daily,

weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture." 252 F.3d at 76. It continued: "Defendants publicly represented that returns were not increasing and failed to adjust revenues despite their knowledge of rapidly rising returns; these actions, if proven, are consistent with recklessness." *Id.* at 77. In *Solow v. Citigroup, Inc.*, the court likewise held on similar facts that the plaintiff's "allegations that Citigroup knew its capital and liquidity were deteriorating, while continuing to represent that its capital and liquidity were 'strong' and 'plentiful' g[ave] rise to a strong inference of scienter." 827 F. Supp. 2d 280, 290–91 (S.D.N.Y. 2011) (collecting cases).

As those cases make clear, where, as here, Defendants knew facts or had access to information suggesting that their public statements were not accurate,[11] the proper focus is not whether "Defendants knew that bankruptcy was the only option going forward," as the District Court incorrectly determined when evaluating Plaintiffs' scienter allegations. *Garrett II*, 2023 WL 2744029, at *13. Instead, the District Court should have considered Defendants' knowledge of Garrett's

---

[11] "[I]n determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct." *Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 215 (2d Cir. 2020).

precarious financial situation and probable – but not necessarily inevitable – bankruptcy and weighed that against the alleged misstatements and omissions. *See Vivendi II*, 838 F.3d at 232; *see also Slayton*, 604 F.3d at 775 (reaffirming that the Court's conclusion should be based "not on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter").

Construed in the proper light, Plaintiffs' allegations sufficiently support the suggested inference that "Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information regarding" Garrett's circumstances and falsely reassuring investors that Garrett was well-positioned for long-term success, notwithstanding Defendants' knowledge to the contrary. *See Setzer*, 958 F.3d at 214. Defendants knew by no later than the start of the Class Period that Garrett was unsustainable as a stand-alone company (JA-1129 to 1130 ¶¶ 58-61) and that *no* potential strategic buyers were interested in pursuing any transaction with Garrett outside of a bankruptcy restructuring. (JA-1131 ¶ 64). Defendants' retention of Perella Weinberg and AlixPartners to focus on restructuring efforts, the related pursuit of a stalking horse bid process in anticipation of a bankruptcy filing, their engagement in extensive due diligence with potential acquirers, and their entry into the Exclusivity Agreement with stalking horse bidder

KPS Capital less than one month before Garrett's Chapter 11 bankruptcy filing amply demonstrate Defendants' knowledge (or reckless disregard) of the increasing likelihood of bankruptcy.  (JA-1132 to 1133 ¶¶ 67-70).

The District Court glossed over these allegations based on its view that none of them individually showed a definitive decision on the part of Defendants to commence the Bankruptcy Proceedings under Chapter 11.  However, the facts as alleged strongly suggest that Defendants' positive countervailing statements to investors during the Class Period, including that Garrett was holding a "strong financial position" and remained "flexible and resilient," reflects conscious misbehavior or recklessness on the part of Defendants, especially given their behind-the-scenes bankruptcy preparations.  In short, Defendants' "public statements did not match the tenor of the discussions inside the company."  *Vivendi II*, 838 F.3d at 235; *see also Setzer*, 968 F.3d at 215.

### C.  The District Court's Scienter Analysis Improperly Relied on the Prior Decision Addressing a Different Liability Theory

The District Court also erroneously relied on Judge Cronan's prior ruling dismissing the Second Amended Complaint, a complaint that alleged different theories of liability and scienter.  *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").  While the District Court acknowledged that Plaintiffs modified their theory of scienter in the Third Amended

Complaint, it still relied heavily on the findings and conclusions in the prior ruling that specifically addressed Plaintiffs' abandoned theory that Defendants "knew at the time of the spin-off 'that Garrett's overleveraged capital structure' would inevitably cause it to fail." *Garrett I*, 2022 WL 976269, at *12. Judge Cronan emphasized this point after observing that "during oral argument, Plaintiffs' theory for the case shifted" to that of "an evolving situation." *Id.* He continued:

> In Plaintiffs' view, this meant that the Garrett Defendants were at the very least reckless in making positive statements about the company as time went on. The Court will not, however, consider this argument in deciding the Garrett Defendants' motion to dismiss because the Second Amended Complaint does not include these allegations and the parties have not briefed it. Instead, the Court will consider only Plaintiffs' core theory in the Second Amended Complaint that the Garrett Defendants made false and misleading statements about whether Garrett would fail because they knew at the time of the spin-off "that Garrett's overleveraged capital structure" would inevitably cause it to fail.

*Id.*

Despite the critical differences between the two pleadings, Judge Rochon found the Third Amended Complaint's allegations regarding Defendants' scienter insufficient "for largely the same reasons articulated in the Court's March 2022 Opinion." *Garrett II*, 2023 WL 2744029, at *12. Quoting Judge Cronan's prior ruling, the District Court determined that Defendants' retention of financial advisors to review strategic alternatives did not support an inference of scienter because "[n]o multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action." *Id.* (quoting *Garrett I*, 2022

WL 976269, at *14).  But during the shorter Class Period alleged in the Third Amended Complaint, Defendants did far more than just retain advisors.  *First*, Defendants learned from the advisors that no sale would be possible outside of a court-supervised restructuring.[12]  (JA-1131 ¶ 64).  *Second*, Defendants directed the active selection of a stalking horse bidder through a bid process (a complex, costly and time-consuming process), thereby setting the Company well along the path toward bankruptcy.  (JA-1132 ¶ 67).  *Third*, the Company selected a stalking horse bidder and, in less than a month, filed for Chapter 11 bankruptcy.  (JA-1133 ¶ 70, JA-1160 ¶ 138).

From these undisputed facts as confirmed by the Deason Bankruptcy Declaration, it is clear that even if bankruptcy was not inevitable, it was certainly an increasingly likely outcome, and thus Defendants were obligated to provide adequate storm warnings.  *See Vivendi II*, 838 F.3d at 232.  Even assuming, as the District Court did, that Garrett's lawsuit against Honeywell, which was resolved in

---

[12] The District Court stated that "the allegation that those advisors warned Garrett that potential buyers were wary of its balance sheet does not support a strong inference of scienter because Plaintiffs still do not allege that the financial advisors ever opined that Garrett's only option forward was bankruptcy." *Garrett II*, 2023 WL 2744029, at *12.  This wrongly ignores the fact that Morgan Stanley reported to Garrett that a sale outside of a bankruptcy restructuring was not possible.  (JA-1131 ¶ 64).  Certainly, Defendants took the Morgan Stanley report to require a bankruptcy filing because they immediately directed the pursuit of a stalking horse bid process.  (JA-1132 ¶ 67).

2021 as a result of the Chapter 11 proceeding, "provided Garrett a potential way to get out of the Honeywell Obligation[s] that did not involve bankruptcy," *Garrett II*, 2023 WL 2744029, at *13, that lawsuit was filed months before the start of the Class Period, before Morgan Stanley reported that a bankruptcy filing was required for a sale, and before Defendants directed the stalking horse bid process. Actions speak more loudly than words. Here, Defendants' actions in pursuit of bankruptcy, coupled with the fact that the lawsuit was not being actively prosecuted pre-bankruptcy,[13] speak volumes about what Defendants actually thought about the merits of the Honeywell lawsuit.

Put simply, the statements of half-truths made by Defendants are actionable because they were made despite their "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308; *see also Vivendi II*, 838 F.3d at 240. The absence of any discussion or consideration by the District Court of the applicable case law in analyzing the Third Amended Complaint's allegations only underscores its undue reliance on Judge Cronan's prior holdings addressing a theory that is no longer part of this case.

---

[13] The lawsuit was commenced in December 2019 merely by summons with notice in New York state court without filing a complaint until January 15, 2020, and had progressed minimally until it was removed as an adversary proceeding to be adjudicated by Judge Wiles in the Bankruptcy Proceedings.

**D.     The District Court Erred in Failing to Weigh Plaintiffs' Scienter Allegations as a Whole**

The District Court acknowledged Plaintiffs' argument on the motion to dismiss that their theory of scienter did not depend on motive, but erroneously found that the absence of motive meant the strength of Plaintiffs' circumstantial allegations of scienter had to be correspondingly greater. *See Garrett II*, 2023 WL 2744029, at *11 (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). While that may be a correct generic statement, the District Court was nevertheless required "to assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021). As this Court has made clear, it is "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity" that determines whether the complaint adequately pleads scienter. *Id.* at 138; *see also Slayton*, 604 F.3d at 776 ("While the absence of a motive allegation is not fatal, motive can be a relevant factor, and personal financial gain may weigh heavily in favor of a scienter inference."); *Set Capital*, 996 F.3d at 78 ("The complaint alleges circumstantial evidence of conscious misbehavior or recklessness that, when viewed holistically and together with the allegations of motive and opportunity, supports a strong inference of scienter.").

Rather than consider Plaintiffs' scienter allegations together as a whole, the District Court made myopic piecemeal determinations as to whether certain

individual allegations, standing alone, were sufficient to support an inference of scienter. The District Court's failure "to weigh Plaintiffs' scienter allegations as a whole" was error. *Hain Celestial*, 20 F.4th at 137; *see also South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009) (reiterating that "the court must consider whether '*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard'" (quoting *Tellabs*, 551 U.S. at 328)).

## III. THE DISTRICT COURT ERRED IN FINDING THAT ALLEGATIONS BASED ON POST-CLASS PERIOD STATEMENTS IN THE DEASON BANKRUPTCY DECLARATION CONSTITUTED FRAUD BY HINDSIGHT

The District Court also erred in characterizing the allegations based on the Deason Bankruptcy Declaration as impermissible "fraud by hindsight." The District Court reasoned that "Defendants' knowledge about Garrett's financial strains *during* the bankruptcy proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings." *Garrett II*, 2023 WL 2744029, at *11 (quoting *Garrett I*, 2022 WL 976269, at *14). This is simply incorrect. The Deason Bankruptcy Declaration details the cascading and failed steps *Defendants themselves* were taking before and during the Class Period and, in doing so, established contrary facts known or available to Defendants *prior to and contemporaneously with* the twenty-two Class Period misstatements and omissions.

40

### A.   Plaintiffs Properly Relied on the Deason Bankruptcy Declaration to Show Defendants' Knowledge of Contrary Facts

The District Court erroneously compared the present case "to a host of cases in which courts have dismissed, as fraud in hindsight, complaints filed after a company's bankruptcy based [only] on the conclusory allegation that defendants had or should have been aware of the liquidity crisis." *Id.* But here, unlike, for example, in *Hutchinson v. Perez*, No. 12 Civ. 1073(HB), 2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012), an unpublished decision cited by the District Court, the Deason Bankruptcy Declaration amply reveals the inconsistencies between what Defendants knew at the time they made the alleged misstatements and omissions and what they stated to investors – including its description of the Morgan Stanley report and the Board's pursuit of a stalking horse bidder to pursue a bankruptcy sale. (JA-0720 to 0721 ¶ 74). Plaintiffs are entitled to rely on such evidence. *See Scholastic Corp.*, 252 F.3d at 74 ("[Second Circuit] cases have relied on post-class period data to confirm what a defendant should have known during the class period" (citing *Rothman*, 220 F.3d at 92 and *Novak*, 216 F.3d at 312–13)). A strong inference of scienter is amply supported by the facts in the Deason Bankruptcy Declaration confirming that Defendants increasingly became aware that Garrett's liquidity-related issues had materialized to a point where Defendants believed Chapter 11 bankruptcy was the Company's only viable option. (JA-0722 ¶ 78).

**B.** **Plaintiffs Adequately Alleged That Defendants Knew or Should Have Known That Their Statements Were False or Misleading When Made**

The Deason Bankruptcy Declaration also confirms Plaintiffs' allegations that while Defendant Rabiller was touting Garrett's "significant financial flexibility" and ability to manage "any short-term fluctuations in the underlying macro environment" in the first quarter of 2020 (JA-1135 ¶ 79), it was becoming "increasingly clear" to Defendants "that the Company's capital structure was ill-suited to cope with meaningful operational or liquidity challenges and posed significant ongoing risks" (JA-0722 ¶ 77). The Deason Bankruptcy Declaration further reveals that the strategic review process led by Morgan Stanley in the fourth quarter of 2019 had alerted Defendants that no financial sponsors were interested in exploring a potential transaction unless Garrett's "excessive funded debt leverage" and liabilities were "left behind or discharged" and the business could be "acquired free and clear of those burdens." (JA-0720 to 0721 ¶ 74).

The Deason Bankruptcy Declaration likewise confirms that the three final stalking horse bidders that were selected on or about June 15, 2020, following non-binding indications of interest, "made clear to the Company that they would not purchase the Company except in a Chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet." (JA-0723 ¶ 80). Despite the fact that all potential stalking horse bidders made clear a

bankruptcy sale was a condition for their bids, Defendants nevertheless reassured investors in May and June 2020 that their "positive long-term fundamentals" remained intact and that they were taking appropriate measures to "flex [their] cost structure to maintain [their] agility and strengthen [their] position for long-term success." (JA-1154 ¶ 121). And in late July 2020, as the bankruptcy-related bid process moved to conclusion, Defendant Rabiller told investors: "[W]e continue to benefit from our robust infrastructure and agile working capabilities as we execute on our long-term strategy." (JA-1144 ¶ 101). These statements all stood in stark contrast to the increasing likelihood of a bankruptcy filing and Garrett's related but undisclosed true liquidity risk.

Defendants' misleading statements highlighting Garrett's "significant financial flexibility," "resilient business model," and "strong free cash flow generation" (JA-1135 to 1136 ¶¶ 79-80, JA-1138 ¶¶ 87-88, JA-1140 ¶ 93) were all likewise inconsistent with the admissions in the Deason Bankruptcy Declaration that Defendants knew by late 2019 and early 2020 that Garrett's capital structure posed a significant risk to its future viability as a stand-alone company, which Defendant Deason acknowledged made it "extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its [liabilities]." (JA-0719 ¶ 71, JA-0720 ¶ 73). Indeed, the Deason Bankruptcy Declaration details how, just prior to the start of the Class Period, Garrett

unsuccessfully sought potential merger partners "due to a variety of factors including the Company's over-leveraged capital structure" (JA-0720 ¶ 73). *See Scholastic Corp.*, 252 F.3d at 72 ("Pre-class data is relevant in this case . . . to establish that at the start of the class period, defendants had a basis for knowing increased Goosebumps sales were unlikely in the third quarter due to marked decreased sales experienced in the second quarter.").

Thus, the admissions in the Deason Bankruptcy Declaration support the inference advanced by Plaintiffs that Defendants made statements touting Garrett's "significant financial flexibility" and "strong free cash flow generation" when they knew or had access to information that Garrett's cash flow was severely restricted, that its capital structure "posed significant ongoing risks," that Defendants were actively pursuing a bankruptcy strategy, and that bankruptcy was increasingly likely. (JA-0722 ¶ 77). On these facts, Plaintiffs have adequately met the pleading standard for scienter in the Second Circuit. *See Novak*, 216 F.3d at 308.

## IV. THE DISTRICT COURT ERRED IN DETERMINING THAT POLICY CONSIDERATIONS RELIEVED DEFENDANTS' DUTY TO TELL THE WHOLE TRUTH WHEN THEY CHOSE TO SPEAK ABOUT GARRETT'S FINANCIAL CONDITION

As discussed, Plaintiffs' claims fundamentally rely on the long and well-settled precedent in this Circuit – as reiterated in *Vivendi II* – that "once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or

topic." 838 F.3d at 258; *see also Caiola*, 295 F.3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."). Had Defendants chosen not to speak about Garrett's financial condition, the policy reasons cited by the District Court may have offered Defendants some measure of protection. But Defendants did choose to speak. They routinely painted a picture of clear financial skies and calm seas with statements containing half-truths falsely touting Garrett's "significant financial flexibility," "strong financial position," and ability "to meet [its] short-term liquidity needs for at least the next twelve months." That choice required the storm warnings necessary to render those half-truths not misleading.

For those reasons, the claims in the Third Amended Complaint should be reinstated in all respects.[14]

---

[14] In addition to the Section 10(b) and Rule 10b-5 claims, Plaintiffs assert control-person liability claims against each of the Individual Defendants under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). To state a control-person liability claim, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Because the District Court dismissed Plaintiffs' Section 20(a) claim based solely on its determination that Plaintiffs had failed to adequately plead a primary violation under Section 10(b), should this Court reverse the District Court's judgment for the reasons discussed in Parts I and II *supra*, it should also reinstate Plaintiffs' Section 20(a) claim. *See, e.g.*, *Setzer*, 968 F.3d at 216 ("Because we disagree with the district (*cont'd*)

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the District Court, reinstate the Third Amended Complaint in all respects, and remand this matter for further proceedings.

Respectfully submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
ENTWISTLE & CAPPUCCI LLP
500 W. 2nd Street, Suite 1900
Austin, TX 78701
(512) 710-5960
aentwistle@entwistle-law.com

-and-

Arthur V. Nealon
Joshua K. Porter
ENTWISTLE & CAPPUCCI LLP
230 Park Avenue, 3rd Floor
New York, NY 10169
(212) 894-7200
anealon@entwistle-law.com
jporter@entwistle-law.com

*Counsel for Plaintiffs-Appellants*

---

court's determination as to scienter, we also reverse the district court's dismissal of the Section 20(a) claims and remand for further proceedings consistent with this opinion.").

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,767 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font Times New Roman.

Dated: August 1, 2023                     */s/ Andrew J. Entwistle*
                                           Andrew J. Entwistle

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Page

Opinion and Order by the Hon. Jennifer L. Rochon Granting
Defendants' Motion to Dismiss the Third Amended Complaint dated
March 31, 2023…………………………………………………….     SPA 1

Judgment Dismissing Plaintiffs' Third Amended Complaint dated
March 31, 2023…………………………………………………….     SPA 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

Case No. 1:20-cv-07992 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., and GAMCO Asset Management Inc. (together, "Plaintiffs") bring this consolidated, purported class action against Garrett Motion Inc. ("Garrett") and several of its directors and officers, including Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos M. Cardoso, Maura J. Clark, Courtney M. Enghauser, Susan L. Main, Carsten J. Reinhardt, and Scott A. Tozier (together, "Director and Officer Defendants" and together with Garrett, "All Defendants" or "Defendants"), alleging violations of Section 10(b) of the Exchange Act as to All Defendants, and violations of Section 20(a) of the Exchange Act as to the Director and Officer Defendants. ECF No. 83 ("Third Amended Complaint," "Complaint," or "TAC") ¶¶ 1, 31-42, 160-181. Since the commencement of this action, Plaintiffs' Second Amended Complaint was dismissed, with leave to replead, on the grounds that Plaintiffs had failed to adequately plead scienter. *See generally* ECF No. 82 ("March 2022 Opinion"); *In re Garrett Motion Inc. Sec. Litig.* (*Garrett I*), No. 20-cv-7992 (JPC), 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022). Now before the Court is Defendants' motion to dismiss the Third Amended Complaint.

ECF No. 86; ECF No. 87 ("Br.").[1]  For the reasons that follow, Defendants' motion to dismiss is

GRANTED.

**BACKGROUND**[2]

The Court assumes the parties' familiarity with the facts underlying this case, the

background of Garrett's spin-off from Honeywell International Inc. ("Honeywell"), and the

subsequent struggles Garrett faced before it filed for bankruptcy in September 2020, all of which

are articulated in the Court's March 31, 2022 Opinion and Order.  *See Garrett I*, 2022 WL

976269, at *2-6.  For purposes of this Opinion, however, the Court will summarize the factual

allegations set forth in the Third Amended Complaint, with a particular focus on the facts alleged

with respect to the narrowed class period in the Third Amended Complaint:  February 27, 2020

---

[1] Plaintiffs filed their Third Amended Complaint on May 2, 2022.  *See* TAC.  Defendants moved
to dismiss the Third Amended Complaint on June 24, 2022.  *See* Br.  On August 18, 2022,
Plaintiffs filed their opposition to the motion.  *See* ECF No. 90 ("Opp.").  On September 22,
2022, the case was reassigned to the undersigned.  ECF No. 93.  On September 23, 2022,
Defendants filed their reply brief in further support of their motion.  *See* ECF No. 94 ("Reply").
Defendants also requested oral argument on the motion.  *See* ECF No. 89.  However, in the
exercise of its discretion, the Court denies that motion as the briefing was extensive and oral
argument would not be helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral
argument rests within its discretion" (citation omitted)).

[2] Unless otherwise stated, the allegations stated herein come from the Third Amended
Complaint, and notwithstanding the "[e]xacting pleading requirements" of the Private Securities
Litigation Reform Act that apply in this case, "as with any motion to dismiss for failure to plead
a claim on which relief can be granted," the Court must "accept all factual allegations in the
complaint as true."  *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 322 (2007).
The Court at this stage may consider, among other things, documents attached to the complaint,
statements or documents incorporated by reference in the complaint, and legally required public
disclosures filed with the U.S. Securities and Exchange Commission ("SEC").  *See Tongue v.
Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  "The Court also considers facts drawn from the news
releases, financial reports, and transcripts of earnings calls that contain the statements that
Plaintiff alleges were false or misleading, and which are incorporated into the Complaint by
reference."  *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 221 (S.D.N.Y. 2021) (citing
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  All emphases from
the Complaint and other papers are omitted unless otherwise indicated.

2

**SPA 0002**

through September 18, 2020 ("Class Period").  *See* TAC ¶ 1.  The Court will also briefly

summarize its March 2022 Opinion, which articulated many similar principles at issue in the

present motion.

### A.  Factual Background

In October 2018, Honeywell spun-off its transportation systems division, Garrett, into a

stand-alone company (the "Spin-Off").  TAC ¶¶ 4, 31, 43.  That company was incorporated in

Delaware, with its headquarters located in Rolle, Switzerland.  *Id.* ¶ 31.  As part of the Spin-Off,

however, Honeywell saddled Garrett with massive amounts of debt, liabilities, and other

encumbrances.  *Id.* ¶ 44.[3]  The three contracts (the Indemnification Agreement, the Credit

Agreement, and the Tax Matters Agreement, which together will be referred to as the

"Honeywell Obligations") that formed – and severely restricted – Garrett's capital structure are

explained in detail in the March 2022 Opinion.  *See Garrett I*, 2022 WL 976269, at *3-5.  As

relevant here, the Indemnification Agreement required Garrett to indemnify Honeywell "for

certain asbestos liabilities" up to $5.25 billion.  TAC ¶ 45.  The Indemnification Agreement also

restricted the types of transactions Garrett could engage in, and "effectively provided Honeywell

with an absolute veto over any Garrett transaction outside of the ordinary course of business."

*Id.*  Through the Credit Agreement, Garrett assumed significant debt "to fund a $1.6 billion

'dividend' to Honeywell."  *Id.* ¶ 46.  The loans were not scheduled to mature until September 26,

2023 and September 27, 2025.  *Id*.  Finally, Garrett entered into the Tax Matters Agreement,

under which Honeywell required Garrett to reimburse it for certain tax obligations.  *Id.* ¶ 47.

---

[3] Although Honeywell spun off Garrett to avoid billions of dollars in asbestos-related liability,
the propriety of that move is not at issue in this case.  *See Garrett I*, 2022 WL 976269, at *1.

SPA 0003

Despite these significant encumbrances, prior to the Class Period, Defendants allegedly regularly lauded Garrett's "superior technology and R&D funding and growth plan" (*id.* ¶ 49), and bragged to investors about its "financial health, flexibility[,] and resiliency" (*id.* ¶ 50). However, from the time of the Spin-Off until the Class Period began on February 27, 2020, Plaintiffs allege that Defendants were developing deeper knowledge into the "undisclosed impacts [of] the inherited capital structure and related Honeywell Obligations." *Id.* ¶ 51. Plaintiffs rely on statements made during the September 2020 bankruptcy proceeding to argue that the company and Board were aware of the significant challenges inherent in Garrett's capital structure, and knew (as of February 27, 2020) that "the inherited capital structure was not resilient, that it was ill suited to any market issues, and, of course, that Garrett was already in the process of pursuing restructuring." *Id.* ¶ 66.

Defendants' knowledge, according to Plaintiffs, began to evolve immediately after the Spin-Off, when the Board was aware that "Garrett's leverage ratio grossly exceeded industry standards." *Id.* ¶ 52. Plaintiffs allege that, "[s]ince the Spin-Off, [Garrett] has struggled with the capital structure Honeywell foisted upon it, which is not sustainable and puts [Garrett] at a substantial disadvantage to its competitors." *Id.* ¶ 53 (citing Quinn Application, *Garrett Motion Inc., et al.*, 20-bk-12212 (Bankr. S.D.N.Y. Sept. 30, 2020), ECF No. 137 ("Quinn Bankr. Application")). Plaintiffs further allege that, prior to the Class Period, in early 2019, Garrett's Board retained (1) financial advisors from Morgan Stanley & Co. LLC ("Morgan Stanley") in order to conduct a strategic review of Garrett's operations only months after the Spin-Off (TAC ¶ 54), and (2) the law firm Quinn Emanuel to review the legality of the Indemnity Agreement and other Honeywell Obligations which impacted Garrett's business (*id.* ¶ 55). Additionally, Garrett attempted to negotiate the terms of the Indemnity Agreement to be less restrictive.

SPA 0004

*Id.* ¶ 56.  Plaintiffs allege that these facts demonstrate that, prior to the Class Period, "Defendants understood the enormous impact the Honeywell Obligations and resulting capital structure were having on Garrett's business," and they were attempting to "find a way out of the restrictive underlying agreements."  *Id.* ¶ 56.

Plaintiffs also contend that filings made in the bankruptcy proceeding demonstrate that Garrett's "capital structure and Indemnification Agreement would make it impossible" for Garrett to succeed for four reasons, all allegedly known to Defendants:  (1) the "precarious balance sheet" – replete with debt and other restrictive obligations from the Spin-Off – made it difficult to maintain business with original equipment manufacturers ("OEMs"), who require bids years out of the actual production of vehicles, and who have competing offers from competitors who are not as overleveraged (*see id.* ¶¶ 57-58);[4] (2) Garrett's leverage and indemnity obligations "effectively preclude[d]" it from adapting to a fast-changing automotive industry because it would not be able to "engag[e] in strategic acquisitions or other consolidation" (*id.* ¶ 59); (3) Garrett's leverage also made it difficult to invest in research and development, a necessary area of focus given the fast-changing industry (*id.* ¶ 60); and (4) "no lender or investor" would provide new capital "subordinated to both [Garrett's] funded debt and its indemnity obligations," making it difficult for Garrett to secure such equity capital (*id.* ¶ 61). In support of these allegations – and as apparent evidence that Defendant knew about these

---

[4] Plaintiffs allege that Garrett's customers "had growing concerns about" Garrett's financials, and cite to statements made in the bankruptcy proceeding in support of this allegation.  TAC ¶ 58.  But the filing – CFO Sean Deason's September 20, 2020 Declaration (*see* ECF No. 15, 20-bk-12212 & ECF No. 88-10, Ex. J to Br. ("Deason Decl.")), which is incorporated by reference into the Third Amended Complaint – is not so specific, and states that "concerns among OEMs and suppliers will grow as [Garrett's] technological advantages decline with underinvestment." Deason Decl. ¶ 68.

hindrances – Plaintiffs cite to Garrett CFO Sean Deason's September 20, 2020 Declaration.  *See Id.* ¶¶ 58-61 (citing Deason Decl. ¶¶ 65-71).

Furthermore, Plaintiffs allege that, "[r]ecognizing the internally known but publicly undisclosed impacts of the inherited capital structure and Honeywell Obligations," Garrett attempted mediation with Honeywell in September 2019, which was ultimately unsuccessful.  *Id.* ¶ 62.  Garrett then launched what Plaintiffs have described as a "Hail-Mary lawsuit" in December 2019 against Honeywell in New York state court, in an attempt to "void certain aspects of the Honeywell Obligations."  *Id.* ¶ 63.  Plaintiffs allege that this litigation was "futile." *Id.*  It was ultimately resolved in 2021 as part of the bankruptcy proceeding.  *Id.* ¶ 2.

Sometime in late 2019, Garrett's Board also "secretly" directed Morgan Stanley to conduct a market test with about 15 entities to assess the possibility of a merger or acquisition. *Id.* ¶ 64.  After conducting that test, in December 2019 and January 2020, Morgan Stanley reported that "multiple financial sponsors" would be interested in a potential transaction "if and only if" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.*, a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation)."  *Id.* ¶ 64 (citing Deason Decl. ¶ 74).  This report led Defendants to retain, on February 1, 2020, Perella Weinberg Partners ("PWP") to further evaluate strategies like a potential restructuring.  *Id.* ¶¶ 11, 64.

Nevertheless, on February 27, 2020, Garrett issued a press release in which Defendant Rabiller touted Garrett's "significant financial flexibility" that made it "well positioned to build upon the progress we achieved during our first full year as an independent company."  *Id.* ¶ 78

**SPA 0006**

(**Statements 1 & 2**); *see* ECF No. 88-9, Ex. I to Br. at 1 ("Feb. 27, 2020 Press Release").[5]  That

same day, in an earnings call, Defendant Rabiller also told investors that Garrett "maintained

[its] strong financial position" and that Garrett's "flexible and resilient business model" provided

"significant flexibility to help mitigate the impact from any short-term fluctuations in the

underlying macro environment[.]"  TAC ¶ 79 (**Statements 3, 4, 6**).  Rabiller further relayed to

investors that, "[g]oing forward, we plan to continue to utilize our strong free cash flow

generation to reduce net debt and deleverage our balance sheet."  *Id.* ¶ 79 (**Statement 5**).  Garrett

also released its Form 10-K, which stated:

> We believe we will meet our known or reasonably likely future cash
> requirements through the combination of cash flows from operating
> activities, available cash balances and available borrowings through
> our debt agreements.  If these sources of liquidity need to be
> augmented, additional cash requirements would likely be financed
> through the issuance of debt or equity securities; however, there can
> be no assurances that we will be able to obtain additional debt or
> equity financing on acceptable terms in the future.  Based upon our
> history of generating strong cash flows, we believe we will be able to
> meet our short-term liquidity needs for at least the next twelve
> months.

*Id.* ¶ 80 (**Statement 7**); ECF No. 88-8, Ex. H to Br., ("Feb. 27, 2020 10-K").[6]  Defendants

Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier signed the February

2020 Form 10-K, in addition to Defendant Rabiller.  TAC ¶¶ 33, 35-41.

---

[5] All numbered statements – the alleged misstatements – are based on the numbering in
Appendix 1 ("Chart of Alleged Misstatements") to Defendants' Brief in Support of their Motion
to Dismiss, *see* ECF No. 87-1, attached hereto, with non-substantive modifications, as Appendix
A.

[6] Plaintiffs also allege that language contained in the February 2020 10-K, the May 2020 10-Q,
and the July 2020 10-Q was false and misleading.  The February 2020 10-K contained risk
factors about the Indemnity Agreement, stating it "may have material adverse effects on our
liquidity and cash flows and on our results of operations, regardless of whether we experience a
decline in net sales," "may also require us to accrue significant long-term liabilities on our
consolidated and combined balance sheet," and that "our access to capital to fund our operations

SPA 0007

The COVID-19 or coronavirus pandemic also began to affect Garrett's operations in or about late February 2020.  Plaintiffs allege that Garrett operated a facility in Wuhan, China, a location that was central to the COVID-19 pandemic, and had to pause operations there for a time.  *See id.* ¶ 87.  On March 19, 2020, as part of a "press release announcing [that] its Wuhan, China facility was restarting operations following the COVID pause[,]" Defendant Rabiller emphasized that Garrett's "focus remains on leveraging our flexible and resilient business model."  *Id.* ¶ 87 (**Statement 6**).  By the following day, March 20, 2020, Garrett's Board had retained the law firm Sullivan & Cromwell and consulting firm AlixPartners LLP "to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure."  *Id.* ¶ 64; *see also id.* ¶ 121.

Days later, on April 7, 2020, Garrett issued another press release that provided a pandemic-related update, reported preliminary first quarter financials, and "withdr[ew] the Company's financial guidance for the year ending December 31, 2020."  *Id.* ¶ 88; *see also* ECF No. 88-11, Ex. K to Br. ("April 7, 2020 Press Release").  In that press release, Defendant Rabiller also praised Garrett's actions "to enhance our liquidity and preserve the long-term health of the business," and the expectation that Garrett would rely on its "resilient business model to emerge from this crisis as a stronger company."  TAC ¶ 88 (**Statements 8 & 9**).

Plaintiffs allege that Defendants continued to make false and misleading statements throughout the spring and summer of 2020.  In particular, Plaintiffs point to the following statements on May 11, 2020:

---

may be materially adversely affected."  TAC ¶ 114, 116 (**Statement 19**).  The 10-K also warned that "[o]ur indebtedness could adversely affect our business, financial condition and results of operations."  TAC ¶ 114 (**Statement 19**).  The May 2020 10-Q and July 2020 10-Q incorporated these risk factors by reference.  TAC ¶¶116-118 (**Statement 19**).

- In a press release, Defendant Rabiller announced Garrett's first quarter 2020 financial results, and claimed that Garrett's "positive business fundamentals remain intact" and Garrett's flexibility allowed it "to maintain our agility and strengthen our position for long-term success." *Id.* ¶ 92 (**Statements 10 & 11**); *see* ECF No. 88-14, Ex. N to Br. at 1 ("May 11, 2020 Press Release").

- In an earnings call, Defendants Rabiller and Bracke boasted that Garrett would "leverage [its] flexible and resilient business model[,]" that its "long-term technology growth strategy remains intact;" and that it was "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success." TAC ¶ 93 (**Statements 12 & 13**); *see* ECF No. 88-12, Ex. L to Br., ("May 11, 2020 Earnings Call").

- In its Form 10-Q, Garrett made the following statement about meeting anticipated cash and liquidity requirements:  "If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . . [W]e believe we will be able to meet our short-term liquidity needs for at least the next twelve months." TAC ¶ 94 (**Statement 14**); *see* ECF No. 88-13, Ex. M to Br., ("May 11, 2020 10-Q").

Also on May 11, 2020, Defendant Rabiller told investors on an earnings call that Garrett's "former parent imposed on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment,

SPA 0009

meaning that was really unsustainable that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges." TAC ¶ 134.

On June 12, 2020, Plaintiffs allege that Garrett "entered into amendments to certain of its credit agreements – a strategy that Defendants knew at best would simply buy the Company some additional time." *Id.* ¶ 72.  In a press release that day, Defendant Rabiller announced that "[t]he modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown." *Id.*  He also announced that, despite the extensive effects the pandemic had on the automotive industry, Garrett's "positive long-term fundamentals . . . remain intact." *Id.* ¶ 98 (**Statement 15**).

Plaintiffs allege that three days later, by June 15, 2020, "Garrett had received 5 non-binding indications of interests, all of which were contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet.'" *Id.* ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett narrowed the bids to the top three, and in the next three weeks, those companies conducted due diligence. *Id.* ¶ 69.  During that time, one of the parties removed themselves from consideration. *Id.*  The two remaining parties conducted several more weeks of diligence, had expert sessions with advisors and management, reviewed 50,000 pages of debtors' documents, and submitted over 400 questions related to due diligence. *Id.*

During the later stages of that diligence, on July 30, 2020, Garrett issued another press release with its second quarter 2020 financials, in which Defendant Rabiller also assuaged concerns related to COVID disruptions:

> Garrett's proven track record in operational excellence has helped us
> navigate the current pandemic-induced downturn.  Although the

**SPA 0010**

> market environment remains highly uncertain, we continue to benefit
> from our robust infrastructure and agile working capabilities as we
> execute on our long-term strategy and lead the evolution of advanced
> turbocharging, electric-boosting, and software solutions for the global
> automotive industry.

*Id.* ¶ 101 (**Statement 16**); *see* ECF No. 88-16, Ex. P to Br. ("July 30, 2020 Press Release").  That

same day, on an earnings call with investors and Defendants Rabiller, Deason, and Bracke,

Rabiller boasted about "the strong fundamentals of Garrett . . . combined with a variable cost

model that helps preserve cash and an attractive margin profile," and "the resiliency of

[Garrett's] operating structure."  *Id.* ¶ 102 (**Statement 17**); *see* ECF No. 88-17, Ex. Q to Br.

("July 30, 2020 Earnings Call").  In the Form 10-Q released on July 30, 2020, Garrett also

removed language that had been in the May 2020 10-Q, which stated: "Our management has

concluded that the foregoing conditions and events raise substantial doubt as to our ability to

continue as a going concern. The accompanying financial statements do not include any

adjustments or classifications that may result from the possible inability of the Company to

continue as a going concern within one year after the issuance of the financial statements."  TAC

¶¶ 106-107 (**Statement 18**); *see* ECF No. 88-15, Ex. O to Br. ("July 30, 2020 10-Q").

A few days later, on August 3, 2020, the two remaining bidders who had been finishing

due diligence submitted non-binding proposals to Garrett.  TAC ¶ 70.  On "August 13, 2020,

Garrett signed an Exclusivity Agreement with" stalking horse purchaser, KPS Capital Partners,

LP ("KPS").  TAC ¶¶ 14, 70; *see also* Deason Decl. ¶ 81.

On August 26, 2020, about a month before Garrett entered a final purchase agreement

with KPS ("Purchase Agreement"), but after Garrett signed the Exclusivity Agreement,

Defendants issued yet another press release stating that "today[, Garrett] announced that, with

the assistance of its financial and legal advisors, it is exploring alternatives for addressing its

SPA 0011

previously disclosed balance sheet concerns." TAC ¶ 110; *see* ECF No. 88-18, Ex. R to Br. ("August 26, 2020 Press Release"). Plaintiffs allege that on that day, for the first time, Garrett revealed that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility . . . thereby putting Garrett at a meaningful disadvantage relative to its peers." TAC ¶ 110. The press release went on to disclose that "Garrett is seeking to address its balance sheet concerns while its core business remains strong in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer." *Id.* ¶ 110 (**Statement 20**). Garrett further warned that "any actions taken by Garrett in relation to liability management may materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock." *Id.* (**Statement 21**). Finally, the statement declared that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives." *Id.* ¶ 111 (**Statement 22**).

On September 17, 2020, the Wall Street Journal reported that Garrett was close to a sale through bankruptcy. *Id.* ¶ 137. Garrett's stock price fell from $2.41 on September 17, 2020 to $2.01 a share on September 18, 2020. *Id.* On September 20, 2020, Garrett entered into the Purchase Agreement with KPS, and filed for bankruptcy. *Id.* ¶¶ 31, 138; Deason Decl. ¶ 81. Garrett's stock price subsequently fell from $2.01 on September 18, 2020 to $1.76 per share on September 20, 2020. TAC ¶ 138. Plaintiffs allege that Defendants' bankruptcy filings make clear that "COVID was not the cause of the Garrett's capital structure problems or its eventual bankruptcy." TAC ¶ 66. But, according to the Press Release issued by Garrett that day, "'the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell

– all exacerbated by COVID-19 – created a significant long-term burden on our business'" that led Garrett to bankruptcy.  TAC ¶ 105.

### B.    The Court's March 2022 Opinion

When Plaintiffs first brought this litigation, their theory of the case was different than articulated now.  In the Second Amended Complaint, Plaintiffs put forth a broad view of the alleged wrongdoing, a longer class period, and a different theory of scienter.   As the Court articulated, Plaintiffs' early theory was that "Defendants made false and misleading statements about whether Garrett would fail because they 'knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed.'"  *Garrett I*, 2022 WL 976269, at *12 (citing ECF No. 43 ("Second Amended Complaint" or "SAC") ¶ 8).  In March 2022, prior to the reassignment of this case to the undersigned, the Court rejected the Second Amended Complaint, and in turn that broad theory, on the grounds that Plaintiffs had failed to plead at least one element of a securities violation:  scienter.  *See Garrett I*, 2022 WL 976269, at *11.

The Court concluded that Plaintiffs failed to plead scienter in part because the allegations did not plead a plausible motive for Defendants to commit fraud.  *Id.* at *12-13.  "[W]hy would the . . . Defendants promise the market that Garrett would continue to innovate and remain a cutting-edge technology company if they knew the company 'was doomed to failure' because it was 'nearly impossible for Garrett to survive as an independent company'?"  *Id.* at *13 (citing SAC ¶¶ 131, 159).  The allegations did not answer this question.  Defendants' compensation packages did not otherwise create a motive to commit the alleged fraud, because motives based on compensation alone are "common to most corporate officers," and because the actual compensation packages were contingent upon "the successful completion of the Spin-Off that

**SPA 0013**

would not vest until Garrett's fourth year as a publicly-traded Company." *Id.* (citing SAC ¶ 259). The Court held that the suggestion that Defendants would "tie their compensation to Garrett surviving for four years if . . . they knew that Garrett had fatal issues . . . defies economic reason . . . ." *Id.* (citations omitted).

This Court also concluded that Plaintiffs had failed to plead the alternative basis for scienter: "strong circumstantial evidence of conscious behavior or recklessness." *Id.* at *13-15. In particular, the Court faulted Plaintiffs' heavy reliance "on the bankruptcy proceedings to impute knowledge onto . . . Defendants *before* those proceedings took place." *Id.* at *14. What Defendants knew and shared during the bankruptcy proceedings – which began in September 2020 – "has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings." *Id.* (citing *Hutchinson v. Perez* (*Hutchinson I*), No. 12-cv-1073 (HB), 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012)).

Additionally, the Court found insufficient Plaintiffs' allegations that Defendants acted with scienter because, shortly before making the alleged misstatements, Garrett "retain[ed] financial advisors [who] . . . concluded bankruptcy was likely without a restructuring of the Honeywell Obligations . . . ." *Id.* (citations omitted). Apart from the fact that failure to disclose the retention of the financial advisors alone does not support an inference of scienter, the Court explained that, as alleged, it was not reckless for Defendant Rabiller to continue to make positive statements about Garrett's financial flexibility after the financial advice was provided to Garrett. *Id.* In particular, the Court emphasized that "Plaintiffs [did] not allege that the financial advisors ever opined that Garrett's *only* option forward was bankruptcy[,]" but instead alleged that Garrett was advised it would need to "restructure the Honeywell Obligations through bankruptcy *or other means*." *Id.* (quoting SAC ¶ 115) (emphasis added). At the time the advisors were

SPA 0014

retained, Garrett had sued Honeywell in an attempt to alleviate the burdens caused by the

Honeywell Obligations. *Id.* With litigation still available as a potential solution to Garrett's

woes, it was not reckless for Defendant Rabiller to make positive statements about Garrett trying

to increase its financial flexibility. *Id.*

Finally, the Court rejected Plaintiffs' argument that the Second Amended Complaint

properly alleged scienter through the "core operations" theory. *Id.* at *15. Under that theory,

when the alleged misstatements concern information critical to a company's core operations,

knowledge of that critical information is attributable to executives of the company, which

permits an inference of scienter. *Id.* Specifically, the Court noted that while the viability of the

doctrine is currently in doubt, the doctrine can only bolster allegations of scienter and cannot

independently create a sufficient allegation of scienter. *Id.* (collecting cases). Because Plaintiffs

otherwise failed to allege scienter, their "core operations" theory also failed. *Id.*

### C.     Leave to Replead

The Court allowed Plaintiffs leave to replead because, for the first time at oral argument,

Plaintiffs presented "a different theory of . . . Defendants' scienter." *Id.* at 19. Specifically, in

their Second Amended Complaint, Plaintiffs had alleged that Defendants "knew since the time of

the Spin-Off that the Company's capital structure and Indemnification Agreement would make it

impossible for the Company to succeed." *Id.* (citing SAC ¶ 8). However, at oral argument,

Plaintiffs for the first time shifted their theory, and argued that there was an "evolving situation"

at Garrett, whereby Defendants' knowledge grew, and they only came "to appreciate the full

effect of the Honeywell Obligations on the company at a later date." *Id.* Because this new

theory changed Plaintiffs' allegations of scienter and falsity, and because the March 2022

**SPA 0015**

Opinion was "the first time that the Court . . . ruled on whether Plaintiffs had deficiencies in their pleadings[,]" the Court granted leave to amend.  *Id.*

In their Third Amended Complaint, Plaintiffs, among other things, shortened the initial October 1, 2018 through September 18, 2020 Class Period (SAC ¶ 16), to February 27, 2020 through September 18, 2020 (TAC ¶ 1), thereby narrowing the pool of alleged misstatements. Defendants moved to dismiss the Third Amended Complaint on June 24, 2022.  *See generally* Br.

## MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, the facts must be sufficient to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  On a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal brackets omitted).  The court shall not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

However, securities fraud claims "are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99. Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud."  Under Rule 9(b), the Second Circuit has held that "[a] securities fraud complaint based on misstatements must (1) specify the statements that the

**SPA 0016**

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99.  The Private Securities Litigation Reform Act ("PSLRA") further provides for heightened pleading standards in securities fraud actions, requiring that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## DISCUSSION

Under Section 10(b) of the Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  The Securities and Exchange Commission ("SEC") has implemented this provision through Rule 10b-5, which "explicitly prohibits making any untrue statement of a material fact."  *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citing 17 C.F.R. § 240.10b-5(b)).  In order to state a claim under Rule 10b-5, a "plaintiff must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014)).

SPA 0017

In their motion to dismiss the Third Amended Complaint, Defendants argue that Plaintiffs have failed to plead three of the six required elements for a Rule 10b-5 claim:  any material misrepresentations or omissions made by Defendants, scienter, and loss causation.  *See generally* Br.  The Court agrees that Plaintiffs have once again failed to plead scienter, and have also failed to allege any material misstatements or omissions made by Defendants.  Therefore, the Court need not address Defendants' arguments regarding loss causation.

### A.    Scienter

In order to adequately plead a claim for securities fraud pursuant to Rule 10b-5 and the heightened pleading requirements of Rule 9(b) and the PLSRA, "a plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'"  *Emps.' Ret. Sys. of Gov't of the Virgin Is.*, 794 F.3d at 305 (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis added).  The state of mind required for a claim pursuant to Rule 10b-5 is an "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)).  Recklessness is also "a sufficiently culpable mental state for securities fraud" in the Second Circuit.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*ECA, Loc. 134*"), 553 F.3d 187, 198 (2d Cir. 2009).  The Supreme Court has opined that a "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314.  A scienter inquiry is thus "inherently comparative" in that "the Court 'must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"  *Saraf v. Ebix, Inc.*, No. 21-cv-01589 (JMF), 2022 WL 4622676, at *3 (S.D.N.Y. Sept. 30, 2022) (quoting *Tellabs, Inc.*,

SPA 0018

551 U.S. at 323-24).  Courts also must "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering '*all* of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'"  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (quoting *Tellabs, Inc.*, 551 U.S. at 323, 326).  Finally, "[i]n order to allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving rise to a strong inference that 'someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 543 (S.D.N.Y. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

A plaintiff can satisfy the scienter pleading requirement by alleging facts that show either of the following: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Loc. 134*, 445 F.3d at 198.  To show a motive and opportunity to defraud, "[p]laintiffs must allege that [a company] or its officers benefitted in some concrete and personal way from the purported fraud[.]"  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  If a party cannot show a motive, they may plead scienter through strong circumstantial evidence of conscious misbehavior or recklessness, but "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).  Indeed, "[t]o plead recklessness through circumstantial evidence, Plaintiffs would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . ."  *ECA, Loc. 134*, 445 F.3d at 202-03 (internal quotation marks omitted).  This standard presents a "significant burden" for plaintiffs pleading

SPA 0019

recklessness in securities fraud litigation.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).

Having failed to plead scienter in their Second Amended Complaint, *see Garrett I*, 2022 WL 976269, at *11, Plaintiffs modified their theory in the Third Amended Complaint.  Now Plaintiffs allege that "[e]ach of the Defendants had actual knowledge by no later than February 27, 2020, and increasingly through the [new] Class Period . . . that Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to fix the unsustainable capital structure and the Honeywell Obligations."  TAC ¶ 120.  On close inspection of the allegations in the Third Amended Complaint, it becomes clear that Plaintiffs' Third Amended Complaint suffers from similar deficiencies as the Second Amended Complaint.

As an initial matter, Plaintiffs appear to admit that their scienter allegations do not rely on Defendants' motives.  *See* Opp. at 22 (arguing that "Defendants' laser focus on 'motive' is a red herring" because the Court already acknowledged that a plaintiff need not show motive to allege scienter).  Nevertheless, Plaintiffs' Third Amended Complaint contains a section detailing Defendant Rabiller's alleged financial motivations to inflate Garrett's stock price.  *See* TAC ¶¶ 128-131.  That section outlines Rabiller's employment agreement, which as described in *Garrett I*, includes a compensation package containing over $4 million in "Founder's Grants" that would not vest until Garrett was a public company for at least four years, and other incentive-based compensation.  *See id*. ¶¶ 128-130.  According to the Third Amended Complaint, Rabiller's compensation included incentive pay equal to his annual salary, yearly salary increases, and a guarantee of "24 months of base salary and incentive compensation

20

severance in the event of his involuntary termination of employment." *Id.* ¶ 129. Some incentive compensation was also tied to Garrett's performance. *Id.* ¶ 130.

However, to the extent these allegations differ somewhat from those in the Second Amended Complaint, they do not change the Court's analysis of Rabiller's alleged motive. As stated in the Court's March 2022 Opinion, "if 'scienter could be pleaded' through incentive compensation 'alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Garrett I*, 2022 WL 976269, at *13 (quoting *Kalnit*, 264 F.3d at 140). That is why courts have held that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute motive for purposes of this inquiry." *ECA, Loc. 134*, 553 F.3d at 198 (quotations omitted); *see In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product. Similarly, corporate executives are generally motivated to maximize bonus compensation. These allegations do not support an inference of scienter."). Plaintiffs have failed to allege anything beyond incentive-based compensation, which is not sufficient to show motive under the circumstances alleged here.[7]

Plaintiffs' more persuasive – but ultimately still unsuccessful – argument is that they have shown a strong inference of scienter through circumstantial evidence about what

---

[7] The March 2022 Opinion also noted that motive and opportunity were implausible as alleged there because, if Defendants knew at the time of the Spin-Off that Garrett was likely to fail, they would not have tied their compensation to Garrett's success by permitting their stock to vest only after four years. *Garrett I*, 2022 WL 976269, at *13. Even though Plaintiffs no longer contend Defendants knew Garrett would fail from the time of the Spin-Off when the employment agreements were created, for the reasons set forth above, such agreements still do not demonstrate a motive to commit fraud.

SPA 0021

Defendants knew prior to the Class Period, which was contrary to what Defendants actually said during the Class Period. *See* Opp. at 19-22. Notably, because Plaintiffs have failed to demonstrate motive, the "strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citation omitted). Courts in this Circuit have described "at least four circumstances [that] may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Garrett I*, 2022 WL 976269, at *14 (quoting *ECA, Loc. 134*, 553 F.3d at 199).

Plaintiffs argue that the Third Amended Complaint alleges sufficient facts under the third prong – that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" prior to February 27, 2020. Opp. at 19 (internal citation omitted). While this analysis necessarily overlaps with the inquiry into whether or not a statement was false or misleading, the Court will nevertheless address each element separately. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) ("Largely for the same reasons that the various statements at issue have been held neither false nor misleading, the facts pled in the SAC fall far short of pleading recklessness, and, thus, scienter."); *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-cv-01405 (RPP), 2009 WL 174656, at *26 (S.D.N.Y. Jan. 26, 2009) ("In such situations, the *scienter* analysis and the determination of whether the defendant made false or misleading statements are essentially combined." (internal quotation marks and citation omitted)).

"To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (internal quotation marks and citation omitted).  In support of their scienter allegations, Plaintiffs rely in large part on a declaration submitted by Defendant Deason during the bankruptcy proceedings, dated September 20, 2020.  *See generally* Deason Decl.  For instance, they allege that soon after the Spin-Off, Defendants knew that Garrett's debt and other obligations made it difficult to maintain business with OEMs, that it was unlikely to be able to adapt to a fast-evolving industry due to its leverage and indemnity obligations, and that lenders and investors were unlikely to provide new capital to the company "subordinated to both [Garrett's] funded debt and its indemnity obligations."  TAC ¶ 61; *see also id.* ¶¶ 57-61.  In making these allegations, however, Plaintiffs rely on Deason's statements made on September 20, 2020.  *See* Deason Decl. ¶¶ 65-71.  As this Court explained in its prior opinion, "Defendants' knowledge about Garrett's financial strains *during* the bankruptcy proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior* to those proceedings."  *Garrett I*, 2022 WL 976269, at *14.  "Allegations of 'fraud by hindsight' are insufficient to withstand a motion to dismiss."  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *see also Hutchinson I*, 2012 WL 5451258, at *7 ("This case is therefore analogous to a host of cases in which courts have dismissed, as 'fraud in hindsight,' complaints filed after a company's bankruptcy based on

the conclusory allegation that defendants had or should have been aware of the 'liquidity crisis.'") (collecting cases).[8]

Perhaps recognizing this flaw, Plaintiffs point to other allegations of scienter to oppose Defendants' motion to dismiss.  For instance, they contend that, before the pandemic, "Garrett's customer relationship teams reported to the directors and officers that customers were nervous about the Company's capital structure . . . ."  Opp. at 20 (citing TAC ¶ 58).  But that allegation is based on Deason's bankruptcy declaration and overstates its contents.  Deason's declaration only states that, at the time of the bankruptcy in September 2020, "if . . . balance sheets problems [created by the Spin-Off] are not addressed, concerns among OEMs and suppliers will grow . . . ."  Deason Decl. ¶ 68.  Plaintiffs' new allegation therefore, again, has little bearing on what Defendants knew prior to the Class Period.

The remaining pre-Class-Period allegations regarding scienter describe Defendants' retention of companies to review their financials and challenge the Honeywell Obligations. Plaintiffs rely on allegations that Garrett, in early 2019, started working with Morgan Stanley "to explore strategic alternatives" and were told in early 2020 that "multiple financial sponsors" would be interested in a potential transaction "*if and only if*" the structures of those transactions "included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet . . . ."  TAC ¶¶ 64 (citing Deason Decl. ¶ 74), 121; *see* Opp. at 20.  And on February 1,

---

[8] Plaintiffs appear to argue that, as described in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), they are merely relying on "post-class period data to confirm what a defendant should have known during the class period."  Opp. at 20-21.  Of course, a post-class period statement explaining what happened during the class period, to argue that a defendant knew or should have known about that event, is not hindsight, as articulated in *In re Scholastic*.  But a post-class period statement about a belief or knowledge a party has at the time that post-class period statement was made does not necessarily impute that belief or knowledge to the class period.  *See Garrett I*, 2022 WL 976269, at *14.  Plaintiffs largely continue to do the latter in their Third Amended Complaint.

SPA 0024

2020, in response to Morgan Stanley's report, Defendants hired Perella Weinberg Partners ("PWP") to further evaluate a potential restructuring.  TAC ¶ 64.

These scienter allegations fail for largely the same reasons articulated in the Court's March 2022 Opinion.  Because "[n]o multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action," hiring financial advisors alone does not raise an inference of scienter.  *Garrett I*, 2022 WL 976269, at *14 (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007)).  And the allegation that those advisors warned Garrett that potential buyers were wary of its balance sheet does not support a strong inference of scienter because Plaintiffs still "do not allege that the financial advisors ever opined that Garrett's only option forward was bankruptcy." *Id.* at *14. Rather, the Third Amended Complaint – like the Second Amended Complaint – contains allegations that the financial advisors reported that a merger or other significant transaction was unlikely absent discharging of the Honeywell Obligations, whether that be through litigation, bankruptcy, or some other means.  *See* TAC ¶¶ 64, 121 & n.25 ("All financial sponsors insisted on potential transaction structures in which the balance sheet of the Company – including its excess funded debt leverage, the ASASCO Indemnity Agreement and other legal liabilities – could be left behind or discharged and the business of the Company acquired free and clear of those burdens." (quoting Deason Decl. ¶ 74)).  While Plaintiffs allege that one option going forward involved "an auction process for a stalking horse bidder to take the company into bankruptcy," *id.* ¶ 11, "discussions about restructuring [are] hardly the same as the company's decision to file for bankruptcy," *Hutchinson v. Perez* (*Hutchinson II*), No. 12-cv-01073 (HB), 2013 WL 1775374, at *3 (S.D.N.Y. Apr. 25, 2013).  Therefore, while Garrett's hiring of advisors and discussions about potential bankruptcy is clear in the Complaint, the allegations otherwise

25

lack specificity as to precisely what Defendants knew about a definitive bankruptcy filing. *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("Absent concrete allegations as to defendants' knowledge, the Amended Complaint cannot generate a strong inference of scienter." (internal brackets and citation omitted)); *see also Coronel*, 2009 WL 174656, at *27 (holding, in context of scienter, that "because the Complaint alleges no specific facts demonstrating that Defendants possessed – at the time they made the allegedly false statements concerning the reserve amounts – information contradicting their statements, fraud has not been shown").

Further adding ambiguity is the fact that, at the time Morgan Stanley reported to Garrett that "multiple financial sponsors" might be interested in a transaction, Defendants had hired the law firm Quinn Emanuel to launch a "Hail Mary" litigation against Honeywell to attempt to "void certain aspects of the Honeywell Obligations . . . ." TAC ¶ 63. Even though Plaintiffs contend that the litigation was "futile," it was ongoing through the bankruptcy proceeding, and only eventually resolved in 2021. *Id*. ¶¶ 63, 2. That ongoing litigation, which continued through the Class Period when the alleged misstatements were made, "provided Garrett a potential way to get out of the Honeywell Obligation[s]" that did not involve bankruptcy. *Garrett I*, 2022 WL 976269, at *14. This negates any "strong inference" that Defendants knew that bankruptcy was the only option going forward. Rather, a more compelling, but less cynical, inference from these allegations is that Garrett was doing everything in its power to evaluate other options to avoid bankruptcy, including by seeking the advice of several expert advisors, and by retaining experienced legal counsel to void the restrictive Honeywell Obligations or negotiate a release with Honeywell. *See Constr. Laborers Pension Tr. for S. Cal.*, 433 F. Supp. 3d at 546 ("And the alleged emergency Board meeting – in addition to failing to establish with any particularity what

**SPA 0026**

the Board knew – more plausibly evinces that the Board was being circumspect and cautious in
the face of *uncertainty* about what the future held for Moonves, as opposed to being evidence
that the Board had concrete knowledge that a scathing and accurate report was forthcoming.").
Absent motive, Plaintiffs have not met the "greater" burden of pleading conscious misbehavior
or recklessness, and have otherwise failed to plead a "strong inference" of scienter arising prior
to February 27, 2020.

Plaintiffs' allegations of scienter during the course of the Class Period are also
insufficient.  The Third Amended Complaint generally describes Defendants' process in
assessing whether restructuring through bankruptcy was the only way forward, but it is silent
about when Defendants knew that bankruptcy was inevitable.  *See Stratte-McClure v. Morgan
Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (affirming dismissal of complaint for failure to plead
scienter where it was "silent about when employees realized that the more pessimistic
assessments of the market were likely to come to fruition and that they would be unable to
reduce the Long Position").  Instead, Plaintiffs allege that, during the Class Period, Defendants
continued to make optimistic statements about Garrett's well-being and future despite knowing
facts to the contrary.  Plaintiffs allege that the following facts contributed to Defendants'
knowledge during that period:

- On March 20, 2020, Garrett's Board retained the law firm Sullivan & Cromwell, and
  the consulting firm AlixPartners LLP "to assist in reviewing and preparing for various
  court-supervised restructuring processes given its global footprint and capital
  structure."  TAC ¶¶ 64, 121.

SPA 0027

- On June 12, 2020, Garrett "entered into amendments to certain of its credit agreements – a strategy that Defendants knew at best would simply buy the Company some additional time." *Id*. ¶ 72.

- On June 15, 2020, Garrett received five non-binding indications of interest in response to the advisors' inquiries about a stalking horse purchase, "all of which were contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet.'" *Id*. ¶ 68 (quoting Deason Decl. ¶ 80). The top two candidates subsequently conducted over six weeks of due diligence. *Id*. ¶ 69.

- On August 3, 2020, the two remaining bidders submitted non-binding proposals to Garrett. *Id*. ¶ 70.

- On August 13, 2020, Garrett entered into an Exclusivity Agreement with stalking horse purchaser KPS. *Id*.

Like the allegations prior to the Class Period, these allegations show that Garrett was continuing to investigate restructuring throughout the Class Period. But again, the hiring of financial advisors does not give rise to a strong inference of scienter on its own. And the additional facts do not bolster an inference of scienter because, on balance, they also show that Garrett was investigating its options while the "Hail-Mary" litigation proceeded. Plaintiffs point to Rabiller's August 26, 2020 statement that "Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives" after Garrett had already signed the Exclusivity Agreement on August 13, 2020. *Id*. ¶ 111. Plaintiffs appear to argue that Defendants were at the very least reckless in making these statements because Garrett knew it had no viable option other than bankruptcy by this time. *See* Opp. at 22 (referencing alleged misstatements that were made

**SPA 0028**

after the Exclusivity Agreement was signed and 25 days before bankruptcy); *see also id.* at 20 (arguing that by Class Period "adverse impact of the Honeywell Obligations had already materialized sufficiently for Defendants to conclude Garrett had no viable option other than to pursue bankruptcy"); TAC ¶¶ 7, 121-122.  But the signing of an Exclusivity Agreement does not mean that a decision had been made concerning bankruptcy.  While the Court is unable to locate the actual Exclusivity Agreement in the record, and the parties have not delineated the precise terms of that agreement, Plaintiffs have not pleaded that the Exclusivity Agreement required Garrett to enter a final agreement with KPS or to enter into bankruptcy.  Generally speaking, exclusivity agreements provide for a period of time in which one party must *negotiate* for an eventual purchase, exclusively with the other party.  *See, e.g.*, *TCS Cap. Mgmt., LLC v. Apax Partners, L.P.*, No. 06-cv-13447 (CM), 2008 WL 650385, at *21 (S.D.N.Y. Mar. 7, 2008) (dismissing claim alleging that it was misleading to not disclose exclusivity agreement "in anticipation of the sale," because no law imposed a duty to "disclose offers or negotiations to purchase a majority interest"); *see also Energy Intel. Grp., Inc. v. Cowen & Co., LLC*, No. 14-cv-03789 (NRB), 2016 WL 3939747, at *3 (S.D.N.Y. July 15, 2016) (describing exclusivity agreement which provided "for 30 days of exclusive negotiations"); *Cyber Media Grp., Inc. v. Island Mortg. Network, Inc.*, 183 F. Supp. 2d 559, 565 (E.D.N.Y. 2002) (describing exclusivity agreement as barring party from "negotiating with any other prospective buyers for a period of thirty days").  Defendants did not sign the Purchase Agreement with KPS until September 20, 2020.

A more plausible inference from Rabiller's August 2020 disclosures is that Defendants were in a position to update the public as to the efforts it had and was currently taking to assess Garrett's future viability and warn the public of the difficulties the Company currently faced,

**SPA 0029**

including consideration of, but not a determination to, pursue restructuring. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks."). The August 26, 2020 Press Release provides a fairly robust explanation of Garrett's struggles, including its high leverage and the Honeywell Obligations, as well as its strengths, including "ample liquidity" to support current commitments, and strong operating performance. *See* August 26, 2020 Press Release. The Press Release noted that "Garrett has not yet determined" if it would pursue restructuring options, but it further explained that "any actions taken by Garrett in relation to liability management may materially reduce the value" of stocks, or among other things, could cancel existing stock. *Id.*

Importantly, as stated previously, the final stalking horse Purchase Agreement was not entered into until September 20, 2020, less than a month after the August 26, 2020 press release and the same day the bankruptcy proceeding commenced. TAC ¶¶ 31, 138. Because "it would defy economic reason for [Garrett] to make statements that would accelerate a bankruptcy filing, thereby causing more harm to investors, no reasonable inference of fraudulent intent can be drawn" from the failure to disclose the negotiations. *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013). Plaintiffs have not pleaded any specific facts suggesting that Defendants had made the decision to enter bankruptcy by August 26, 2020 when the last purported misstatement was made by Defendants. *See Stratte-McClure*, 776 F.3d at 107 (affirming dismissal of complaint for failure to plead scienter where it was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position"); *Jones*, 550 F. App'x at 28 (noting that "the second amended complaint alleges no fact supporting an inference that, between September 12, 2011,

and September 30, 2011, defendants became aware that a bankruptcy restructuring was in fact necessary").  Therefore, it was not "highly unreasonable" or "an extreme departure from the standards of ordinary care," *ECA, Loc. 134*, 553 F.3d at 203, for Rabiller to warn investors of the possibility of restructuring, while also indicating that no final decision had been made.[9]

When viewing the full picture of Plaintiffs' allegations regarding Defendants' knowledge, it becomes clear that Garrett was a company dealing with difficult choices and considering how to proceed.  *See generally* August 26, 2020 Press Release.  Indeed, "[a] company is permitted a period of time to investigate any problem it detects before reporting it to the public."  *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 179830, at *4 (citing *Slayton*, 604 F.3d at 777).  And while, during the Class Period, bankruptcy was one option, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).  Any inference of recklessness based on Defendants'

---

[9] Plaintiffs rely on *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) to argue that the "incongruity between word and deed establishes a strong inference of scienter."  Opp. at 21.  In that case, an inference of scienter was warranted because "Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed."  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d at 238.  Plaintiffs had also adequately pleaded facts showing that Defendants were aware of the risks posed by the CDOs, or at the very least were reckless "in not appreciating" the risks they posed.  *Id.* at 237.  Risks, and related statements, associated with a portion of a company's asset portfolio are different from a company's consideration of a potential future bankruptcy.  Caselaw makes clear that a company does not need to immediately disclose that it is considering bankruptcy.  *See, e.g.*, *Hutchinson II*, 2013 WL 1775374, at *3; *In re Renewable Energy Grp. Sec. Litig.*, No. 21-cv-01832 (DLC), 2022 WL 179830, at *4 (S.D.N.Y. Jan. 20, 2022) (citing *Slayton*, 604 F.3d at 777).  And here, unlike in *Citigroup*, Plaintiffs have failed to plead sufficient facts detailing that Defendants knew or were reckless in appreciating that bankruptcy was inevitable on or before August 26, 2020, the latest date upon which Plaintiffs allege a misstatement was made.

optimistic statements is negated by the disclosures themselves, which relay the decline of Garrett

and warned investors that a restructuring was possible during the Class Period.  *See Kuriakose*,

897 F. Supp. 2d at 185 (noting that "truthful disclosures" negated inference of scienter); *see also*

*Silsby v. Icahn,* 17 F. Supp. 3d 348, 369-70 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616

F. App'x 448 (2d Cir. 2015) (finding that disclosures weighed against scienter).  In February

2020, Garrett's 10-K listed several risk factors with regard to the Indemnity Agreement, stating

the agreement "may have material adverse effects on our liquidity and cash flows and on our

results of operations, regardless of whether we experience a decline in net sales," "may also

require us to accrue significant long-term liabilities on our consolidated and combined balance

sheet," and that "our access to capital to fund our operations may be materially adversely

affected."  TAC ¶ 114.  The 10-K also warned that "our indebtedness could adversely affect our

business, financial condition and results of operations."  *Id*. ¶ 114 (brackets omitted).  The May

2020 10-Q and July 2020 10-Q incorporated these risk factors by reference.  *Id*. ¶¶ 116, 118.  In

May 2020, Rabiller noted that the capital structure imposed by Honeywell was "ill suited to cope

with any meaningful operating challenges."  *Id*. ¶ 134.  Also, two weeks after Garrett entered

into an Exclusivity Agreement with KPS, on August 26, 2020, Defendant Rabiller announced

that Garrett was "exploring alternatives for addressing its previously disclosed balance sheet

concerns," and shared concern that the "leveraged capital structure" created challenges to

"strategic and financial flexibility."  *Id*. ¶ 110.[10]

---

[10] Defendants argue that Garrett made robust *pre-Class Period* disclosures about the capital structure of Garrett, its balance sheet, and the restrictions imposed by the Honeywell Obligations. *See* Br. at 4-7.  Plaintiffs contend that these are "truth-on-the-market" arguments not appropriate for a motion to dismiss. *See* Opp. at 10-11.  The Court is not evaluating pre-Class Period disclosures as part of a truth-on-the-market defense, but is instead noting that contemporaneous Class Period disclosures overall weigh against a strong inference of scienter.  *See Kuriakose*, 897 F. Supp. 2d at 185 (finding that allegations do not support an inference of scienter on a motion to

On balance, the most cogent inference that can be drawn from these allegations, including Garrett's retention of financial and legal advisors, the report from Morgan Stanley, the Honeywell litigation, and the August 2020 disclosures, is that the company "delayed releasing information" until signing the stalking horse Purchase Agreement in order to "to carefully review" its options "and was at worst negligent as to the effect of the delay on investors." *Stratte-McClure*, 776 F.3d at 107; *see also Jones*, 550 F. App'x at 26 ("Thus, like the district court, we conclude that the more compelling inference from the facts alleged in the second amended complaint is that defendants properly disclosed relevant information to the public while Kodak was struggling to avoid bankruptcy and that defendants' best efforts did not materialize." (internal brackets, quotation marks, and citation omitted)); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 548 ("[T]he Court deems the more compelling inference to be that, rather than knowing or being reckless in not knowing that PXRE's loss estimates were flawed, Defendants were, at most, negligent in issuing the challenged statements.").[11]

Accordingly, the Court concludes that Plaintiffs have again failed to adequately plead scienter, which alone is grounds for granting Defendants' motion and dismissing the Third Amended Complaint.

---

dismiss in part because "[w]hether executives referred to these loans as 'risky,' 'non-prime,' 'subprime-like,' or 'subprime' is irrelevant since Freddie Mac fully disclosed the composition of the company's portfolio").

[11] Plaintiffs' "core operations" theory fails for the same reasons articulated in the March 2022 Opinion. *See Garrett I*, 2022 WL 976269, *15 ("Because Plaintiffs have failed to allege scienter for any Defendants, none of the allegations involving core operations properly plead scienter." (citing *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171-72 (S.D.N.Y. 2021))).

SPA 0033

### B.      Material Misstatements or Omissions

However, even if Plaintiffs had properly pleaded scienter, the Third Amended Complaint would still be dismissed because Plaintiffs have failed to allege any material misstatements or omissions on the part of Defendants.  Defendants contend that: (i) Plaintiffs have failed to adequately plead that any of the alleged misstatements are actually false or misleading, (ii) many of the statements are nonactionable puffery, and (iii) other statements are protected forward-looking statements.  *See* Br. at 7-20.  Because the Court finds that Plaintiffs have failed to allege with particularity that any of the statements were false or misleading, it need not address Plaintiffs' arguments with respect to puffery or the safe harbor for forward-looking statements.[12]

Actionable statements under Rule 10b-5 are "either 'untrue' outright or 'misleading' by virtue of what [they] omit[] to state*.*"  *In re Vivendi, S.A. Sec. Litig.* (*Vivendi II*), 838 F.3d 223, 239 (2d Cir. 2016).  "A statement is misleading if a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)).  While "[s]uch a determination is generally a question reserved for the trier of fact[,]" on a motion to dismiss, a Court may grant the motion if "the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made."  *Id.* (quoting *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990)).  Indeed, even though "[t]he federal securities laws do not protect against only those false and misleading statements that are false or misleading with

---

[12] Nevertheless, as noted in the March 2022 Opinion, the Court again observes without deciding that many of Plaintiffs' allegations do still "appear to be puffery, [and] to fall under the PSLRA's safe harbor and the bespeaks caution doctrine."  *Garrett I*, 2022 WL 976269, at \*19 n.17.

SPA 0034

respect to very specific material facts," *Vivendi II*, 838 F.3d at 249, at the pleading stage, "[p]laintiffs [in securities fraud actions] must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so[,]"*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Defendants argue that Plaintiffs fail to plead with particularity that any of the statements were actually false or misleading when made. *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 207 (S.D.N.Y. 2020) ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*." (internal citation omitted)). The Court agrees.

As a threshold matter, it is important to note that there is no specific allegation in the Third Amended Complaint as to when, prior to September 20, 2020, bankruptcy was inevitable, or as the Court described with respect to scienter, when Defendants knew it was inevitable. Plaintiffs ask the Court to surmise from the allegations that at least by February 27, 2020, Defendants had actual knowledge that "Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to fix the unsustainable capital structure and Honeywell Obligations." TAC ¶ 120. In Plaintiffs' view, therefore, every statement in the Class Period implying that Garrett was *not* inevitably headed for bankruptcy or "court-supervised restructuring" is misleading. But, as the Court has already described with respect to scienter, other facts in the Third Amended Complaint suggest that Defendants may have reasonably understood that Garrett had options other than bankruptcy before and during the Class Period, or at least until a reasonable time before the final Purchase Agreement was signed and Garrett filed for bankruptcy on September 20, 2020. Plaintiffs do not allege that Garrett or Defendants made any

SPA 0035

misstatements in the time directly leading up to the bankruptcy filing in September 2020; in fact, the Class Period ends on August 26, 2020.

During the Class Period, the allegations suggest that Garrett was still considering its options.  Garrett did not receive "non-binding indications of interest" from potential purchasers, contingent on "acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet,'" until June 15, 2020, over halfway through the Class Period.  *Id.* ¶ 68 (quoting Deason Decl. ¶ 80).  Garrett did not receive *final* non-binding proposals until August 3, 2020, or sign the Exclusivity Agreement until August 13, 2020, near the end of the Class Period.  *Id.* ¶ 70.  Throughout this entire time, Garrett amended its credit agreements to obtain some relief (*id.* ¶ 72), and was involved in a pending lawsuit against Honeywell, which sought to void the Honeywell Obligations and rid Garrett of its precarious balance sheet (*id.* ¶ 63).  Only after the bankruptcy filing on September 20, 2020 – nearly a month after the Class Period – was the litigation involving Honeywell resolved.  *Id.* ¶¶ 2, 31, 63.  With this timeline in mind, the Court will address the alleged misstatements in chronological order.

To start, the February 27, 2020 statements (**Statements 1, 2, 3, 4, 5, 6, & 7**) tout Garrett's "significant financial flexibility," "strong financial position," and "resilient business model," among other things.  *Id.* ¶¶ 78-79.  Plaintiffs allege that these statements were false and misleading because Garrett was struggling with its capital structure, had retained financial advisors for strategic review, and was attempting to void the Honeywell Obligations through litigation.  *See id.* ¶ 82.  But these facts do not contradict the optimistic statements made on February 27, 2020.  Plaintiffs have not attempted to define "flexibility" or "strong financial position," and they do not specify how these statements contradict previously undisclosed

SPA 0036

financial data about Garrett.  *See Francisco*, 481 F. Supp. 3d at 210 ("In other words, the
complaint does not provide information as to why these activities necessarily belied Abengoa's
statements that it was in sound financial health at the time.").  The February 27, 2020 Press
Release contains statements that provide context for these alleged misstatements; in that press
release, Garrett highlighted that it was endeavoring to "strengthen[] the company's balance sheet
by utilizing our solid cash flow to reduce net debt by $176 million for the year and $292 million
since our Spin-Off."  Feb. 27, 2020 Press Release at 2-3.  The press release further explains that
while "the near-term macro environment remain[ed] volatile," Garrett had a "robust schedule of
new product launches," and was otherwise increasing net sales and net income.  *Id.*   In this
context, and absent any specific allegations to the contrary, Plaintiffs have failed to allege how
these statements are misleading.

Plaintiffs' further attempts to otherwise show the falsity of these statements fall flat.
First, they argue that Defendant Rabiller's May 11, 2020 admission about Garrett's "rigid capital
structure," "cannot be reconciled" with the optimistic statements made in February 2020.  TAC
¶ 83.  But it is not relevant that in May 2020 – months after the February 2020 statements were
made – Rabiller referenced Garrett's "rigid capital structure," and described the structure as
unsustainable and "ill suited" to handling challenges.  *Id*.  This is classic hindsight, and does not
support Plaintiffs' otherwise conclusory allegations that the February 2020 statements were false
or misleading.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016)
("The fact that a financial item is accounted for differently, or in a later period, does not support
an inference that a previously filed financial statement was fraudulent.  This is an allegation of
fraud by hindsight, which is insufficient to withstand a motion to dismiss." (internal citation
omitted)).

SPA 0037

Furthermore, Plaintiffs have not alleged specific facts explaining why it was false or misleading for Defendants' February 2020 Form 10-K to pronounce:  "We believe we will meet our known or reasonably likely future cash requirements" and that "[i]f these sources of liquidity need to be augmented," Garrett may need to issue debt or equity securities.  TAC ¶ 80 (**Statement 7**).  The entire statement makes clear that "there can be no assurances" that such debt or equity financing would be available.  *Id.*  Garrett qualified that "we believe we will be able to meet our short-term liquidity needs for at least the next twelve-months."  *Id.*[13]  Plaintiffs have not alleged any facts showing that Defendants did not hold these beliefs at the time.  Instead, they contend that the statements were misleading given the steps Garrett had taken to explore a restructuring.  TAC ¶¶ 84-85.  But at this time, Garrett had not even received proposals from bidders; thus, the Court is unable to infer from the allegations that Defendants, at the time, had "actual knowledge that the [bankruptcy] *will* occur," and misled investors by stating otherwise.  *Set Cap. LLC*, 996 F.3d at 85.

---

[13] The 10-K itself contains entire sections devoted to warnings about the Honeywell Obligations, including detailing the terms of the Indemnification Agreement, *see* Feb. 27, 2020 10-K at 22-23, the terms of the Tax Agreement, *see id.* at 27, and the risks of the Spin-Off more generally, *see id.* at 27-29.  In fact, the 10-K specifically says: "Our indebtedness could adversely affect our business, financial condition and results of operations."  *Id.* at 29.  A reasonable investor would certainly be aware of these hindrances, and would likely not ignore these warnings and instead rely on fragmented optimistic statements (arguably puffery) about Garrett's flexibility, strength, or resilience.  *See* Feb. 27, 2020 10-K; *see also* **Statements 1, 2, 3, 4, 5, 6, & 7**.  *See, e.g.*, *ECA, Loc. 134*, 553 F.3d at 206 (concluding that "statements [which] were merely generalizations regarding . . . business practices . . . are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (citations omitted)); *Shemian v. Rsch. In Motion Ltd.*, No. 11-cv-04068 (RJS), 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (concluding that "vague" statements about "success," "exciting growth," "laying a strong foundation," "bullish[-ness]", etc., were nonactionable puffery); *Schaffer v. Horizon Pharma PLC*, No. 16-cv-01763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) ("For example, statements by Defendants extolling their 'unique commercial business model', noting that the company was 'on track', and highlighting that prescription growth was 'exceeding [their] expectations' are not actionable under the securities laws.") (collecting cases).

SPA 0038

Notably, Plaintiffs rely on statements made by Defendant Deason in his bankruptcy declaration in September 2020 to allege the falsity of statements made months prior, in February 2020.  TAC ¶¶ 84-95 (citing Deason Decl. ¶¶ 66, 71).  Those statements, made as part of a declaration filed with the bankruptcy proceeding on September 20, 2020, maintain that Garrett "ha[s] no access to equity capital," because investors are unlikely to invest to Garrett's debt due in part to the Indemnity Agreement (Deason Decl. ¶ 71), and that Garrett "has no access to incremental debt" to fund research and development in light of its "high leverage" (*id*. ¶ 66).  Given that Deason's statements were relaying facts as of September 20, 2020, Plaintiffs' allegations of false statements in February 2020 based on these facts rely on hindsight and consequently fail.  *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d at 211.

The alleged misstatements made in March and April 2020 suffer from the same flaws.  Plaintiffs contend that Defendants made a series of misstatements, including explaining that Garrett's "focus remains on leveraging our flexible and resilient business model," touting Garrett's efforts "to enhance our liquidity and preserve the long-term health of the business," and announcing an expectation that Garrett would rely on its "resilient business model to emerge from the crisis as a stronger company."  TAC ¶¶ 87, 88 (**Statements 5, 8, & 9**).  At this time, Defendants had retained more advisors, but Plaintiffs do not otherwise allege specific, undisclosed information that contradicts these statements, or otherwise demonstrate that Defendants knew bankruptcy was inevitable.  It bears noting that by then, Defendants were dealing with the COVID-19 pandemic, and had to shut down a facility in Wuhan, China.  *See id*. ¶ 87.  Defendants had disclosed, and would continue to disclose, the negative impact of COVID on their business.  *See* Feb. 27, 2020 10-K at 19 ("As a result of disruptions to our business as a result of the novel coronavirus, we expect that our revenues and results of operations will be

negatively affected, which, among other things, could cause us to fail to comply with certain financial covenants [including the Credit Agreement and Indemnification Agreement]"); *see also id.* (generally describing potential risks from coronavirus); April 7, 2020 Press Release (noting "substantial disruption" caused by COVID-19, withdrawing 2020 guidance, and indicating steps it is taking to adjust to the pandemic). Plaintiffs otherwise rely on a statement made by Rabiller in May 2020, *see* TAC ¶ 92, to allege the falsity of statements made months before that, and, in dismissing the disclosures that Garrett made regarding COVID, only assert, without factual support, that "COVID was not the cause of Garrett's eventual bankruptcy," *id.* ¶¶ 90-91. Plaintiffs therefore fail to show that Garrett's optimistic statements in March and April 2020 were false or misleading when made.

With respect to statements made by Defendants in May 2020, Plaintiffs again do not allege any additional undisclosed facts that alter the Court's determination that Plaintiffs have not adequately alleged false or misleading statements by Garrett. The statements by Defendants on May 11, 2020 resemble statements already addressed herein. For instance, Defendants stated that Garrett's "positive business fundamentals remain intact," that its flexibility allowed it "to maintain [its] agility and strengthen [its] position for long-term success," that it would "leverage [it's] flexible and resilient business model," and that it remained "well positioned to accelerate [its] cutting-edge technologies to the market and drive long-term success." *Id.* ¶¶ 92-93 (**Statements 10, 11, 12, 13**). In the Form 10-Q that month, Garrett again noted that "[i]f these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities . . . [and] we believe we will be able to meet our short-term liquidity needs for at least the next twelve months." *Id.* ¶ 94 (**Statement 14**). Also on May 11, 2020, Defendant Rabiller noted in his earnings call that: "Our former parent imposed

**SPA 0040**

on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges." *Id.* ¶ 134.

Nothing in the Third Amended Complaint details precisely why these statements were false or misleading at the time they were made.  To be sure, Plaintiffs allege that Defendants were still engaging advisors to explore restructuring options in the face of challenges from its capital structure.  But these allegations do not imply that bankruptcy was certain, or that Defendants knew restructuring was the only option going forward.  Nor are they contrary to the statements made that day.  For instance, on the earnings call, Defendant Bracke noted that, with respect to dealing with the Honeywell Obligations, "[t]here are a few options open" and went on to discuss amendments to credit agreements.  May 11, 2020 Earnings Call at 14-15.  And with respect to the pandemic, Defendant Bracke warned that "there is no firm answer to this.  I think the only thing we can say is that for now we believe that should be okay, but this can definitely change depending upon how the crisis develops." *Id.* at 23.  When viewed in the context of all of the statements made that day, Defendants appear to have been giving investors insight into the risks the company faced at that time, including from the COVID-19 pandemic and its "rigid capital structure," while also noting Garrett's positive features. *Cf. Slayton*, 604 F.3d at 777 ("Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks."); *see also* May 11, 2020 Earnings Call (discussing the negative effect of the COVID-19 pandemic on Garrett's operations).  The Form 10-Q notes that "there can be no assurances" about financing options, "particularly in light of the volatility in global financial markets as a

SPA 0041

result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all . . . ."  TAC ¶ 94.  Moreover, and importantly, Plaintiffs yet again impermissibly rely on the same statements made by Defendant Deason in September 2020 in the bankruptcy proceeding to impute knowledge to Defendants back in May 2020.  *See id*. ¶¶ 96-97 (citing Deason Decl. ¶¶ 66, 71).  When viewed holistically, and without considering the hindsight-based facts alleged in the Third Amended Complaint, Plaintiffs have failed to allege specific facts showing that these May 2020 statements were false or misleading.

On June 12, 2020, Garrett entered into certain "amendments" to credit agreements.  TAC ¶ 72.  In announcing these moves, Defendant Rabiller declared that "[d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact."  *Id*. ¶ 98 (**Statement 15**).  Plaintiffs allege this statement was false or misleading because Garrett was actively pursuing restructuring, and knew that Garrett "was unable to survive as an independent company . . . ." *Id*. ¶ 100.  However, Rabiller had just announced that Garrett's "modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown."  *Id*. ¶ 72.  When viewed with this context, Rabiller's statement does not contradict undisclosed facts – or actual knowledge of an inevitable restructuring – but instead voices optimism and an intent by Defendants to take creative measures, such as Credit Agreement modifications, to ensure the success of the company and avoid bankruptcy.

Later in the summer, Garrett had received "5 non-binding indications of interests" from potential buyers that were "contingent on delivering Garrett and acquiring the business 'in a chapter 11 proceeding or other process that could deliver the business free and clear of its current

**SPA 0042**

balance sheet.'" *Id*. ¶ 68 (quoting Deason Decl. ¶ 80).  After two of those companies began due

diligence, Garrett issued a press release and some Defendants went on an earnings call on July

30, 2020 to tout Garrett's "robust infrastructure and agile working capabilities as we execute on

our long-term strategy and lead the evolution" in the automotive industry, its "strong

fundamentals . . . [and] variable cost model that helps preserve cash and an attractive margin

profile," and the "resiliency of [Garrett's] operating structure."  *Id*. ¶¶ 101-102 (**Statements 16**

**& 17**); *see id*. ¶ 104.

Plaintiffs allege that it was misleading to make such optimistic statements while in the

final stages of due diligence with a potential stalking horse bidder.  *Id*.  The Court disagrees.

These optimistic statements were made at a time when Garrett was still pursuing litigation

against Honeywell to relieve itself of its financial encumbrances bestowed by the parent

company during the Spin-Off.  *See id*. ¶¶ 2, 63.  While Plaintiffs allege that litigation was

"futile," Plaintiffs have not alleged that Defendants were aware of that fact when the statements

were made.  *Id*. ¶ 63; *cf. Garrett I*, 2022 WL 976269, at *14 (noting that Honeywell litigation

was a "potential way to get out of the Honeywell Obligation," and therefore it was not "highly

unreasonable and . . . representing an extreme departure from the standards of ordinary care . . .

for Rabiller to say that the Company took actions to obtain increased financial flexibility"

(internal citations and quotation marks omitted)).  Notably, also, Defendants did not receive final

stalking horse bids until several days after these statements were made, on August 3, 2020.  TAC

¶ 104.  The only specific fact alleged as contradictory to these statements is that Defendants

stated on September 20, 2020, in connection with their bankruptcy announcement, that the

"financial strains of the heavy debt load and liabilities we inherited in the spinoff from

Honeywell – all exacerbated by COVID-19 – created a significant long-term burden on our

business . . . ." *Id.* ¶ 105 (quoting September 20, 2020 Press Release, available at:

https://investors.garrettmotion.com/news-releases/news-release-details/garrett-motion-enters-

definitive-transaction-agreement-and).  But this alleged admission is from September 20, 2020,

long after the summer 2020 alleged misstatements.  Moreover, on July 30, 2020, Defendants

made further disclosures about the negative impact the pandemic was having on their business.

*See, e.g.*, July 30, 2020 Press Release at 2 (noting that lower production, the shutdown of plants,

and a "challenging demand environment . . . could further challenge our capital structure and

limit our ability to expand on our strategy now and in the future"); *see also* July 30, 2020

Earnings Call at 7, 12 (noting that despite success in continuing operations, the future was

"uncertain," and "our capital structure remains a significant challenge").  Therefore, Plaintiffs do

not allege facts that, absent hindsight, demonstrate with specificity that the June and July 2020

statements were false or misleading.

     Plaintiffs also allege that it was misleading for Defendants to omit from their July 2020

Form 10-Q language indicating that "management has concluded that the foregoing conditions

and events raise substantial doubt as to our ability to continue as a going concern."  TAC ¶¶ 106-

107.  Absent a duty to disclose information, "[a]n omission of information . . . is . . . actionable

only when disclosure of such information is necessary to make . . . statements made, in the light

of the circumstances under which they were made, not misleading."  *Gillis*, 197 F. Supp. 3d at

577 (internal quotation marks and citation omitted).  Plaintiffs argue that it was misleading for

Defendants to exclude these risk factors because they knew that Garrett was heading for

bankruptcy at this time.  TAC ¶ 108.  Plaintiffs further contend that the omission misled

investors into thinking that the "going concern" language included in the May 2020 Form 10-Q

"was tied solely to Garrett's credit agreement negotiation," and not its possible bankruptcy.  *Id*.

**SPA 0044**

¶ 109.  But once again, without considering hindsight-based statements, the facts alleged do not

specifically show that, as of July 30, 2020, it was misleading to omit this "going concern"

language.  Defendant Rabiller had already disclosed concerns about the capital structure in May

2020, and Defendant Deason noted in the July 30, 2020 earnings call that, despite the removal of

that language, "[o]ur capital structure remains a significant challenge," particularly "from 2023

onward."  July 30, 2020 Earnings Call at 12.  Plaintiffs have not pointed to – and the Court is not

aware of any – obligation on the part of Defendants to disclose that two potential bidders were

conducting due diligence.  To the contrary, they almost certainly were not under any obligation

to do so.  *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348 (noting that in light of other

disclosures about "intensive efforts to ameliorate the company's liquidity problem, the lack of

disclosure regarding its bankruptcy planning did not transform its disclosures during this period

into misrepresentations").[14]  Plaintiffs therefore have not alleged that the omission of the "going

concern" language was misleading in context.

Finally, Plaintiffs contend that the statements made on August 26, 2020, two weeks after

Garrett had entered an Exclusivity Agreement with KPS, were materially false and misleading.

*See* TAC ¶¶ 110-113.  On that day, Garrett "announced that, with the assistance of its financial

and legal advisors, it is exploring alternatives for addressing its previously disclosed balance

---

[14] The Court also rejects Plaintiffs' allegations that language contained in the February 2020 10-K, May 2020 10-Q, and July 2020 10-Q, articulating risk factors related to the Honeywell Obligations (TAC ¶ 114 (**Statement 19**)) is misleading.  Plaintiffs take issue with the fact that the risk factors warned that there *may* be material adverse effects to liquidity and cash flow from the Indemnity Agreement.  *See id.* ¶¶ 104, 114-118.  When these fairly boilerplate risk factors were printed in Garrett's filings, Garrett had disclosed the contents of the Honeywell agreements, *see, e.g.*, Feb. 2020 10-K, had not yet received final proposals from bidders, and was otherwise attempting to navigate the Honeywell Obligations' encumbrances.  Accordingly, in the context of the facts alleged here, it was not misleading for Plaintiffs to disclose those risk factors, without also stating that bankruptcy was on the horizon.

SPA 0045

sheet concerns." *Id*. ¶ 110.  Plaintiffs allege that it was false and misleading to state that Garrett

is seeking to address its balance sheet concerns while its "core business remains strong," and that

"any actions taken by Garrett in relation to liability management *may* materially reduce the value

or trading price of our common stock, dilute existing holders of our common stock by the

issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or

result in the cancellation of existing common stock." *Id*. ¶¶ 110, 113 (**Statements 20 & 21**)

(added).  Plaintiffs further contend it was misleading for Defendants to state that "Garrett has not

yet determined whether to pursue any balance sheet restructuring alternatives." *Id*. ¶ 111

(**Statement 22**).  Plaintiffs have not alleged specific facts that contradict these disclosures;

instead, Plaintiffs argue that they are misleading in light of the steps Garrett had previously taken

to explore restructuring, and the fact that Garrett had already entered the Exclusivity Agreement.

*See id*. ¶113.  But the purchase agreement was not signed until September 20, 2020, almost a

month later.  *See* Br. at 19.  This timeline suggests that bankruptcy was not necessarily imminent

(indeed, the Honeywell litigation, albeit deemed as a "Hail Mary," appears to have been

ongoing) and therefore it was not necessarily misleading to state that "Garrett has not yet

determined" whether to pursue bankruptcy, just as the disclosures state.  *Cf. Set Cap. LLC*, 996

F.3d at 85 (concluding complaint adequately alleged that "Defendants knew with virtual

certainty" that their "hedging activity" would decrease value of notes because "three prior

volatility spikes" put them on notice of that effect).  Thus, unlike in *In re Vivendi Universal, S.A.*

(*Vivendi I*), on which Plaintiffs rely, Plaintiffs here have not "alleged sufficient facts to show

defendants could not have reasonably believed the statements made to the public."  381 F. Supp.

**SPA 0046**

2d 158, 182 (S.D.N.Y. 2003).[15]  Nothing in the Third Amended Complaint adequately alleges that these statements were false or misleading when made.

While not central to the Court's holding, there is also a sound policy basis, articulated by other courts in this District, for not requiring immediate disclosure when a company is contemplating bankruptcy.  *See, e.g.*, *Hutchinson I*, 2012 WL 5451258, at *8 ("Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." (quoting *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009))).[16]  This conclusion is also consistent with the principle that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields*, 25 F.3d at 1129-30.

---

[15] The additional cases cited by Plaintiffs involve situations where, unlike here, Defendants had actual knowledge of an event that was already occurring, or certain to occur, but publicly disclosed uncertainty about whether that event would happen.  *See In re Globalstar Sec. Litig.*, No. 01-cv-01748 (SHS), 2003 WL 22953163, at *11 (S.D.N.Y. Dec. 15, 2003) (noting in context of Section 11 claim that defendants publicly stated problems "might delay" the availability of their service, when in fact they knew the delay was already happening, and knew it would impact their potential revenue); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized.").  Here, Plaintiffs have not alleged when Defendants knew bankruptcy was certain; therefore, the alleged public misstatements do not contradict undisclosed information as alleged in the Third Amended Complaint.

[16] Plaintiffs argue that, unlike the parties in *Beleson*, they are not arguing that Defendants were required to disclose that they were going to file for bankruptcy, only that it was misleading to make certain statements about Garrett's capital structure which led to its bankruptcy, or issue risk factors of what "may happen," when those things were "already materializing."  Opp. at 12 n.11.  But, for the reasons stated above, Plaintiffs have failed to allege with particularity that the alleged statements were misleading in light of what was "materializing" at the time the statements were made.

SPA 0047

Accordingly, the Court concludes that Plaintiffs have failed to plead with specificity that the alleged misstatements were false or misleading as required under federal securities laws.

### C.    Section 20 Claim

"To plead a section 20(a) claim, a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Garrett I*, 2022 WL 976269, at *18 (quoting *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 236). When a claim under Section 10(b) is dismissed, a claim under Section 20(a) ought to be dismissed as well. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108 (noting that if a plaintiff "fails to allege any primary violation[,] . . . it cannot establish control person liability"); *Schwab v. E\*TRADE Fin. Corp.*, 752 F. App'x 56, 59-60 (2d Cir. 2018) ("Because [the plaintiff]'s Section 10(b) claim was properly dismissed, . . . [the plaintiff]'s Section 20(a) claim also necessarily fails and was properly dismissed."). Because the Court has concluded that Plaintiffs' Section 10(b) claim fails on scienter and falsity grounds, the Section 20(a) claim also fails for these reasons.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party.").

SPA 0048

The Clerk of Court is respectfully directed to CLOSE this case.

Dated: March 31, 2023
New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

SPA 0049

# APPENDIX A[1]

| # | ¶¶ | Date | Source | Statement[2] |
|---|---|---|---|---|
| 1 | 78 | 2/27/20 | Press Release | "*significant financial flexibility*" |
| 2 | | | | "*well positioned to build upon the progress we achieved during our first full year as an independent company*" |
| 3 | 79 87 | 2/27/20 3/19/20 | Earnings Call Press Release | "*significant flexibility* to help mitigate the impact from any short-term fluctuations in the underlying macro environment" |
| 4 | | | | "maintained [its] *strong financial position*" |
| 5 | | | | "[g]oing forward, we plan to continue to *utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet*" |
| 6 | | | | "*flexible and resilient business model*" (¶¶ 79, 87) |
| 7 | 80 | 2/27/20 | 10-K | "*We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however,* there *can be no assurances* that we will be able to obtain additional debt or equity financing on acceptable terms in the future. *Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*" |
| 8 | 88 | 4/7/20 | Press Release | "*to enhance our liquidity and preserve the long-term health of the business*" |
| 9 | | | | "*resilient business model* to emerge from this crisis as a stronger company" |
| 10 | 92 | 5/11/20 | Press Release | "*positive business fundamentals remain intact*" |
| 11 | | | | "*to maintain our agility and strengthen our position for long-term success*" |

---

[1] This Appendix is sourced from ECF No. 87-1, Defendants' Appendix 1.  The Court has only made non-substantive changes, and attaches this to its Opinion for ease of reference.

[2] Paragraph references are to the Third Amended Complaint ("TAC").  All material in the "Statement" column is quoted from the TAC.  Emphases are Plaintiffs'.

i

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
| 12 | | | | "*take advantage of our[3] flexible and resilient business model*" |
| 13 | 93 | 5/11/20 | Earnings Call | "*well positioned to accelerate our cutting-edge technologies to the market and drive long-term success*" |
| 14 | 94 | 5/11/20 | 10-Q | "If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all… *we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |
| 15 | 98 | 6/12/20 | Press Release | "[d]espite the near-term disruption across the automotive industry and global economy, *it is important to remember that the positive long-term fundamentals of our business remain intact.*" |
| 16 | 101 | 7/30/20 | Press Release | "*agile working capabilities as we execute on our long-term strategy*" |
| 17 | 102 | 7/30/20 | Earnings Call | "*the strong fundamentals of Garrett . . . combined with a variable cost model that helps preserve cash and an attractive margin profile,*" and "the *resiliency of [Garrett's] operating structure.*" |
| 18 | 107 | 7/30/20 | 10-Q | Removal of "going concern" language |

---

[3] Paragraph 93 alleges the statement "leverage [its] flexible and resilient business model," which does not appear in the May 11, 2020 Earnings Call Transcript. *See* ECF No. 88-12, Carlinsky Decl Ex. L. The phrase "take advantage of our flexible and resilient business model" appears on page 12, and so that sentence is included in this Appendix. *See id.* at 12.

ii

| # | ¶¶ | Date | Source | Statement |
|---|---|---|---|---|
| 19 | 114 | 2/27/20 | 10-K | "***may*** *have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales,*" "***may*** *also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet,*" *and that* "*our access to capital to fund our operations **may** be materially adversely affected.*" The February 27, 2020 Form 10-K also contained a separate risk factor stating that "[o]ur indebtedness **could** adversely affect our business, financial condition and results of operations." |
|  | 116-17 | 5/11/20 | 10-Q | References to / inclusion of similar language |
|  | 118 | 7/30/20 | 10-Q | References to / inclusion of similar language |
| 20 | 110 | 8/26/20 | Press Release | "*Garrett is seeking to address its balance sheet concerns while **its core business remains strong** in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer.*" |
| 21 |  |  |  | "*any actions taken by Garrett in relation to liability management **may** materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock.*" |
| 22 | 111 | 8/26/20 | Press Release | "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives.***" |

SPA 0052

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

20 **CIVIL** 7992 (JLR)

## JUDGMENT

----------------------------------------------------------X

      It is, **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the Court's Opinion and Order dated March 31, 2023, Plaintiffs' Third Amended Complaint is dismissed. Because Plaintiffs have been given an opportunity to amend to plead fraud with greater specificity, and have failed, the Court concludes that leave to amend is not warranted under these circumstances. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."); accordingly, the case is closed.

**Dated:**  New York, New York
      March 31, 2023

**RUBY J. KRAJICK**

_____
**Clerk of Court**

**BY:**     *K. Mango*
_____
**Deputy Clerk**

SPA 0053